Jaba Tsitsuashvili (CA Bar No. 309012)
Anya Bidwell* (TX Bar No. 24101516)
Patrick Jaicomo* (MI Bar No. P-75705)
INSTITUTE FOR JUSTICE
901 N. Glebe Road
Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
jtsitsuashvili@ij.org
abidwell@ij.org
pjaicomo@ij.org

*Applications for admission
pro hac vice forthcoming

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| RENÉ QUIÑONEZ and MOVEMENT INK LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DOES 1 through 5, United States Postal Service and United States Postal Inspection Service officials in their individual capacities,<br><br>Defendants. | Case No. ______________<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. The Fourth Amendment guarantees us the right to be secure in our papers and effects. That promise is illusory if postal officials can seize or search personal property without an individualized, articulable basis to believe that the property contains contraband or evidence of a crime. Worse yet would be if postal officials could seize or search personal property because of its political message. That is why the Constitution requires postal officials—like other government officials—to get a judicial warrant based on probable cause before seizing or searching personal property. It is also why the Constitution, federal statutes, and state statutory and common law



United States District Court
Northern District of California

provide judicially enforceable remedies for violations of these rights, against both individual federal officials and the United States.

2. In this case, postal officials did not have reasonable suspicion—let alone probable cause and a warrant (or probable cause and exigent circumstances)—when they seized four properly addressed and neatly taped brown boxes sent to various cities by René Quiñonez and Movement Ink LLC, which is René's small, family-run screen-printing business in Oakland, California that, like businesses small and large across the country, regularly ships well-bound brown boxes from one location to cities nationwide.

3. As confirmed by the postal official Defendants' internal notes memorializing the seizures and searches of those boxes, millions of packages shipped every year share the unexceptional characteristics of René's and Movement Ink's packages that Defendants relied on to justify their suspicionless, warrantless seizures and searches. And those same internal notes make clear that Defendants knew the packages coming from Movement Ink contained—in Defendants' words—"BLM MASKS." So Defendants appear to have violated not just the Fourth Amendment, but also the First Amendment, while committing several common law torts in the process.

4. The wisdom of our constitutional design is that it knows significant harms befall the public when government officials exceed constitutional bounds and violate rights. That is exactly what happened here. Defendants' unconstitutional and tortious seizures and searches have inflicted several significant harms, including reputational harms on René and Movement Ink that have cost them not only the opportunity to expand their labor of love but also significant business growth.

5. First, the packages were delayed by 48 hours. That is no trivial matter. They contained thousands of Covid-protective masks when the pandemic was raging and mass protests over police violence were happening every day. Second, these political mask shipments' recipients were not only deprived the Covid-protective effects of the masks, but also expression of the political messages emblazoned on the masks. Third, René and Movement Ink—for whom these shipments were not just commercial transactions—similarly had their rights to political speech stymied. Finally, René and Movement Ink lost the goodwill and business relationships they earned over a



United States District Court
Northern District of California

United States District Court
Northern District of California

decade of building community trust based on their activism and their quality products—costing them the opportunity to do substantial business not only with the recipients of the masks, but other existing and potential partners too. And all those partners lost a trusted supplier because of the uncertainty and air of suspicion created by Defendants' baseless seizures and searches of René's and Movement Ink's political mask shipments.

6. For all these reasons, René and Movement Ink seek to hold personally accountable the postal and law enforcement officials responsible for their injuries under the Constitution, *Bivens*, the Westfall Act (28 U.S.C. § 2679(b)(2)(A)), and California law, as well as the federal government as those officials' employer under the Federal Tort Claims Act.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, 1356, 1357, 1367, 2201, 2202, 2674, and 2679 and the United States Constitution.

8. Venue is proper in the Northern District of California under 28 U.S.C. § 1391.

**PARTIES**

9. Plaintiff René Quiñonez is an adult resident of California. He is the majority owner and manager of Plaintiff Movement Ink LLC.

10. Plaintiff Movement Ink LLC is a California limited liability company. Its majority owner and manager is Plaintiff René Quiñonez.

11. Defendants Does 1 through 5 are officials of the United States Postal Service and the United States Postal Inspection Service who are responsible for the acts, violations, and injuries alleged in this action. Their identities and their number are currently unknown to Plaintiffs. They will be added as named Defendants when their identities are determined. They are sued in their individual capacities under the Constitution, *Bivens*, the Westfall Act (28 U.S.C. § 2679(b)(2)(A)), and California law. The acts, violations, and injuries for which they are responsible in this action also form the basis for liability of the United States of America under the Federal Tort Claims Act.

**STATEMENT OF FACTS**

12. René Quiñonez is a family man, entrepreneur, organizer, businessperson, activist,

and former youth gang prevention nonprofit director. All those aspects of his personality find expression in Movement Ink LLC, the small screen-printing business he and his family have spent the last decade building into a community presence, known for its brand of activism-inspired business practices and relationships.

13. From its inception, as the company's name indicates, Movement Ink has been publicly allied and involved with social justice and activism movements, organizations, nonprofits, and individual organizers.

14. René and Movement Ink have spent years cultivating their brand, their image, and their reputation in these spaces, including community involvement and social media presence.

15. As a result of years of commitment to causes, trust-building, and high-quality screen-printing, René and Movement Ink successfully developed business relationships with activist movements, organizations, nonprofits, and individual organizers, who relied on René and Movement Ink for various screen-printing needs for years leading up to and into 2020, regularly ordering products ranging from t-shirts, to hoodies, to onesies for toddlers.

16. René and Movement Ink methodically built and carved out this niche, making René very proud of what he and his family have built.

17. The business of screen-printing is hard, labor-intensive work. So is the work of community building and activism. But both, especially together, are a labor of love for René and his family.

18. From 2016 to 2019, Movement Ink's gross annual sales grew steadily.

19. So did its reputation—until that long-earned reputation was dashed one day by Defendants' baseless seizures and searches of Movement Ink's most high-profile, lucrative, and promising shipments.

20. Defendants' seizures and searches of those shipments impeded Movement Ink's opportunities for business and activism expansion.

21. Defendants' seizures and searches of those shipments also dashed René's newfound dream that he might actually be able to retire someday.



United States District Court
Northern District of California

22. In the early months of the Covid-19 pandemic, from March to May 2020, Movement Ink was able to weather the economy's lockdowns and downturns, thanks to increases in certain types of orders, including, most notably, screen-printed Covid-protective masks.

23. Thanks to the years René and Movement Ink spent promoting and developing social justice causes and organizations, they were the supplier of choice when organizers around the country began ordering Covid-protective masks bearing political messages for the mass protests that broke out following the police killings of George Floyd and Breonna Taylor in 2020.

24. In the last week of May and the first week of June 2020, René, his family, and at least a dozen employees and volunteers worked around the clock to print, pack, and ship thousands of Covid-protective masks around the country. René could count on two hands the number of hours he slept over the course of several days.

25. The masks that René, Movement Ink, his family, and their employees and volunteers printed were emblazoned with core political messages, such as "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE."

26. To be sure, Movement Ink was getting paid for its products. But this hard work and dedication was borne of much more than a profit motive; it was borne of a desire to contribute to the protest movement and express René's and Movement Ink's support for the messages they were printing.

27. Before the seizures and searches of the four political mask shipments at issue in this case, René and Movement Ink fulfilled three orders for thousands of political masks to organizers in Atlanta, Los Angeles, and Oakland.

28. René shipped those three orders, as well as the four at issue in this case, from the same postal facility and using similar packaging methods as he has done for years on behalf of Movement Ink.

29. The postal officials at that facility know René and his business. They were friendly with each other, and the postal officials used to joke about René's and Movement Ink's last-minute rush shipments and the high prices he paid for next-day deliveries. But after the seizures and

searches at issue in this case, their friendly relationship ended; the postal officials became standoffish and quiet whenever René entered.

30. René's and Movement Ink's regular practice was to write on each box that it came from Movement Ink and what it contained, such as "masks."

31. This was done to avoid confusion because Movement Ink shares a workspace with another company, and also so that after boxes were taped up it would be obvious what was in them and where René or another Movement Ink employee should deliver or ship them.

32. The initial three political mask shipments to Atlanta, Los Angeles, and Oakland, which René sent about a week before the four at issue in this case, were packaged no differently or sent in any manner different than the subsequent four whose seizures and searches are at issue in this case.

33. Like the initial three political mask shipments, René and Movement Ink shipped the four packages at issue in this case in nondescript, securely packaged, cleanly taped boxes. The boxes were full; one or more of them may have had a bulge where masks where squeezed in tightly.

34. As usual, all of the political mask shipments were marked or identified with Movement Ink as the sender, and likely had their contents handwritten on the side, in accordance with René's and Movement Ink's regular practice.

35. Like the initial three political mask shipments, René and Movement Ink shipped the four packages at issue in this case using priority mail express overnight shipping—paying a premium to get the masks delivered as quickly as possible because the protests and Covid were both raging every day.

36. But unlike so many Movement Ink shipments before—including the initial three political mask shipments—the four that René and Movement Ink shipped on June 3, 2020 did not arrive on time.

37. This was no snafu in mail processing or an unavoidable or mistaken delay.

38. Rather, all four political mask shipments were, as indicated by the Postal Service's online tracking system, "Seized by Law Enforcement" (i.e., by Defendants) in Oakland on June 3

or June 4—the day the political mask shipments were already supposed to be arriving to organizers in Brooklyn, DC, Minneapolis, and St. Louis.

39. René and the shipments' intended recipients were greeted by this cryptic "Alert" on the Postal Service's online tracking system, which said only that René's and Movement Ink's political mask shipments were "Seized by Law Enforcement":




40. The four political mask shipments would not end up arriving at their destinations until June 6 (two days and several protests late), having been held by Defendants without reasonable suspicion, probable cause, or a warrant for more than 24 hours.

41. René and the mask recipients were all confused, dismayed, and disrupted in their critical work. Instead of focusing on printing and shipping political Covid-protective masks and other apparel, René and Movement Ink had to waste time figuring out why their innocuous packages were in the hands of law enforcement, and how to get them released, while also fielding questions, concerns, and even accusations from partners, community members, and social media commenters.

42. Similarly, the recipient organizers had to divert attention and resources to the seizure issue, having to consult legal counsel and field calls about this distraction, and having to post on social media about this latest disruption to their organizing efforts and their health and safety efforts.

43. René, Movement Ink, and their partners were left wondering why these Covid-protective political masks were in the hands of law enforcement officials instead of on the faces of political protestors.

44. This uncertainty had a catastrophic impact on the reputation and the business that René and Movement Ink had worked so hard and so long to build.

45. As evidenced by the seven political mask shipments already made and commitments for more going forward on a rolling basis, René and Movement Ink were poised to become regular, national suppliers of activist Covid-protective masks and other activist apparel for protest movements and organizers.

46. Instead, Defendants' baseless seizures and searches of René's and Movement Ink's political mask shipments created a pall of suspicion, distraction, uncertainty, and confusion around René and Movement Ink.

47. René and Movement Ink suffered severe reputational harm because of Defendants' baseless seizures and searches of René's and Movement Ink's political mask shipments.

48. Talks for future orders were terminated, and René could not even get a call back from many of his partners—including not only his new partners, but preexisting ones too.

49. For example, in addition to the recipients of the political mask shipments at issue in this case, who terminated talks for future orders, at least three other groups who had regularly ordered from and collaborated with René and Movement Ink ceased their partnerships and cut off all ties with René and Movement Ink.

50. Those partnerships have not revived, and that business has not returned.

51. René's and Movement Ink's substantial, steady revenue opportunity and their opportunity to do substantial, steady work supporting movements and causes they are deeply committed to were dead on arrival because of Defendants' baseless seizures and searches of René's and Movement Ink's political mask shipments.

52. Defendants' baseless seizures and searches also caused and continue to cause René significant emotional and mental distress—not just because of his and Movement Ink's financial and reputational hits, but because he and Movement Ink have been effectively shut out of a movement and a community that they spent (and continue to spend) years investing their time and energy in.

53. All of the harms described in paragraphs 35 through 52 and 99 are the direct and sole result and effect of Defendants' baseless, suspicionless, unconstitutional, and tortious seizures and searches of René's and Movement Ink's political mask shipments.

54. Feeling targeted, surveilled, despondent, and desperate to find out what happened, René worked with the office of his Congressperson, Rep. Barbara Lee, who submitted an official inquiry to the Postal Service.

55. The Postal Service responded in a letter that:

> *On June 3, 2020, the parcels in question were detained solely because the external physical characteristics of the parcels were consistent with parcels in other non-related instances that were confirmed to contain nonmailable matter, specifically controlled substances. The parcels in question were not detained based on the sender or recipient, because they were associated with organizations involved in protests or any other First Amendment protected activity, or because it was known the parcels contained masks or any articles containing statements supporting any group or position. Furthermore, there were no external characteristics of the parcels that indicated they contained masks or were associated with any specific organization.*
>
> *The customer in this matter did not contact the Inspection Service, but instead contacted the news media. On the morning of June 5, when the Inspection Service became aware of the media stories on the matter and what the contents of the parcels were, we immediately took action to rectify the situation. At 7:07 AM the parcels were placed back in the mail stream. The parcels were delivered on the following day to the intended destinations. Additionally, the USPIS assisted Mr. Quinonez with obtaining a full*

*refund for the cost of the mailings.*

56. The Postal Service's letter to Rep. Lee's office asserts that USPIS became aware of the contents of the parcels on June 5. But as described in paragraph 75, Defendants' own seizure notes explain that they knew the packages contained—in their words—"BLM MASKS."

57. The Postal Service's letter to Rep. Lee's office asserts that USPIS assisted René in obtaining a refund for the cost of the mailings. That is not true. René and Movement Ink did not receive refunds.

58. On information and belief, the recipients of the packages may have received refunds of the shipping costs from USPIS.

59. In any event, a refund could and would do nothing to account for any of the harms described in paragraphs 35 through 52 and 99, which remain and will remain entirely unremedied.

60. René's and Movement Ink's political mask shipments resembled lawful packages that legitimate businesses, including Movement Ink, ship on a regular basis.

61. The four political mask shipments were in neatly taped, nondescript brown boxes with the identities and locations of the sender and the recipients clearly labeled.

62. René remains at a loss to understand how that could give rise to a federal law enforcement seizure of his and Movement Ink's personal property.

63. According to the Postal Service's letter to Rep. Lee's office, the federal postal official Defendants asserted that they could seize, search, and hold for over 24 hours René's and Movement Ink's property because of the packages' "external physical characteristics".

64. According to the Postal Service's letter to Rep. Lee's office, the federal postal official Defendants asserted that they could seize, search, and hold for over 24 hours René's and Movement Ink's property based on "external physical characteristics" that apply to millions of packages shipped around the country every day, and to packages shipped by René and Movement Ink on a regular basis.

65. The "external physical characteristics" that the federal postal official Defendants relied on apply to millions of packages shipped around the country every day, and to packages

shipped by René and Movement Ink on a regular basis.

66. René also remains shocked that the federal postal official Defendants would do nothing for more than 24 hours to confirm or dispel any concerns or suspicions, namely by either confirming the identity of the sender and/or seeking a judicial warrant based on an attempt to demonstrate probable cause.

67. For more than 24 hours, Defendants did not attempt to confirm the identity or location of the sender of the packages.

68. For more than 24 hours, Defendants did not seek or obtain a warrant.

69. For more than 24 hours, Defendants did not establish that the packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed, or an articulable risk that a particular suspect would escape.

70. Instead, it appears from the Postal Service's letter to Rep. Lee's office that Defendants abandoned the political mask shipments to sit indefinitely until the issue became national news.

71. Had the issue not become national news, the packages would have remained seized even longer.

72. Defendants' own notes regarding the seizures and searches of René's and Movement Ink's packages, which René obtained through Freedom of Information Act requests to the Postal Service, confirm that Defendants did not have an individualized, articulable basis for seizing the political mask shipments, and did not obtain a warrant for their continued seizure.

73. Defendants' notes make clear that Defendants seized the political mask shipments without reasonable suspicion, because there was no individualized, particularized basis to believe the packages contained contraband or evidence of a crime, which is not satisfied by the nondescript, common characteristics of the packages at issue.

74. Defendants' notes make clear that Defendants left the packages unattended for over 24 hours without efforts to confirm or dispel whatever assumptions attended their seizures of the packages, which violates the Fourth Amendment even if the initial seizures could be justified by

United States District Court
Northern District of California

reasonable suspicion to conduct brief investigatory seizures.

75. Defendants' notes make clear that Defendants knew the contents of the package were, in Defendants' words, "BLM MASKS."

76. It is not clear whether Defendants knew that the packages contained—in Defendants' words—"BLM MASKS" before seizing the packages.

77. If Defendants knew that the packages contained—in Defendants' words—"BLM MASKS" before seizing the packages, Defendants violated the First Amendment by seizing packages because of their political messages.

78. If Defendants learned the contents of the packages after seizing them, by searching them, Defendants violated the Fourth Amendment by searching the packages in the absence of consent, probable cause plus a warrant, or probable cause plus exigent circumstances.

79. There was and is no indication anywhere—nor could there be—that the packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed, or an articulable risk that a particular suspect would escape.

80. Defendants' notes make clear that they did not have reasonable suspicion to conduct the initial seizures of the political mask shipments. Defendants' notes contend that the shipments were suspicious because of (1) "bulging contents," (2) "frequently mailed parcels from the same sender/address," (3) "parcel destination is a known drug trafficking area," (4) "taped or glued on all seams," and (5) "parcel mailed from a known drug source area."

81. Defendants' assertions are not reasonable suspicion because they do not satisfy the Fourth Amendment's demand for individualized circumstances suggesting that a particular, articulable crime is occurring in order to justify a seizure.

82. Defendants' assertions justifying the initial seizures of the political mask shipments apply to (1) any United States business or individual (2) that regularly sends padded items (like pillows, or vases wrapped in bulging padding) (3) in well-bound boxes (4) from just about any major United States city to any other major United States city.

83. On information and belief, Defendants have no comprehensive list of which cities

are or are not "known drug trafficking area[s]" or "known drug source area[s]."

84. On information and belief, Defendants do not rely on any definition of "known drug trafficking area" or "known drug source area."

85. On information and belief, most if not all American cities are either "known drug trafficking area[s]" or "known drug source area[s]."

86. If Defendants' assertions were sufficient to satisfy reasonable suspicion, then (1) any United States business or individual (2) that regularly sends padded items (like pillows, or vases wrapped in bulging padding) (3) in well-bound boxes (4) from just about any major United States city to any other major United States city is continually subjecting themselves to arbitrary seizure of their property by federal postal officials.

87. There is one additional purported justification that appears in Defendants' notes (and is implied in the letter sent from the Postal Service to Rep. Lee's office): that the political mask shipments resembled packages recently "sent from Eureka" that contained contraband.

88. That additional assertion regarding Eureka did not rise to reasonable suspicion sufficient to conduct a brief investigatory seizure.

89. Defendants could have confirmed or dispelled that assertion regarding Eureka without first seizing the packages.

90. After seizing the packages, Defendants could have immediately determined that the packages were from Movement Ink in Oakland, not anyone in Eureka.

91. After determining that the packages were from Movement Ink in Oakland and not anyone in Eureka, Defendants could have immediately released the packages.

92. Assuming Defendants' assertion regarding Eureka gave rise to reasonable suspicion sufficient to conduct a brief investigatory seizure (which it did not), and that Defendants could not confirm or dispel that assertion without first seizing the packages (which there is no reason to think they could not), Defendants still obviously violated the Fourth Amendment because as soon as they conducted that seizure, they could and should have immediately determined that the packages were from Movement Ink in Oakland, not anyone in Eureka, and immediately released them.

United States District Court
Northern District of California

93. Defendants did not release the packages or seek a warrant for over 24 hours.

94. Even if Defendants determined that the packages were from Movement Ink in Oakland, not anyone in Eureka, but still remained convinced they could not release the packages, they still obviously violated the Fourth Amendment because in order to continue the seizure of the packages beyond that brief investigatory period or to search the packages, they needed probable cause and a warrant.

95. Defendants did not have probable cause.

96. Defendants did not obtain a warrant.

97. Instead, they searched the packages and/or left the packages unattended for more than 24 hours.

98. Defendants would apparently have let the packages sit indefinitely had René and Movement Ink not generated a national news story about Defendants' violations of their Fourth and First Amendment rights.

99. In addition to the harms and injuries described in paragraphs 35 through 52, Defendants' baseless seizures and searches of René's and Movement Ink's political mask shipments have directly resulted in the chilling of René's and Movement Ink's political speech in two ways: (1) René and Movement Ink are less active and vocal on social media and in the community because of the pall of suspicion and fear of surveillance that Defendants' conduct has cast over them, and (2) René and Movement Ink have lost substantial opportunities to express their political views through their work because Defendants' conduct has significantly depressed their client base and their apparel production, which have always been built on the basis of political activism and speech.

100. On March 11, 2022, René and Movement Ink submitted claims for relief under the Federal Tort Claims Act to the Postal Service and the Postal Inspection Service. The agencies have until six months from that date to resolve the claims. If the claims are not resolved by the end of that six months, René and Movement Ink intend to amend this Complaint to include those claims in this action.

## CLAIMS FOR RELIEF

### Count 1
### Unreasonable Seizures in Violation of the Fourth Amendment
### Against Defendants Does 1 through 5
### Under *Bivens*

101. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

102. Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

103. Defendants Does 1 through 5 seized Plaintiffs' personal property in violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

104. Seizures of personal property without reasonable suspicion, probable cause, or a warrant are obviously unconstitutional.

105. It is clearly established and every reasonable postal official has fair warning that warrantless seizures of personal property are presumptively unconstitutional.

106. It is clearly established and every reasonable postal official has fair warning that postal officials must have at least reasonable suspicion to conduct brief investigatory seizures of personal property.

107. It is clearly established and every reasonable postal official has fair warning that postal officials do not have reasonable suspicion to conduct brief investigatory seizures of personal property in the absence of individualized circumstances suggesting that a particular, articulable crime is occurring.

108. It is clearly established and every reasonable postal official has fair warning that postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to seize personal property beyond the time needed for a brief

United States District Court
Northern District of California

investigatory seizure based on reasonable suspicion.

109. It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

110. It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.

111. It is clearly established and every reasonable postal official has fair warning that postal officials do not face exigent circumstances in the absence of an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

112. It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by (1) seizing personal property in the absence of reasonable suspicion based on individualized circumstances suggesting that a particular, articulable crime is occurring or (2) seizing property beyond the time needed for a brief investigatory seizure arising from reasonable suspicion in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) plus either a warrant or an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

113. It is clearly established and every reasonable postal official has fair warning that reasonable suspicion cannot be based on assumed facts that the postal official could dispel before conducting an investigatory seizure of personal property.

114. It is clearly established and every reasonable postal official has fair warning that reasonable suspicion cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

United States District Court
Northern District of California

115. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable suspicion but was dispelled while conducting an investigatory seizure of personal property.

116. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

117. It is clearly established and every reasonable postal official has fair warning that probable cause to believe that drugs are present is not, in the absence of a risk of their destruction, an exigent circumstance that permits forgoing the warrant requirement.

118. Defendants seized Plaintiffs' personal property without reasonable suspicion. The characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were allegedly bulging, were taped all around, were going from one purported drug activity city to another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent packages that businesses small and large—including Plaintiffs themselves—ship throughout the country every single day. Every reasonable postal official should know that those characteristics do not give rise to reasonable suspicion because those characteristics are not individualized circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

119. Even with the additional allegation that Plaintiffs' packages resembled some from Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an investigatory seizure because (1) that additional factual assumption did not give rise to reasonable suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

120. Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not

any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

121. But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

122. Therefore, at every step, Defendants violated Plaintiffs' clearly established right to be free from unreasonable seizures of their personal property.

123. Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

124. Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

125. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

126. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' seizures of their personal property.

**Count 2**
**Unreasonable Seizures in Violation of the Fourth Amendment**
**Against Defendants Does 1 through 5**
**Under the Westfall Act (28 U.S.C. § 2679(b)(2)(A))**

127. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

128. Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

129. Defendants Does 1 through 5 seized Plaintiffs' personal property in violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

130. Seizures of personal property without reasonable suspicion, probable cause, or a warrant are obviously unconstitutional.

131. It is clearly established and every reasonable postal official has fair warning that warrantless seizures of personal property are presumptively unconstitutional.

132. It is clearly established and every reasonable postal official has fair warning that postal officials must have at least reasonable suspicion to conduct brief investigatory seizures of personal property.

133. It is clearly established and every reasonable postal official has fair warning that postal officials do not have reasonable suspicion to conduct brief investigatory seizures of personal property in the absence of individualized circumstances suggesting that a particular, articulable crime is occurring.

134. It is clearly established and every reasonable postal official has fair warning that postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to seize personal property beyond the time needed for a brief investigatory seizure based on reasonable suspicion.

135. It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

136. It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.

137. It is clearly established and every reasonable postal official has fair warning that postal officials do not face exigent circumstances in the absence of an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

138. It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by (1) seizing personal property in the absence of reasonable suspicion based on individualized circumstances suggesting that a particular, articulable crime is occurring or (2) seizing property beyond the time needed for a brief investigatory seizure arising from reasonable suspicion in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) plus either a warrant or an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

139. It is clearly established and every reasonable postal official has fair warning that reasonable suspicion cannot be based on assumed facts that the postal official could dispel before conducting an investigatory seizure of personal property.

140. It is clearly established and every reasonable postal official has fair warning that reasonable suspicion cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

141. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable suspicion but was dispelled while conducting an investigatory seizure of personal property.

142. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on characteristics that, individually and as a whole, apply to personal

property that has no connection to criminal activity.

143. It is clearly established and every reasonable postal official has fair warning that probable cause to believe that drugs are present is not, in the absence of a risk of their destruction, an exigent circumstance that permits forgoing the warrant requirement.

144. Defendants seized Plaintiffs' personal property without reasonable suspicion. The characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were allegedly bulging, were taped all around, were going from one purported drug activity city to another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent packages that businesses small and large—including Plaintiffs themselves—ship throughout the country every single day. Every reasonable postal official should know that those characteristics do not give rise to reasonable suspicion because those characteristics are not individualized circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

145. Even with the additional allegation that Plaintiffs' packages resembled some from Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an investigatory seizure because (1) that additional factual assumption did not give rise to reasonable suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

146. Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

147. But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did

not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

148. Therefore, at every step, Defendants violated Plaintiffs' clearly established right to be free from unreasonable seizures of their personal property.

149. Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

150. Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

151. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

152. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' seizures of their personal property.

**Count 3**
**Unreasonable Seizures in Violation of the Fourth Amendment**
**Against Defendants Does 1 through 5**
**Under the Fourth Amendment**

153. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

154. Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

155. Defendants Does 1 through 5 seized Plaintiffs' personal property in violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during

which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

156. Seizures of personal property without reasonable suspicion, probable cause, or a warrant are obviously unconstitutional.

157. It is clearly established and every reasonable postal official has fair warning that warrantless seizures of personal property are presumptively unconstitutional.

158. It is clearly established and every reasonable postal official has fair warning that postal officials must have at least reasonable suspicion to conduct brief investigatory seizures of personal property.

159. It is clearly established and every reasonable postal official has fair warning that postal officials do not have reasonable suspicion to conduct brief investigatory seizures of personal property in the absence of individualized circumstances suggesting that a particular, articulable crime is occurring.

160. It is clearly established and every reasonable postal official has fair warning that postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to seize personal property beyond the time needed for a brief investigatory seizure based on reasonable suspicion.

161. It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

162. It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.

163. It is clearly established and every reasonable postal official has fair warning that postal officials do not face exigent circumstances in the absence of an articulable risk of immediate

physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

164. It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by (1) seizing personal property in the absence of reasonable suspicion based on individualized circumstances suggesting that a particular, articulable crime is occurring or (2) seizing property beyond the time needed for a brief investigatory seizure arising from reasonable suspicion in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) plus either a warrant or an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

165. It is clearly established and every reasonable postal official has fair warning that reasonable suspicion cannot be based on assumed facts that the postal official could dispel before conducting an investigatory seizure of personal property.

166. It is clearly established and every reasonable postal official has fair warning that reasonable suspicion cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

167. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable suspicion but was dispelled while conducting an investigatory seizure of personal property.

168. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

169. It is clearly established and every reasonable postal official has fair warning that probable cause to believe that drugs are present is not, in the absence of a risk of their destruction, an exigent circumstance that permits forgoing the warrant requirement.

170. Defendants seized Plaintiffs' personal property without reasonable suspicion. The

characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were allegedly bulging, were taped all around, were going from one purported drug activity city to another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent packages that businesses small and large—including Plaintiffs themselves—ship throughout the country every single day. Every reasonable postal official should know that those characteristics do not give rise to reasonable suspicion because those characteristics are not individualized circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

171. Even with the additional allegation that Plaintiffs' packages resembled some from Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an investigatory seizure because (1) that additional factual assumption did not give rise to reasonable suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

172. Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

173. But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

United States District Court
Northern District of California

174. Therefore, at every step, Defendants violated Plaintiffs' clearly established right to be free from unreasonable seizures of their personal property.

175. Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

176. Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

177. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

178. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' seizures of their personal property.

**Count 4**
**Unreasonable Searches in Violation of the Fourth Amendment**
**Against Defendants Does 1 through 5**
**Under *Bivens***

179. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

180. Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

181. Defendants Does 1 through 5 seized and searched Plaintiffs' personal property in violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures and searches of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

182. Searches of personal property without reasonable suspicion, probable cause, or a

United States District Court
Northern District of California

warrant are obviously unconstitutional.

183. It is clearly established and every reasonable postal official has fair warning that warrantless searches of personal property are presumptively unconstitutional.

184. It is clearly established and every reasonable postal official has fair warning that postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to search personal property.

185. It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

186. It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.

187. It is clearly established and every reasonable postal official has fair warning that postal officials do not face exigent circumstances in the absence of an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

188. It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by searching personal property in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) and either a warrant or an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

189. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable suspicion but was dispelled while conducting an investigatory seizure of personal property.

190. It is clearly established and every reasonable postal official has fair warning that

United States District Court
Northern District of California

probable cause cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

191. It is clearly established and every reasonable postal official has fair warning that probable cause to believe that drugs are present is not, in the absence of a risk of their destruction, an exigent circumstance that permits forgoing the warrant requirement.

192. Defendants seized Plaintiffs' personal property without reasonable suspicion. The characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were allegedly bulging, were taped all around, were going from one purported drug activity city to another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent packages that businesses small and large—including Plaintiffs themselves—ship throughout the country every single day. Every reasonable postal official should know that those characteristics do not give rise to reasonable suspicion because those characteristics are not individualized circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

193. Even with the additional allegation that Plaintiffs' packages resembled some from Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an investigatory seizure because (1) that additional factual assumption did not give rise to reasonable suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

194. Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

195. But Defendants did not release Plaintiffs' packages immediately upon that

realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

196. Therefore, Defendants violated Plaintiffs' clearly established right to be free from unreasonable searches of their personal property.

197. Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

198. Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

199. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

200. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' searches of their personal property.

**Count 5**
**Unreasonable Searches in Violation of the Fourth Amendment**
**Against Defendants Does 1 through 5**
**Under the Westfall Act (28 U.S.C. § 2679(b)(2)(A))**

201. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

202. Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

203. Defendants Does 1 through 5 seized and searched Plaintiffs' personal property in

United States District Court
Northern District of California

violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures and searches of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

204. Searches of personal property without reasonable suspicion, probable cause, or a warrant are obviously unconstitutional.

205. It is clearly established and every reasonable postal official has fair warning that warrantless searches of personal property are presumptively unconstitutional.

206. It is clearly established and every reasonable postal official has fair warning that postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to search personal property.

207. It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

208. It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.

209. It is clearly established and every reasonable postal official has fair warning that postal officials do not face exigent circumstances in the absence of an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

210. It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by searching personal property in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) and either a warrant or an

United States District Court
Northern District of California

articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

211. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable suspicion but was dispelled while conducting an investigatory seizure of personal property.

212. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

213. It is clearly established and every reasonable postal official has fair warning that probable cause to believe that drugs are present is not, in the absence of a risk of their destruction, an exigent circumstance that permits forgoing the warrant requirement.

214. Defendants seized Plaintiffs' personal property without reasonable suspicion. The characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were allegedly bulging, were taped all around, were going from one purported drug activity city to another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent packages that businesses small and large—including Plaintiffs themselves—ship throughout the country every single day. Every reasonable postal official should know that those characteristics do not give rise to reasonable suspicion because those characteristics are not individualized circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

215. Even with the additional allegation that Plaintiffs' packages resembled some from Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an investigatory seizure because (1) that additional factual assumption did not give rise to reasonable suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

216. Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief

United States District Court
Northern District of California

investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

217. But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

218. Therefore, Defendants violated Plaintiffs' clearly established right to be free from unreasonable searches of their personal property.

219. Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

220. Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

221. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

222. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' searches of their personal property.

**Count 6**
**Unreasonable Searches in Violation of the Fourth Amendment**
**Against Defendants Does 1 through 5**
**Under the Fourth Amendment**

223. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

224. Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

225. Defendants Does 1 through 5 seized and searched Plaintiffs' personal property in violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures and searches of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

226. Searches of personal property without reasonable suspicion, probable cause, or a warrant are obviously unconstitutional.

227. It is clearly established and every reasonable postal official has fair warning that warrantless searches of personal property are presumptively unconstitutional.

228. It is clearly established and every reasonable postal official has fair warning that postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to search personal property.

229. It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

230. It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.



United States District Court
Northern District of California

231. It is clearly established and every reasonable postal official has fair warning that postal officials do not face exigent circumstances in the absence of an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

232. It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by searching personal property in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) and either a warrant or an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

233. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable suspicion but was dispelled while conducting an investigatory seizure of personal property.

234. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

235. It is clearly established and every reasonable postal official has fair warning that probable cause to believe that drugs are present is not, in the absence of a risk of their destruction, an exigent circumstance that permits forgoing the warrant requirement.

236. Defendants seized Plaintiffs' personal property without reasonable suspicion. The characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were allegedly bulging, were taped all around, were going from one purported drug activity city to another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent packages that businesses small and large—including Plaintiffs themselves—ship throughout the country every single day. Every reasonable postal official should know that those characteristics do not give rise to reasonable suspicion because those characteristics are not individualized circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

237. Even with the additional allegation that Plaintiffs' packages resembled some from Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an investigatory seizure because (1) that additional factual assumption did not give rise to reasonable suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

238. Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

239. But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

240. Therefore, Defendants violated Plaintiffs' clearly established right to be free from unreasonable searches of their personal property.

241. Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

242. Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.



United States District Court
Northern District of California

243. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

244. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' searches of their personal property.

**Count 7**
**Retaliation in Violation of the First Amendment**
**Against Defendants Does 1 through 5**
**Under *Bivens***

245. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

246. Plaintiffs shipped four packages of their personal property via the United States Postal Service. Those packages consisted of Covid-protective masks bearing core political speech, including phrases such as "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE."

247. Retaliation for protected speech is an obvious violation of the First Amendment.

248. It is clearly established and every reasonable postal official has fair warning that seizing, searching, detaining, or delaying personal property or interfering with contractual or business relationships or operations because of the property's or its owner's speech, message, content, viewpoint, association, or affiliation is a violation of the First Amendment.

249. It is clearly established and every reasonable postal official has fair warning that protected speech, adverse government action that might chill an ordinary person from continuing to engage in that speech, and a causal relationship between the two constitute retaliation in violation of the First Amendment, and that a government actor's knowledge of the speech and the temporal proximity of the speech and the adverse government action raise an inference of retaliation.

250. Plaintiffs' packages were going to community activists and organizers in four major cities where large racial justice demonstrations were happening every day.

251. René is a known community activist and organizer with a community and social media presence promoting racial and social justice messages.



United States District Court
Northern District of California

252. Movement Ink is a screen printing business; its commercial activity is expressive in nature. And it is known for its community and social media presence promoting racial and social justice messages.

253. Plaintiffs' business is more than just a business; it is also an outlet for expressing and helping others express core political speech and activism. Plaintiffs have always publicly cultivated and publicly promoted that expressive and activist identity as core to their business model.

254. Plaintiffs are well-known to the postal officials at their local post office, from which Plaintiffs have regularly shipped Movement Ink packages for years.

255. When national protests erupted in May 2020 following the police killings of George Floyd and Breonna Taylor, Plaintiffs began receiving a much higher volume of orders than usual. Activists and organizers around the country came to Plaintiffs seeking thousands of Covid-protective masks for protests that were happening all over the country every day.

256. Those protests were controversial. In particular, governmental attitudes and responses to the protestors' messages—including "Black Lives Matter" and "Defund the Police"—were highly critical and often violent.

257. So while Plaintiffs have for years worked with and been connected to social and racial justice movements, this was the first time they were connected to such high profile, highly publicized, and highly visible protests, organizers, and apparel, and the first time they were shipping such rapid quantities of apparel in such rapid time.

258. Covid-protective masks, which all four of Plaintiffs' seized and searched packages contained, were also controversial and subject to governmental and societal disdain.

259. Plaintiffs' packages were clearly identified as having been shipped from Movement Ink in Oakland to major cities across the country.

260. Defendants' own internal notes clearly state Defendants' knowledge that Plaintiffs' packages contained, in Defendants' words, "BLM MASKS."

261. Within days of Plaintiffs' apparent association with and support for the protests in the form of politically emblazoned Covid-protective masks, Defendants seized, searched, detained,

and delayed the shipment of Plaintiffs' packages, interfering with Plaintiffs' contractual and business relationships and operations, as well as Plaintiffs' political speech.

262. Plaintiffs' public association with and support for the protests, their marking of their politically emblazoned Covid-protective masks with Movement Ink identifiers, Defendants' own "BLM MASKS" notation in their internal notes, and the immediacy of Defendants' adverse action against Plaintiffs raise an inference of retaliation.

263. Therefore, Defendants violated Plaintiffs' clearly established right to be free from retaliation for protected political speech.

264. Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

265. Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

266. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

267. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' retaliatory conduct.

**Count 8**
**Retaliation in Violation of the First Amendment**
**Against Defendants Does 1 through 5**
**Under the Westfall Act (28 U.S.C. § 2679(b)(2)(A))**

268. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

269. Plaintiffs shipped four packages of their personal property via the United States Postal Service. Those packages consisted of Covid-protective masks bearing core political speech, including phrases such as "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE."

270. Retaliation for protected speech is an obvious violation of the First Amendment.

United States District Court
Northern District of California

271. It is clearly established and every reasonable postal official has fair warning that seizing, searching, detaining, or delaying personal property or interfering with contractual or business relationships or operations because of the property's or its owner's speech, message, content, viewpoint, association, or affiliation is a violation of the First Amendment.

272. It is clearly established and every reasonable postal official has fair warning that protected speech, adverse government action that might chill an ordinary person from continuing to engage in that speech, and a causal relationship between the two constitute retaliation in violation of the First Amendment, and that a government actor's knowledge of the speech and the temporal proximity of the speech and the adverse government action raise an inference of retaliation.

273. Plaintiffs' packages were going to community activists and organizers in four major cities where large racial justice demonstrations were happening every day.

274. René is a known community activist and organizer with a community and social media presence promoting racial and social justice messages.

275. Movement Ink is a screen printing business; its commercial activity is expressive in nature. And it is known for its community and social media presence promoting racial and social justice messages.

276. Plaintiffs' business is more than just a business; it is also an outlet for expressing and helping others express core political speech and activism. Plaintiffs have always publicly cultivated and publicly promoted that expressive and activist identity as core to their business model.

277. Plaintiffs are well-known to the postal officials at their local post office, from which Plaintiffs have regularly shipped Movement Ink packages for years.

278. When national protests erupted in May 2020 following the police killings of George Floyd and Breonna Taylor, Plaintiffs began receiving a much higher volume of orders than usual. Activists and organizers around the country came to Plaintiffs seeking thousands of Covid-protective masks for protests that were happening all over the country every day.

279. Those protests were controversial. In particular, governmental attitudes and responses to the protestors' messages—including "Black Lives Matter" and "Defund the Police"—

United States District Court
Northern District of California

were highly critical and often violent.

280. So while Plaintiffs have for years worked with and been connected to social and racial justice movements, this was the first time they were connected to such high profile, highly publicized, and highly visible protests, organizers, and apparel, and the first time they were shipping such rapid quantities of apparel in such rapid time.

281. Covid-protective masks, which all four of Plaintiffs' seized and searched packages contained, were also controversial and subject to governmental and societal disdain.

282. Plaintiffs' packages were clearly identified as having been shipped from Movement Ink in Oakland to major cities across the country.

283. Defendants' own internal notes clearly state Defendants' knowledge that Plaintiffs' packages contained, in Defendants' words, "BLM MASKS."

284. Within days of Plaintiffs' apparent association with and support for the protests in the form of politically emblazoned Covid-protective masks, Defendants seized, searched, detained, and delayed the shipment of Plaintiffs' packages, interfering with Plaintiffs' contractual and business relationships and operations, as well as Plaintiffs' political speech.

285. Plaintiffs' public association with and support for the protests, their marking of their politically emblazoned Covid-protective masks with Movement Ink identifiers, Defendants' own "BLM MASKS" notation in their internal notes, and the immediacy of Defendants' adverse action against Plaintiffs raise an inference of retaliation.

286. Therefore, Defendants violated Plaintiffs' clearly established right to be free from retaliation for protected political speech.

287. Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

288. Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

289. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs'

United States District Court
Northern District of California

packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

290. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' retaliatory conduct.

**Count 9**
**Retaliation in Violation of the First Amendment**
**Against Defendants Does 1 through 5**
**Under the First Amendment**

291. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

292. Plaintiffs shipped four packages of their personal property via the United States Postal Service. Those packages consisted of Covid-protective masks bearing core political speech, including phrases such as "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE."

293. Retaliation for protected speech is an obvious violation of the First Amendment.

294. It is clearly established and every reasonable postal official has fair warning that seizing, searching, detaining, or delaying personal property or interfering with contractual or business relationships or operations because of the property's or its owner's speech, message, content, viewpoint, association, or affiliation is a violation of the First Amendment.

295. It is clearly established and every reasonable postal official has fair warning that protected speech, adverse government action that might chill an ordinary person from continuing to engage in that speech, and a causal relationship between the two constitute retaliation in violation of the First Amendment, and that a government actor's knowledge of the speech and the temporal proximity of the speech and the adverse government action raise an inference of retaliation.

296. Plaintiffs' packages were going to community activists and organizers in four major cities where large racial justice demonstrations were happening every day.

297. René is a known community activist and organizer with a community and social media presence promoting racial and social justice messages.

298. Movement Ink is a screen printing business; its commercial activity is expressive in

nature. And it is known for its community and social media presence promoting racial and social justice messages.

299. Plaintiffs' business is more than just a business; it is also an outlet for expressing and helping others express core political speech and activism. Plaintiffs have always publicly cultivated and publicly promoted that expressive and activist identity as core to their business model.

300. Plaintiffs are well-known to the postal officials at their local post office, from which Plaintiffs have regularly shipped Movement Ink packages for years.

301. When national protests erupted in May 2020 following the police killings of George Floyd and Breonna Taylor, Plaintiffs began receiving a much higher volume of orders than usual. Activists and organizers around the country came to Plaintiffs seeking thousands of Covid-protective masks for protests that were happening all over the country every day.

302. Those protests were controversial. In particular, governmental attitudes and responses to the protestors' messages—including "Black Lives Matter" and "Defund the Police"—were highly critical and often violent.

303. So while Plaintiffs have for years worked with and been connected to social and racial justice movements, this was the first time they were connected to such high profile, highly publicized, and highly visible protests, organizers, and apparel, and the first time they were shipping such rapid quantities of apparel in such rapid time.

304. Covid-protective masks, which all four of Plaintiffs' seized and searched packages contained, were also controversial and subject to governmental and societal disdain.

305. Plaintiffs' packages were clearly identified as having been shipped from Movement Ink in Oakland to major cities across the country.

306. Defendants' own internal notes clearly state Defendants' knowledge that Plaintiffs' packages contained, in Defendants' words, "BLM MASKS."

307. Within days of Plaintiffs' apparent association with and support for the protests in the form of politically emblazoned Covid-protective masks, Defendants seized, searched, detained, and delayed the shipment of Plaintiffs' packages, interfering with Plaintiffs' contractual and

business relationships and operations, as well as Plaintiffs' political speech.

308. Plaintiffs' public association with and support for the protests, their marking of their politically emblazoned Covid-protective masks with Movement Ink identifiers, Defendants' own "BLM MASKS" notation in their internal notes, and the immediacy of Defendants' adverse action against Plaintiffs raise an inference of retaliation.

309. Therefore, Defendants violated Plaintiffs' clearly established right to be free from retaliation for protected political speech.

310. Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

311. Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

312. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

313. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' retaliatory conduct.

## Count 10
## Trespass to Chattels
## Against Defendants Does 1 through 5
## Under California Law

314. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

315. Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

316. Without consent, cause, or legal authority, Defendants intentionally interfered with Plaintiffs' possession, right to possess, use, right to use, enjoyment, and right to enjoy their personal

property by seizing, detaining, and searching Plaintiffs' personal property.

317. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

318. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' conduct.

319. Plaintiffs recognize that this claim is currently barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.

**Count 11**
**Interference with Contractual Relations**
**Against Defendants Does 1 through 5**
**Under California Law**

320. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

321. Plaintiffs had contracts with protest organizers for the rush printing and immediate delivery of four packages containing Covid-protective masks emblazoned with political speech.

322. Defendants knew, should have known, or had reason to know of those contracts, based on Plaintiffs' regular business activities and the packages' shipping information (including the sender and recipients) that Plaintiffs provided to Defendants.

323. Defendants' intentional seizures, detentions, and searches of the packages, as well as Defendants' "Alert" to the recipients of the packages that the packages were "seized by law enforcement," prevented Plaintiffs' performance of the contracts or made Plaintiffs' performance of the contracts more expensive or difficult.

324. Defendants' intentional seizures, detentions, and searches of the packages, as well as Defendants' "Alert" to the recipients of the packages that the packages were "seized by law enforcement," were certain or substantially certain to prevent Plaintiffs' performance of the contracts or make Plaintiffs' performance of the contracts more expensive or difficult.

325. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs'



United States District Court
Northern District of California

United States District Court
Northern District of California

packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

326. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' conduct.

327. Plaintiffs recognize that this claim is currently barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.

**Count 12**
**Interference with Prospective Economic Relations**
**Against Defendants Does 1 through 5**
**Under California Law**

328. Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 100.

329. Plaintiffs had contracts and other economic relationships with protest organizers for the rush printing and immediate delivery of four packages containing Covid-protective masks emblazoned with political speech and for similar ongoing and regular orders in the future.

330. Defendants knew, should have known, or had reason to know of those contracts or those future economic benefits, based on Plaintiffs' regular business activities, the packages' shipping information (including the sender and recipients) that Plaintiffs provided to Defendants, and the ongoing nature of the need for Covid-protective masks and political protests.

331. Defendants' intentionally seized, detained, and searched the packages and issued an "Alert" to the recipients of the packages that the packages were "seized by law enforcement."

332. Defendants' intentional seizures, detentions, and searches of the packages, as well as Defendants' "Alert" to the recipients of the packages that the packages were "seized by law enforcement," were certain or substantially certain to prevent Plaintiffs' performance of the contracts or make Plaintiffs' performance of the contracts more expensive or difficult and to disrupt similar ongoing and regular orders in the future.

333. Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships

with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

334. Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' conduct.

335. Plaintiffs recognize that this claim is currently barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

336. Declare that Defendants Does 1 through 5 are liable in damages under the Constitution, *Bivens*, and the Westfall Act (28 U.S.C. § 2679(b)(2)(A)) for violating Plaintiffs' Fourth Amendment right to be free from unreasonable seizures of personal property.

337. Declare that Defendants Does 1 through 5 are liable in damages under the Constitution, *Bivens*, and the Westfall Act (28 U.S.C. § 2679(b)(2)(A)) for violating Plaintiffs' Fourth Amendment right to be free from unreasonable searches of personal property.

338. Declare that Defendants Does 1 through 5 are liable in damages under the Constitution, *Bivens*, and the Westfall Act (28 U.S.C. § 2679(b)(2)(A)) for violating Plaintiffs' First Amendment right to be free from retaliation for political speech.

339. Declare that Defendants Does 1 through 5 are liable in damages under California law for trespasses to Plaintiffs' chattels. (Plaintiffs recognize that this relief is currently barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.)

340. Declare that Defendants Does 1 through 5 are liable in damages under California law for interference with Plaintiffs' contractual relations. (Plaintiffs recognize that this relief is currently barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.)

341. Declare that Defendants Does 1 through 5 are liable in damages under California law for interference with Plaintiffs' prospective economic relations. (Plaintiffs recognize that this relief is currently barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.)

342. Award Plaintiffs' compensatory damages for Defendants' unconstitutional and

United States District Court
Northern District of California

tortious conduct, in amounts to be proven at trial.

343. Award Plaintiffs' attorneys' fees, costs, and expenses under 28 U.S.C. § 2412 and any other applicable provisions of law or equity.

344. Award any further legal or equitable relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6, Plaintiffs demand a jury trial on all issues so triable.

Dated: June 1, 2022

s/ Jaba Tsitsuashvili
Jaba Tsitsuashvili (CA Bar No. 309012)
Anya Bidwell* (TX Bar No. 24101516)
Patrick Jaicomo* (MI Bar No. P-75705)
INSTITUTE FOR JUSTICE
901 N. Glebe Road
Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
jtsitsuashvili@ij.org
abidwell@ij.org
pjaicomo@ij.org

*Applications for admission
pro hac vice forthcoming

*Counsel for Plaintiffs*