Jaba Tsitsuashvili (CA Bar No. 309012)
Patrick Jaicomo* (MI Bar No. P-75705)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
jtsitsuashvili@ij.org
pjaicomo@ij.org

*Admitted pro hac vice

Anna M. Barvir (CA Bar No. 268728)
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Phone: (562) 216-4444
Fax: (562) 216-4445
abarvir@michellawyers.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| RENÉ QUIÑONEZ and MOVEMENT INK LLC, | Case No. 3:22-cv-3195-WHO |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| UNITED STATES OF AMERICA; and JEFF AGSTER, EVA CHAN, STEPHEN FAJARDO, MARK HODGES, ROBIN LEE, and DOES 1 through 2, United States Postal Service and United States Postal Inspection Service officials in their individual capacities, | Judge: Hon. William H. Orrick |
| Defendants. |  |

United States District Court
Northern District of California

**INTRODUCTION**

1.    The Fourth Amendment guarantees us the right to be secure in our papers and effects. That promise is illusory if postal officials can seize or search personal property without an individualized, articulable basis to believe that the property contains contraband or evidence of a crime. Worse yet would be if postal officials could seize or search personal property because of its political message. That is why the Constitution requires postal officials—like other government officials—to get a judicial warrant based on probable cause before seizing or searching personal property. It is also why the Constitution, federal statutes, and state statutory and common law provide judicially enforceable remedies for violations of these rights, against both individual federal officials and the United States.

2.    In this case, postal officials did not have reasonable suspicion—let alone probable cause and a warrant (or probable cause and exigent circumstances)—when they seized four properly addressed and neatly taped brown boxes sent to various cities by René Quiñonez and Movement Ink LLC, which is René's small, family-run screen-printing business in Oakland, California that, like businesses small and large across the country, regularly ships well-bound brown boxes from one location to cities nationwide.

3.    As confirmed by the postal official Defendants' internal notes memorializing the seizures and searches of those boxes, millions of packages shipped every year share the unexceptional characteristics of René's and Movement Ink's packages that Defendants relied on to justify their suspicionless, warrantless seizures and searches. And those same internal notes make clear that Defendants knew the packages coming from Movement Ink contained—in Defendants' words—"BLM MASKS." So Defendants appear to have violated not just the Fourth Amendment, but also the First Amendment, while committing several common law torts in the process.

4.    The wisdom of our constitutional design is that it knows significant harms befall the public when government officials exceed constitutional bounds and violate rights. That is exactly what happened here. Defendants' unconstitutional and tortious seizures and searches have inflicted several significant harms, including reputational harms on René and Movement Ink that have cost

them not only the opportunity to expand their labor of love but also significant business growth.

5.     First, the packages were delayed by 48 hours. That is no trivial matter. They contained thousands of Covid-protective masks when the pandemic was raging and mass protests over police violence were happening every day. Second, these political mask shipments' recipients were not only deprived the Covid-protective effects of the masks, but also expression of the political messages emblazoned on the masks. Third, René and Movement Ink—for whom these shipments were not just commercial transactions—similarly had their rights to political speech stymied. Finally, René and Movement Ink lost the goodwill and business relationships they earned over a decade of building community trust based on their activism and their quality products—costing them the opportunity to do substantial business not only with the recipients of the masks, but other existing and potential partners too. And all those partners lost a trusted supplier because of the uncertainty and air of suspicion created by Defendants' baseless seizures and searches of René's and Movement Ink's political mask shipments.

6.     For all these reasons, René and Movement Ink seek to hold personally accountable the postal and law enforcement officials responsible for their injuries under the Constitution, *Bivens*, the Westfall Act (28 U.S.C. § 2679(b)(2)(A)), and California law, as well as the federal government as those officials' employer under the Federal Tort Claims Act.

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, 1356, 1357, 1367, 2201, 2202, 2674, and 2679 and the United States Constitution.

8.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391.

**PARTIES**

9.     Plaintiff René Quiñonez is an adult resident of California. He is the majority owner and manager of Plaintiff Movement Ink LLC.

10.     Plaintiff Movement Ink LLC is a California limited liability company. Its majority owner and manager is Plaintiff René Quiñonez.

11.     Defendant United States of America is the national federal government established

United States District Court
Northern District of California

1   by the United States Constitution and liable for the acts of its officials pursuant to the Federal Tort

2   Claims Act, 28 U.S.C. §§ 1346 and 2671–2680.

3       12.     Defendants Jeff Agster, Eva Chan, Stephen Fajardo, Mark Hodges, Robin Lee, and

4   Doe Defendants 1 through 2 are officials of the United States Postal Service and the United States

5   Postal Inspection Service who are responsible for the acts, violations, and injuries alleged in this

6   action. They are sued in their individual capacities under the Constitution, *Bivens*, the Westfall Act

7   (28 U.S.C. § 2679(b)(2)(A)), and California law. The acts, violations, and injuries for which they

8   are responsible in this action also form the basis for liability of Defendant United States of America

9   under the Federal Tort Claims Act.

10      13.     Plaintiffs initially sued Defendants Agster, Chan, Fajardo, Hodges, and Lee as Doe

11  defendants in this action because, in the months leading up to the filing of this action, the federal

12  government refused to disclose Defendants' names in response to Plaintiffs' Freedom of

13  Information Act (FOIA) requests and their FOIA appeal seeking those names. The federal

14  government agreed to disclose those names in September 2022 in lieu of Plaintiffs seeking pre-

15  service expedited discovery in this Court to ascertain those names. Plaintiffs have retained two

16  additional Doe defendants in the case out of an abundance of caution because, as explained below,

17  the records produced by the federal government suggest that other officials may also have been

18  responsible for the acts, violations, and injuries alleged in this action.

19                                  **STATEMENT OF FACTS**

20      14.     René Quiñonez is a family man, entrepreneur, organizer, businessperson, activist,

21  former youth gang prevention nonprofit director, and current executive director of a youth outreach

22  and job skills development nonprofit. All those aspects of his personality find expression in

23  Movement Ink LLC, the small screen-printing business he and his family have spent the last decade

24  building into a community presence, known for its brand of activism-inspired business practices and

25  relationships.

26      15.     From its inception, as the company's name indicates, Movement Ink has been

27  publicly allied and involved with social justice and activism movements, organizations, nonprofits,

28

United States District Court
Northern District of California

1   and individual organizers.

2       16.    René and Movement Ink have spent years cultivating their brand, their image, and

3   their reputation in these spaces, including community involvement and social media presence.

4       17.    As a result of years of commitment to causes, trust-building, and high-quality screen-

5   printing, René and Movement Ink successfully developed business relationships with activist

6   movements, organizations, nonprofits, and individual organizers, who relied on René and

7   Movement Ink for various screen-printing needs for years leading up to and into 2020, regularly

8   ordering products ranging from t-shirts, to hoodies, to onesies for toddlers.

9       18.    René and Movement Ink methodically built and carved out this niche, making René

10  very proud of what he and his family have built.

11      19.    The business of screen-printing is hard, labor-intensive work. So is the work of

12  community building and activism. But both, especially together, are a labor of love for René and his

13  family.

14      20.    From 2016 to 2019, Movement Ink's gross annual sales grew steadily.

15      21.    So did its reputation—until that long-earned reputation was dashed one day by

16  Defendants' baseless seizures and searches of Movement Ink's most high-profile, lucrative, and

17  promising shipments.

18      22.    Defendants' seizures and searches of those shipments impeded Movement Ink's

19  opportunities for business and activism expansion.

20      23.    Defendants' seizures and searches of those shipments also dashed René's newfound

21  dream that he might actually be able to retire someday.

22      24.    In the early months of the Covid-19 pandemic, from March to May 2020, Movement

23  Ink was able to weather the economy's lockdowns and downturns, thanks to increases in certain

24  types of orders, including, most notably, screen-printed Covid-protective masks.

25      25.    Thanks to the years René and Movement Ink spent promoting and developing social

26  justice causes and organizations, they were the supplier of choice when organizers around the

27  country began ordering Covid-protective masks bearing political messages for the mass protests that

28

broke out following the police killings of George Floyd and Breonna Taylor in 2020.

26.     In the last week of May and the first week of June 2020, René, his family, and at least a dozen employees and volunteers worked around the clock to print, pack, and ship thousands of Covid-protective masks around the country. René could count on two hands the number of hours he slept over the course of several days.

27.     The masks that René, Movement Ink, his family, and their employees and volunteers printed were emblazoned with core political messages, such as "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE."

28.     To be sure, Movement Ink was getting paid for its products. But this hard work and dedication was borne of much more than a profit motive; it was borne of a desire to contribute to the protest movement and express René's and Movement Ink's support for the messages they were printing.

29.     Before the seizures and searches of the four political mask shipments at issue in this case, René and Movement Ink fulfilled three orders for thousands of political masks to organizers in Atlanta, Los Angeles, and Oakland.

30.     René shipped those three orders, as well as the four at issue in this case, from the same postal facility and using similar packaging methods as he has done for years on behalf of Movement Ink.

31.     The postal officials at that facility know René and his business. They were friendly with each other, and the postal officials used to joke about René's and Movement Ink's last-minute rush shipments and the high prices he paid for next-day deliveries. But after the seizures and searches at issue in this case, their friendly relationship ended; the postal officials became standoffish and quiet whenever René entered.

32.     René's and Movement Ink's regular practice was to write on each box that it came from Movement Ink and what it contained, such as "masks."

33.     This was done to avoid confusion because Movement Ink shared a workspace with another company, and also so that after boxes were taped up it would be obvious what was in them

United States District Court
Northern District of California

and where René or another Movement Ink employee should deliver or ship them.

34.     The initial three political mask shipments to Atlanta, Los Angeles, and Oakland, which René sent about a week before the four at issue in this case, were packaged no differently or sent in any manner different than the subsequent four whose seizures and searches are at issue in this case.

35.     Like the initial three political mask shipments, René and Movement Ink shipped the four packages at issue in this case in nondescript, securely packaged, cleanly taped boxes. The boxes were full; one or more of them may have had a bulge where masks were squeezed in tightly.

36.     As usual, all of the political mask shipments were marked or identified with Movement Ink as the sender, and likely had their contents handwritten on the side, in accordance with René's and Movement Ink's regular practice.

37.     Like the initial three political mask shipments, René and Movement Ink shipped the four packages at issue in this case using priority mail express overnight shipping—paying a premium to get the masks delivered as quickly as possible because the protests and Covid were both raging every day.

38.     But unlike so many Movement Ink shipments before—including the initial three political mask shipments—the four that René and Movement Ink shipped on June 3, 2020 did not arrive on time.

39.     This was no snafu in mail processing or an unavoidable or mistaken delay.

40.     Rather, all four political mask shipments were, as indicated by the Postal Service's online tracking system, "Seized by Law Enforcement" (i.e., by Defendants) in Oakland from June 3 to June 5—the day after the political mask shipments were already supposed to be arriving to organizers in Brooklyn, DC, Minneapolis, and St. Louis.

41.     René and the shipments' intended recipients were greeted by this cryptic "Alert" on the Postal Service's online tracking system, which said only that René's and Movement Ink's

United States District Court
Northern District of California

political mask shipments were "Seized by Law Enforcement":

42.     The four political mask shipments would not end up arriving at their destinations until June 6 (two days and several protests late), having been held by Defendants without reasonable suspicion, probable cause, or a warrant for more than 24 hours.

43.     René and the mask recipients were all confused, dismayed, and disrupted in their critical work. Instead of focusing on printing and shipping political Covid-protective masks and other apparel, René and Movement Ink had to waste time figuring out why their innocuous packages were in the hands of law enforcement, and how to get them released, while also fielding questions, concerns, and even accusations from partners, community members, and social media commenters.

44.     Similarly, the recipient organizers had to divert attention and resources to the seizure issue, having to consult legal counsel and field calls about this distraction, and having to post on social media about this latest disruption to their organizing efforts and their health and safety efforts.

45.     René, Movement Ink, and their partners were left wondering why these Covid-protective political masks were in the hands of law enforcement officials instead of on the faces of political protestors.

46.     This uncertainty had a catastrophic impact on the reputation and the business that René and Movement Ink had worked so hard and so long to build.

47.     As evidenced by the seven political mask shipments already made, plus three more sent on June 4, and commitments for more going forward on a rolling basis, René and Movement

Ink were poised to become regular, national suppliers of activist Covid-protective masks and other activist apparel for protest movements and organizers.

48.     Instead, Defendants' baseless seizures and searches of René's and Movement Ink's political mask shipments created a pall of suspicion, distraction, uncertainty, and confusion around René and Movement Ink.

49.     René and Movement Ink suffered severe reputational harm because of Defendants' baseless seizures and searches of René's and Movement Ink's political mask shipments.

50.     Talks for future orders were terminated, and René could not even get a call back from many of his partners—including not only his new partners, but preexisting ones too.

51.     For example, in addition to the recipients of the political mask shipments at issue in this case, who terminated talks for future orders, at least three other groups who had regularly ordered from and collaborated with René and Movement Ink ceased their partnerships and cut off all ties with René and Movement Ink.

52.     Those partnerships have not revived, and that business has not returned.

53.     René's and Movement Ink's substantial, steady revenue opportunity and their opportunity to do substantial, steady work supporting movements and causes they are deeply committed to were dead on arrival because of Defendants' baseless seizures and searches of René's and Movement Ink's political mask shipments.

54.     Defendants' baseless seizures and searches also caused and continue to cause René significant emotional and mental distress—not just because of his and Movement Ink's financial and reputational hits, but because he and Movement Ink have been effectively shut out of a movement and a community that they spent (and continue to spend) years investing their time and energy in.

55.     All of the harms described in paragraphs 37 through 54 and 112 are the direct and sole result and effect of Defendants' baseless, suspicionless, unconstitutional, and tortious seizures and searches of René's and Movement Ink's political mask shipments.

56.     Feeling targeted, surveilled, despondent, and desperate to find out what happened,

First Amended Complaint and Demand for Jury Trial – Case No. 3:22-cv-3195-WHO

United States District Court
Northern District of California

1    René worked with the office of his Congressperson, Rep. Barbara Lee, who submitted an official

2    inquiry to the Postal Service.

3          57.     The Postal Service responded in a letter that:

4                   *On June 3, 2020, the parcels in question were detained solely*

5                   *because the external physical characteristics of the parcels were*

6                   *consistent with parcels in other non-related instances that were*

7                   *confirmed to contain nonmailable matter, specifically controlled*

8                   *substances. The parcels in question were not detained based on the*

9                   *sender or recipient, because they were associated with organizations*

10                  *involved in protests or any other First Amendment protected activity,*

11                  *or because it was known the parcels contained masks or any articles*

12                  *containing   statements   supporting   any   group   or   position.*

13                  *Furthermore, there were no external characteristics of the parcels*

14                  *that indicated they contained masks or were associated with any*

15                  *specific organization.*

16                  *The customer in this matter did not contact the Inspection*

17                  *Service, but instead contacted the news media. On the morning of*

18                  *June 5, when the Inspection Service became aware of the media*

19                  *stories on the matter and what the contents of the parcels were, we*

20                  *immediately took action to rectify the situation. At 7:07 AM the*

21                  *parcels were placed back in the mail stream. The parcels were*

22                  *delivered on the following day to the intended destinations.*

23                  *Additionally, the USPIS assisted Mr. Quinonez with obtaining a full*

24                  *refund for the cost of the mailings.*

25          58.     The Postal Service's letter to Rep. Lee's office asserts that USPIS became aware of

26   the contents of the parcels on June 5. But as described in paragraph 77, Defendants' own seizure

27   notes explain that they knew the packages contained—in their words—"BLM MASKS."

28

United States District Court
Northern District of California

United States District Court
Northern District of California

59.     The Postal Service's letter to Rep. Lee's office asserts that USPIS assisted René in obtaining a refund for the cost of the mailings. That is not true. René and Movement Ink did not receive refunds.

60.     On information and belief, the recipients of the packages may have received refunds of the shipping costs from USPIS.

61.     In any event, a refund could and would do nothing to account for any of the harms described in paragraphs 37 through 54 and 112, which remain and will remain entirely unremedied.

62.     René's and Movement Ink's political mask shipments resembled lawful packages that legitimate businesses, including Movement Ink, ship on a regular basis.

63.     The four political mask shipments were in neatly taped, nondescript brown boxes with the identities and locations of the sender and the recipients clearly labeled, in accordance with the Postal Service's own public guidance.

64.     René remains at a loss to understand how that could give rise to a federal law enforcement seizure of his and Movement Ink's personal property.

65.     According to the Postal Service's letter to Rep. Lee's office, Defendants asserted that they could seize, search, and hold for over 24 hours René's and Movement Ink's property because of the packages' "external physical characteristics".

66.     According to the Postal Service's letter to Rep. Lee's office, Defendants asserted that they could seize, search, and hold for over 24 hours René's and Movement Ink's property based on "external physical characteristics" that apply to millions of packages shipped around the country every day, and to packages shipped by René and Movement Ink on a regular basis.

67.     The "external physical characteristics" that Defendants relied on apply to millions of packages shipped around the country every day, and to packages shipped by René and Movement Ink on a regular basis.

68.     René also remains shocked that Defendants did nothing for more than 24 hours to confirm or dispel any concerns or suspicions, namely by either confirming the identity of the sender and/or seeking a judicial warrant based on an attempt to demonstrate probable cause.

69.     For more than 24 hours, Defendants did not attempt to confirm the identity or location of the sender of the packages.

70.     For more than 24 hours, Defendants did not seek or obtain a warrant.

71.     For more than 24 hours, Defendants did not establish that the packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed, or an articulable risk that a particular suspect would escape.

72.     Instead, it appears from the Postal Service's letter to Rep. Lee's office that Defendants abandoned the political mask shipments to sit indefinitely until the issue became national news.

73.     Had the issue not become national news, the packages would have remained seized even longer.

74.     Defendants' own notes regarding the seizures and searches of René's and Movement Ink's packages, which René obtained through Freedom of Information Act requests to the Postal Service, confirm that Defendants did not have an individualized, articulable basis for seizing the political mask shipments, and did not obtain a warrant for their continued seizure.

75.     Defendants' notes make clear that Defendants seized the political mask shipments without reasonable suspicion, because there was no individualized, particularized basis to believe the packages contained contraband or evidence of a crime, which is not satisfied by the nondescript, common characteristics of the packages at issue.

76.     Defendants' notes make clear that Defendants left the packages unattended for over 24 hours without efforts to confirm or dispel whatever assumptions attended their seizures of the packages, which violates the Fourth Amendment even if the initial seizures could be justified by reasonable suspicion to conduct brief investigatory seizures.

77.     Defendants' notes make clear that Defendants knew the contents of the package were, in Defendants' words, "BLM MASKS."

78.     It is not clear whether Defendants knew that the packages contained—in Defendants' words—"BLM MASKS" before seizing the packages.

United States District Court
Northern District of California

79. If Defendants knew that the packages contained—in Defendants' words—"BLM MASKS" before seizing the packages, Defendants violated the First Amendment by seizing packages because of their political messages.

80. If Defendants learned the contents of the packages after seizing them, by searching them, Defendants violated the Fourth Amendment by searching the packages in the absence of consent, probable cause plus a warrant, or probable cause plus exigent circumstances.

81. There was and is no indication anywhere—nor could there be—that the packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed, or an articulable risk that a particular suspect would escape.

82. The contemporaneous notes of Defendant Hodges explain that Defendant Chan initially seized, detained, and searched the packages.

83. Defendant Hodges's notes suggest that in addition to Defendant Chan, other officials may have been responsible for initially seizing, detaining, and searching the packages; so they are named in this action as Doe Defendants 1 through 2.

84. Defendant Hodges's notes explain Defendant Chan's reasons for seizing, detaining, and searching the packages: they were "four big boxes" with "green handwriting," and "she remembered them being overlabeled with DHQ's address, and stated she thought they were sent from Eureka."

85. Those characteristics, individually and together, are innocuous. They do not amount to reasonable suspicion or probable cause justifying the seizure, detention, or search of the packages. And no reasonable official would think that those characteristics amount to reasonable suspicion or probable cause justifying the seizure, detention, or search of the packages.

86. Nevertheless, according to Defendant Hodges's notes: Defendant Chan (and potentially one or both of Doe Defendants 1 through 2) seized, detained, and searched the packages based on those obviously innocuous characteristics; Defendants Agster, Fajardo, and Lee (and potentially one or both of Doe Defendants 1 through 2) kept the packages seized and detained for approximately 24 hours (and apparently, according to USPS's letter to Rep. Lee, would have kept

United States District Court
Northern District of California

them seized and detained indefinitely had the seizures not made national news); and Defendant Hodges kept the packages seized and detained even longer, and went on to order that they be searched before being placed back in the mailstream for delivery.

87.     According to his notes, Defendant Hodges kept the packages seized and detained and ordered that they be searched before being placed back in the mailstream for delivery despite immediately recognizing that "it was not possible the parcels were sent from Eureka."

88.     Defendant Hodges and Defendant Fajardo (and potentially one or both of Doe Defendants 1 through 2) then completed Parcel Detail Worksheets for each package. Those worksheets list Defendants' reasons for the packages' seizures, detentions, and searches.

89.     The reasons in the worksheets appear to be post hoc justifications for the packages' seizures, detentions, and searches because the reasons in the worksheets go beyond the reasons Defendant Chan gave for the packages' seizures, detentions, and searches, described above in paragraph 84. Alternatively, those additional reasons may have been given to Defendant Hodges by one or more of the other Defendants (including potentially one or both of Doe Defendants 1 through 2) but not memorialized in his notes.

90.     In any event, even the reasons in the worksheets make clear that at no point did any Defendant have reasonable suspicion (let alone probable cause) to conduct the initial seizures of the political mask shipments, to keep them detained, or to search them.

91.     Defendants contend in the worksheets that the packages were suspicious because of (1) "bulging contents," (2) "frequently mailed parcels from the same sender/address," (3) "parcel destination is a known drug trafficking area," (4) "taped or glued on all seams," and (5) "parcel mailed from a known drug source area."

92.     Defendants' assertions are not reasonable suspicion because they do not satisfy the Fourth Amendment's demand for individualized circumstances suggesting that a particular, articulable crime is occurring in order to justify a seizure.

93.     Defendants' assertions justifying the initial seizures of the political mask shipments apply to (1) any United States business or individual (2) that regularly sends padded items (like

1   pillows, or vases wrapped in bulging padding) (3) in well-bound boxes (4) from just about any major

2   United States city to any other major United States city.

3       94.     On information and belief, Defendants have no comprehensive list of which cities

4   are or are not "known drug trafficking area[s]" or "known drug source area[s]."

5       95.     On information and belief, Defendants do not rely on any definition of "known drug

6   trafficking area" or "known drug source area."

7       96.     On information and belief, most if not all American cities are either "known drug

8   trafficking area[s]" or "known drug source area[s]."

9       97.     If Defendants' assertions were sufficient to satisfy reasonable suspicion, then (1) any

10  United States business or individual (2) that regularly sends padded items (like pillows, or vases

11  wrapped in bulging padding) (3) in well-bound boxes (4) from just about any major United States

12  city to any other major United States city is continually subjecting themselves to arbitrary seizure

13  of their property by federal postal officials.

14      98.     Indeed, one of Defendants' assertions purporting to justify the packages' seizures,

15  detentions, and searches—i.e., that the packages were "taped or glued on all seams"—purports to

16  deem it suspicious if a shipper complies with the Postal Service's *own public guidance*, which

17  advises: "If you are mailing a very heavy or very dense item, start with a sturdy box, pack the

18  contents securely with a strong material for bracing to prevent shifting, and *tape all the edges with*

19  *reinforced tape*" (emphasis added).

20      99.     The one additional purported justification for seizing, detaining, and searching the

21  political mask shipments—i.e., that they may have resembled packages recently "sent from Eureka"

22  that contained contraband—is also spurious.

23      100.    That additional assertion regarding Eureka did not rise to reasonable suspicion

24  sufficient to conduct a brief investigatory seizure.

25      101.    Defendants Chan, Agster, Fajardo, and Lee (and potentially one or both of Doe

26  Defendants 1 through 2) could have confirmed or dispelled that assertion regarding Eureka without

27  first seizing the packages.

28

United States District Court
Northern District of California

102.     After seizing the packages, Defendants could have immediately determined that the packages were from Movement Ink in Oakland, not anyone in Eureka.

103.     Indeed, Defendant Hodges recognized that immediately, as any reasonable official would. But he still delayed the packages' release, ordered them searched, and appears to have concocted post hoc justifications for their seizures, detentions, and searches.

104.     After determining that the packages were from Movement Ink in Oakland and not anyone in Eureka, Defendants could have—and should have—immediately released the packages.

105.     Even assuming that Defendants' assertion regarding Eureka gave rise to reasonable suspicion sufficient to conduct a brief investigatory seizure (which it did not), and that Defendants could not confirm or dispel that assertion without first seizing the packages (which there is no reason to think they could not), Defendants still obviously violated the Fourth Amendment because as soon as they conducted that seizure, they could and should have immediately determined that the packages were from Movement Ink in Oakland, not anyone in Eureka, and immediately released them.

106.     Defendants did not release the packages or seek a warrant for over 24 hours.

107.     Even if Defendants determined that the packages were from Movement Ink in Oakland, not anyone in Eureka, but still remained convinced they could not release the packages, they still obviously violated the Fourth Amendment because in order to continue the seizure of the packages beyond that brief investigatory period or to search the packages, they needed probable cause and a warrant.

108.     Defendants did not have probable cause.

109.     Defendants did not obtain a warrant.

110.     Instead, they searched the packages and/or left the packages unattended for more than 24 hours.

111.     Defendants would apparently have let the packages sit indefinitely had René and Movement Ink not generated a national news story about Defendants' violations of their Fourth and First Amendment rights.

First Amended Complaint and Demand for Jury Trial – Case No. 3:22-cv-3195-WHO

United States District Court
Northern District of California

112.    In addition to the harms and injuries described in paragraphs 37 through 54, Defendants' baseless seizures and searches of René's and Movement Ink's political mask shipments have directly resulted in the chilling of René's and Movement Ink's political speech in two ways: (1) René and Movement Ink are less active and vocal on social media and in the community because of the pall of suspicion and fear of surveillance that Defendants' conduct has cast over them, and (2) René and Movement Ink have lost substantial opportunities to express their political views through their work because Defendants' conduct has significantly depressed their client base and their apparel production, which have always been built on the basis of political activism and speech.

113.    On March 11, 2022, the Postal Service and the Postal Inspection Service confirmed their receipt of—and the sufficiency of—René's and Movement Ink's administrative claims for relief under the Federal Tort Claims Act. More than six months later, the agencies have not acted on those claims, which amounts to a denial of the claims pursuant to 28 U.S.C. § 2675(a).

**CLAIMS FOR RELIEF**

**Count 1**
**Trespass to Chattels**
**Against Defendant United States of America**
**Under the Federal Tort Claims Act**

114.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

115.    Under the Federal Tort Claims Act, Defendant United States of America is liable for the tortious acts, violations, and injuries alleged in this action caused by Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2 because they caused those tortious acts, violations, and injuries while acting on behalf of a federal agency in an official capacity.

116.    Plaintiffs timely and properly exhausted the Federal Tort Claims Act's administrative claims process.

117.    Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

118.    Without consent, cause, or legal authority, Defendants intentionally interfered with

United States District Court
Northern District of California

Plaintiffs' possession, right to possess, use, right to use, enjoyment, and right to enjoy their personal property by seizing, detaining, and searching Plaintiffs' personal property.

119.    Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

120.    Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' unconstitutional and tortious conduct.

**Count 2**
**Interference with Contractual Relations**
**Against Defendant United States of America**
**Under the Federal Tort Claims Act**

121.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

122.    Under the Federal Tort Claims Act, Defendant United States of America is liable for the tortious acts, violations, and injuries alleged in this action caused by Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2 because they caused those tortious acts, violations, and injuries while acting on behalf of a federal agency in an official capacity.

123.    Plaintiffs timely and properly exhausted the Federal Tort Claims Act's administrative claims process.

124.    Plaintiffs had contracts with protest organizers for the rush printing and immediate delivery of four packages containing Covid-protective masks emblazoned with political speech.

125.    Defendants knew, should have known, or had reason to know of those contracts, based on Plaintiffs' regular business activities and the packages' shipping information (including the sender and recipients) that Plaintiffs provided to Defendants.

126.    Defendants' intentional seizures, detentions, and searches of the packages, as well as Defendants' "Alert" to the recipients of the packages that the packages were "seized by law enforcement," prevented Plaintiffs' performance of the contracts or made Plaintiffs' performance of the contracts more expensive or difficult.

United States District Court
Northern District of California

127.    Defendants' intentional seizures, detentions, and searches of the packages, as well as Defendants' "Alert" to the recipients of the packages that the packages were "seized by law enforcement," were certain or substantially certain to prevent Plaintiffs' performance of the contracts or make Plaintiffs' performance of the contracts more expensive or difficult.

128.    Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

129.    Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' unconstitutional and tortious conduct.

**Count 3**
**Interference with Prospective Economic Relations**
**Against Defendant United States of America**
**Under the Federal Tort Claims Act**

130.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

131.    Under the Federal Tort Claims Act, Defendant United States of America is liable for the tortious acts, violations, and injuries alleged in this action caused by Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2 because they caused those tortious acts, violations, and injuries while acting on behalf of a federal agency in an official capacity.

132.    Plaintiffs timely and properly exhausted the Federal Tort Claims Act's administrative claims process.

133.    Plaintiffs had contracts and other economic relationships with protest organizers for the rush printing and immediate delivery of four packages containing Covid-protective masks emblazoned with political speech and for similar ongoing and regular orders in the future.

134.    Defendants knew, should have known, or had reason to know of those contracts or those future economic benefits, based on Plaintiffs' regular business activities, the packages' shipping information (including the sender and recipients) that Plaintiffs provided to Defendants, and the ongoing nature of the need for Covid-protective masks and political protests.

United States District Court
Northern District of California

135.     Defendants intentionally seized, detained, and searched the packages and issued an "Alert" to the recipients of the packages that the packages were "seized by law enforcement."

136.     Defendants' intentional seizures, detentions, and searches of the packages, as well as Defendants' "Alert" to the recipients of the packages that the packages were "seized by law enforcement," were certain or substantially certain to prevent Plaintiffs' performance of the contracts or make Plaintiffs' performance of the contracts more expensive or difficult and to disrupt similar ongoing and regular orders in the future.

137.     Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

138.     Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' unconstitutional and tortious conduct.

**Count 4**
**Unreasonable Seizures in Violation of the Fourth Amendment**
**Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2**
**Under *Bivens***

139.     Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

140.     Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

141.     Defendants seized Plaintiffs' personal property in violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

142.     Seizures of personal property without reasonable suspicion, probable cause, or a warrant are obviously unconstitutional.

143.   It is clearly established and every reasonable postal official has fair warning that warrantless seizures of personal property are presumptively unconstitutional.

144.   It is clearly established and every reasonable postal official has fair warning that postal officials must have at least reasonable suspicion to conduct brief investigatory seizures of personal property.

145.   It is clearly established and every reasonable postal official has fair warning that postal officials do not have reasonable suspicion to conduct brief investigatory seizures of personal property in the absence of individualized circumstances suggesting that a particular, articulable crime is occurring.

146.   It is clearly established and every reasonable postal official has fair warning that postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to seize personal property beyond the time needed for a brief investigatory seizure based on reasonable suspicion.

147.   It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

148.   It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.

149.   It is clearly established and every reasonable postal official has fair warning that postal officials do not face exigent circumstances in the absence of an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

150.   It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by (1) seizing personal property in the absence of reasonable suspicion based on individualized circumstances suggesting that a particular, articulable

crime is occurring or (2) seizing property beyond the time needed for a brief investigatory seizure arising from reasonable suspicion in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) plus either a warrant or an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

151.    It is clearly established and every reasonable postal official has fair warning that reasonable suspicion cannot be based on assumed facts that the postal official could dispel before conducting an investigatory seizure of personal property.

152.    It is clearly established and every reasonable postal official has fair warning that reasonable suspicion cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

153.    It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable suspicion but was dispelled while conducting an investigatory seizure of personal property.

154.    It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

155.    It is clearly established and every reasonable postal official has fair warning that probable cause to believe that drugs are present is not, in the absence of a risk of their destruction, an exigent circumstance that permits forgoing the warrant requirement.

156.    Defendants seized Plaintiffs' personal property without reasonable suspicion. The characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were allegedly bulging, were taped all around, were going from one purported drug activity city to another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent packages that businesses small and large—including Plaintiffs themselves—ship throughout the country every single day. Every reasonable postal official should know that those characteristics do

not give rise to reasonable suspicion because those characteristics are not individualized circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

157.    Even with the additional allegation that Plaintiffs' packages resembled some from Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an investigatory seizure because (1) that additional factual assumption did not give rise to reasonable suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

158.    Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

159.    But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

160.    Therefore, at every step, Defendants violated Plaintiffs' clearly established right to be free from unreasonable seizures of their personal property.

161.    Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

162.    Plaintiffs have no alternative remedies for their injuries caused by Defendants, and

United States District Court
Northern District of California

Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

163.    Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

164.    Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' seizures of their personal property.

**Count 5**
**Unreasonable Seizures in Violation of the Fourth Amendment**
**Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2**
**Under the Westfall Act (28 U.S.C. § 2679(b)(2)(A))**

165.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

166.    Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

167.    Defendants seized Plaintiffs' personal property in violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

168.    Seizures of personal property without reasonable suspicion, probable cause, or a warrant are obviously unconstitutional.

169.    It is clearly established and every reasonable postal official has fair warning that warrantless seizures of personal property are presumptively unconstitutional.

170.    It is clearly established and every reasonable postal official has fair warning that postal officials must have at least reasonable suspicion to conduct brief investigatory seizures of personal property.

United States District Court
Northern District of California

171.   It is clearly established and every reasonable postal official has fair warning that postal officials do not have reasonable suspicion to conduct brief investigatory seizures of personal property in the absence of individualized circumstances suggesting that a particular, articulable crime is occurring.

172.   It is clearly established and every reasonable postal official has fair warning that postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to seize personal property beyond the time needed for a brief investigatory seizure based on reasonable suspicion.

173.   It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

174.   It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.

175.   It is clearly established and every reasonable postal official has fair warning that postal officials do not face exigent circumstances in the absence of an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

176.   It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by (1) seizing personal property in the absence of reasonable suspicion based on individualized circumstances suggesting that a particular, articulable crime is occurring or (2) seizing property beyond the time needed for a brief investigatory seizure arising from reasonable suspicion in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) plus either a warrant or an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a

United States District Court
Northern District of California

1   particular suspect will escape.

2   177.   It is clearly established and every reasonable postal official has fair warning that
3   reasonable suspicion cannot be based on assumed facts that the postal official could dispel before
4   conducting an investigatory seizure of personal property.

5   178.   It is clearly established and every reasonable postal official has fair warning that
6   reasonable suspicion cannot be based on characteristics that, individually and as a whole, apply to
7   personal property that has no connection to criminal activity.

8   179.   It is clearly established and every reasonable postal official has fair warning that
9   probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable
10   suspicion but was dispelled while conducting an investigatory seizure of personal property.

11   180.   It is clearly established and every reasonable postal official has fair warning that
12   probable cause cannot be based on characteristics that, individually and as a whole, apply to personal
13   property that has no connection to criminal activity.

14   181.   It is clearly established and every reasonable postal official has fair warning that
15   probable cause to believe that drugs are present is not, in the absence of a risk of their destruction,
16   an exigent circumstance that permits forgoing the warrant requirement.

17   182.   Defendants seized Plaintiffs' personal property without reasonable suspicion. The
18   characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were
19   allegedly bulging, were taped all around, were going from one purported drug activity city to
20   another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent
21   packages that businesses small and large—including Plaintiffs themselves—ship throughout the
22   country every single day. Every reasonable postal official should know that those characteristics do
23   not give rise to reasonable suspicion because those characteristics are not individualized
24   circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

25   183.   Even with the additional allegation that Plaintiffs' packages resembled some from
26   Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an
27   investigatory seizure because (1) that additional factual assumption did not give rise to reasonable

suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

184.    Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

185.    But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

186.    Therefore, at every step, Defendants violated Plaintiffs' clearly established right to be free from unreasonable seizures of their personal property.

187.    Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

188.    Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

189.    Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional

United States District Court
Northern District of California

1    and mental distress to René.

2    190.    Plaintiffs are entitled to compensatory damages for their injuries caused by

3    Defendants' seizures of their personal property.

4                                              **Count 6**
     **Unreasonable Seizures in Violation of the Fourth Amendment**
5    **Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2**
                                   **Under the Fourth Amendment**
6
7    191.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

8    192.    Plaintiffs shipped four packages of their personal property via the United States

9    Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests

10   in their packages until the packages were delivered to their intended recipients.

11   193.    Defendants seized Plaintiffs' personal property in violation of the Fourth

12   Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which

13   time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified

14   and unreasonable seizures of Plaintiffs' packages caused the packages' intended recipients to sever

15   all ongoing and future contractual and business relationships with Plaintiffs.

16   194.    Seizures of personal property without reasonable suspicion, probable cause, or a

17   warrant are obviously unconstitutional.

18   195.    It is clearly established and every reasonable postal official has fair warning that

19   warrantless seizures of personal property are presumptively unconstitutional.

20   196.    It is clearly established and every reasonable postal official has fair warning that

21   postal officials must have at least reasonable suspicion to conduct brief investigatory seizures of

22   personal property.

23   197.    It is clearly established and every reasonable postal official has fair warning that

24   postal officials do not have reasonable suspicion to conduct brief investigatory seizures of personal

25   property in the absence of individualized circumstances suggesting that a particular, articulable

26   crime is occurring.

27   198.    It is clearly established and every reasonable postal official has fair warning that

28

postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to seize personal property beyond the time needed for a brief investigatory seizure based on reasonable suspicion.

199.   It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

200.   It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.

201.   It is clearly established and every reasonable postal official has fair warning that postal officials do not face exigent circumstances in the absence of an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

202.   It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by (1) seizing personal property in the absence of reasonable suspicion based on individualized circumstances suggesting that a particular, articulable crime is occurring or (2) seizing property beyond the time needed for a brief investigatory seizure arising from reasonable suspicion in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) plus either a warrant or an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

203.   It is clearly established and every reasonable postal official has fair warning that reasonable suspicion cannot be based on assumed facts that the postal official could dispel before conducting an investigatory seizure of personal property.

204.   It is clearly established and every reasonable postal official has fair warning that

United States District Court
Northern District of California

1    reasonable suspicion cannot be based on characteristics that, individually and as a whole, apply to
2    personal property that has no connection to criminal activity.

3       205.    It is clearly established and every reasonable postal official has fair warning that
4    probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable
5    suspicion but was dispelled while conducting an investigatory seizure of personal property.

6       206.    It is clearly established and every reasonable postal official has fair warning that
7    probable cause cannot be based on characteristics that, individually and as a whole, apply to personal
8    property that has no connection to criminal activity.

9       207.    It is clearly established and every reasonable postal official has fair warning that
10   probable cause to believe that drugs are present is not, in the absence of a risk of their destruction,
11   an exigent circumstance that permits forgoing the warrant requirement.

12      208.    Defendants seized Plaintiffs' personal property without reasonable suspicion. The
13   characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were
14   allegedly bulging, were taped all around, were going from one purported drug activity city to
15   another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent
16   packages that businesses small and large—including Plaintiffs themselves—ship throughout the
17   country every single day. Every reasonable postal official should know that those characteristics do
18   not give rise to reasonable suspicion because those characteristics are not individualized
19   circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

20      209.    Even with the additional allegation that Plaintiffs' packages resembled some from
21   Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an
22   investigatory seizure because (1) that additional factual assumption did not give rise to reasonable
23   suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption
24   without seizing Plaintiffs' packages simply by confirming that the packages came from Movement
25   Ink LLC in Oakland (not any suspicious sender from Eureka).

26      210.    Even if the totality of circumstances did arise to reasonable suspicion (which it did
27   not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief

28   First Amended Complaint and Demand for Jury Trial – Case No. 3:22-cv-3195-WHO

United States District Court
Northern District of California

investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

211.   But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

212.   Therefore, at every step, Defendants violated Plaintiffs' clearly established right to be free from unreasonable seizures of their personal property.

213.   Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

214.   Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

215.   Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

216.   Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' seizures of their personal property.

United States District Court
Northern District of California

**Count 7**
**Unreasonable Searches in Violation of the Fourth Amendment**
**Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2**
**Under *Bivens***

217.   Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

218.   Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

219.   Defendants seized and searched Plaintiffs' personal property in violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures and searches of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

220.   Searches of personal property without reasonable suspicion, probable cause, or a warrant are obviously unconstitutional.

221.   It is clearly established and every reasonable postal official has fair warning that warrantless searches of personal property are presumptively unconstitutional.

222.   It is clearly established and every reasonable postal official has fair warning that postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to search personal property.

223.   It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

224.   It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.

225.   It is clearly established and every reasonable postal official has fair warning that

United States District Court
Northern District of California

postal officials do not face exigent circumstances in the absence of an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

226.   It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by searching personal property in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) and either a warrant or an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

227.   It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable suspicion but was dispelled while conducting an investigatory seizure of personal property.

228.   It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

229.   It is clearly established and every reasonable postal official has fair warning that probable cause to believe that drugs are present is not, in the absence of a risk of their destruction, an exigent circumstance that permits forgoing the warrant requirement.

230.   Defendants seized Plaintiffs' personal property without reasonable suspicion. The characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were allegedly bulging, were taped all around, were going from one purported drug activity city to another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent packages that businesses small and large—including Plaintiffs themselves—ship throughout the country every single day. Every reasonable postal official should know that those characteristics do not give rise to reasonable suspicion because those characteristics are not individualized circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

231.   Even with the additional allegation that Plaintiffs' packages resembled some from

Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an investigatory seizure because (1) that additional factual assumption did not give rise to reasonable suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

232.     Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

233.     But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

234.     Therefore, Defendants violated Plaintiffs' clearly established right to be free from unreasonable searches of their personal property.

235.     Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

236.     Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

237.     Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs'

United States District Court
Northern District of California

packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

238.    Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' searches of their personal property.

### Count 8
### Unreasonable Searches in Violation of the Fourth Amendment
### Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2
### Under the Westfall Act (28 U.S.C. § 2679(b)(2)(A))

239.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

240.    Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

241.    Defendants seized and searched Plaintiffs' personal property in violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures and searches of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

242.    Searches of personal property without reasonable suspicion, probable cause, or a warrant are obviously unconstitutional.

243.    It is clearly established and every reasonable postal official has fair warning that warrantless searches of personal property are presumptively unconstitutional.

244.    It is clearly established and every reasonable postal official has fair warning that postal officials must have probable cause that a particular, articulable crime is occurring and either a warrant or exigent circumstances to search personal property.

245.    It is clearly established and every reasonable postal official has fair warning that postal officials do not have probable cause in the absence of individualized circumstances

United States District Court
Northern District of California

United States District Court
Northern District of California

suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring.

246. It is clearly established and every reasonable postal official has fair warning that to forgo the warrant requirement, postal officials must have probable cause and face exigent circumstances.

247. It is clearly established and every reasonable postal official has fair warning that postal officials do not face exigent circumstances in the absence of an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

248. It is clearly established and every reasonable postal official has fair warning that postal officials violate the Fourth Amendment by searching personal property in the absence of probable cause (individualized circumstances suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable crime is occurring) and either a warrant or an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will be destroyed, or an articulable risk that a particular suspect will escape.

249. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable suspicion but was dispelled while conducting an investigatory seizure of personal property.

250. It is clearly established and every reasonable postal official has fair warning that probable cause cannot be based on characteristics that, individually and as a whole, apply to personal property that has no connection to criminal activity.

251. It is clearly established and every reasonable postal official has fair warning that probable cause to believe that drugs are present is not, in the absence of a risk of their destruction, an exigent circumstance that permits forgoing the warrant requirement.

252. Defendants seized Plaintiffs' personal property without reasonable suspicion. The characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were allegedly bulging, were taped all around, were going from one purported drug activity city to

United States District Court
Northern District of California

another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent packages that businesses small and large—including Plaintiffs themselves—ship throughout the country every single day. Every reasonable postal official should know that those characteristics do not give rise to reasonable suspicion because those characteristics are not individualized circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

253.    Even with the additional allegation that Plaintiffs' packages resembled some from Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an investigatory seizure because (1) that additional factual assumption did not give rise to reasonable suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

254.    Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

255.    But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an articulable risk of immediate physical harm, an articulable risk that particular relevant evidence would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a particular suspect would escape. Nevertheless, Defendants continued to seize and even search Plaintiffs' packages.

256.    Therefore, Defendants violated Plaintiffs' clearly established right to be free from unreasonable searches of their personal property.

257.   Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

258.   Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

259.   Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

260.   Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' searches of their personal property.

**Count 9**
**Unreasonable Searches in Violation of the Fourth Amendment**
**Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2**
**Under the Fourth Amendment**

261.   Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

262.   Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

263.   Defendants seized and searched Plaintiffs' personal property in violation of the Fourth Amendment, delaying the packages' arrival to their intended recipients by 48 hours, during which time the recipients were in dire need of the packages. Defendants' clearly and obviously unjustified and unreasonable seizures and searches of Plaintiffs' packages caused the packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs.

264.   Searches of personal property without reasonable suspicion, probable cause, or a warrant are obviously unconstitutional.

265.   It is clearly established and every reasonable postal official has fair warning that

United States District Court
Northern District of California

1    warrantless searches of personal property are presumptively unconstitutional.

2        266.   It is clearly established and every reasonable postal official has fair warning that

3    postal officials must have probable cause that a particular, articulable crime is occurring and either

4    a warrant or exigent circumstances to search personal property.

5        267.   It is clearly established and every reasonable postal official has fair warning that

6    postal officials do not have probable cause in the absence of individualized circumstances

7    suggesting, to a higher degree of certainty than reasonable suspicion, that a particular, articulable

8    crime is occurring.

9        268.   It is clearly established and every reasonable postal official has fair warning that to

10   forgo the warrant requirement, postal officials must have probable cause and face exigent

11   circumstances.

12       269.   It is clearly established and every reasonable postal official has fair warning that

13   postal officials do not face exigent circumstances in the absence of an articulable risk of immediate

14   physical harm, an articulable risk that particular relevant evidence will be destroyed, or an

15   articulable risk that a particular suspect will escape.

16       270.   It is clearly established and every reasonable postal official has fair warning that

17   postal officials violate the Fourth Amendment by searching personal property in the absence of

18   probable cause (individualized circumstances suggesting, to a higher degree of certainty than

19   reasonable suspicion, that a particular, articulable crime is occurring) and either a warrant or an

20   articulable risk of immediate physical harm, an articulable risk that particular relevant evidence will

21   be destroyed, or an articulable risk that a particular suspect will escape.

22       271.   It is clearly established and every reasonable postal official has fair warning that

23   probable cause cannot be based on an assumed fact that purportedly formed the basis for reasonable

24   suspicion but was dispelled while conducting an investigatory seizure of personal property.

25       272.   It is clearly established and every reasonable postal official has fair warning that

26   probable cause cannot be based on characteristics that, individually and as a whole, apply to personal

27   property that has no connection to criminal activity.

28

United States District Court
Northern District of California

273.    It is clearly established and every reasonable postal official has fair warning that probable cause to believe that drugs are present is not, in the absence of a risk of their destruction, an exigent circumstance that permits forgoing the warrant requirement.

274.    Defendants seized Plaintiffs' personal property without reasonable suspicion. The characteristics they purportedly relied on to seize Plaintiffs' packages (i.e., that the packages were allegedly bulging, were taped all around, were going from one purported drug activity city to another, and were sent by a frequent shipper) apply, individually and as a whole, to entirely innocent packages that businesses small and large—including Plaintiffs themselves—ship throughout the country every single day. Every reasonable postal official should know that those characteristics do not give rise to reasonable suspicion because those characteristics are not individualized circumstances suggesting that a particular, articulable crime (or any crime) is occurring.

275.    Even with the additional allegation that Plaintiffs' packages resembled some from Eureka that had contained drugs, Defendants did not have reasonable suspicion to conduct an investigatory seizure because (1) that additional factual assumption did not give rise to reasonable suspicion and (2) even if it did, Defendants could have easily dispelled that factual assumption without seizing Plaintiffs' packages simply by confirming that the packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka).

276.    Even if the totality of circumstances did arise to reasonable suspicion (which it did not) and Defendants could not dispel that suspicion before seizing Plaintiffs' packages for a brief investigatory seizure, that suspicion was (or should have been) dispelled immediately by Defendants' confirming that Plaintiffs' packages came from Movement Ink LLC in Oakland (not any suspicious sender from Eureka). Therefore, Defendants should have released Plaintiffs' packages immediately upon that realization, or sought a warrant in order to continue their seizure of the packages or to search the packages.

277.    But Defendants did not release Plaintiffs' packages immediately upon that realization. And they did not get a warrant (nor could they have, because these circumstances did not amount to probable cause) or have any reason to believe that Plaintiffs' packages posed an

United States District Court
Northern District of California

1       articulable risk of immediate physical harm, an articulable risk that particular relevant evidence

2       would be destroyed (after all, it was in Defendants' possession), or an articulable risk that a

3       particular suspect would escape. Nevertheless, Defendants continued to seize and even search

4       Plaintiffs' packages.

5              278.    Therefore, Defendants violated Plaintiffs' clearly established right to be free from

6       unreasonable searches of their personal property.

7              279.    Defendants are line-level postal officials operating in the common and recurrent

8       sphere of garden-variety postal inspections and law enforcement with respect to personal property.

9              280.    Plaintiffs have no alternative remedies for their injuries caused by Defendants, and

10      Plaintiffs' claims do not implicate separation of powers, national security considerations, or any

11      other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

12             281.    Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs'

13      packages' intended recipients to sever all ongoing and future contractual and business relationships

14      with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional

15      and mental distress to René.

16             282.    Plaintiffs are entitled to compensatory damages for their injuries caused by

17      Defendants' searches of their personal property.

**Count 10**
**Retaliation in Violation of the First Amendment**
**Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2**
**Under *Bivens***

18

19

20             283.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

21             284.    Plaintiffs shipped four packages of their personal property via the United States

22      Postal Service. Those packages consisted of Covid-protective masks bearing core political speech,

23      including phrases such as "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE."

24             285.    Retaliation for protected speech is an obvious violation of the First Amendment.

25             286.    It is clearly established and every reasonable postal official has fair warning that

26      seizing, searching, detaining, or delaying personal property or interfering with contractual or

27

United States District Court
Northern District of California

business relationships or operations because of the property's or its owner's speech, message, content, viewpoint, association, or affiliation is a violation of the First Amendment.

287.   It is clearly established and every reasonable postal official has fair warning that protected speech, adverse government action that might chill an ordinary person from continuing to engage in that speech, and a causal relationship between the two constitute retaliation in violation of the First Amendment, and that a government actor's knowledge of the speech and the temporal proximity of the speech and the adverse government action raise an inference of retaliation.

288.   Plaintiffs' packages were going to community activists and organizers in four major cities where large racial justice demonstrations were happening every day.

289.   René is a known community activist and organizer with a community and social media presence promoting racial and social justice messages.

290.   Movement Ink is a screen printing business; its commercial activity is expressive in nature. And it is known for its community and social media presence promoting racial and social justice messages.

291.   Plaintiffs' business is more than just a business; it is also an outlet for expressing and helping others express core political speech and activism. Plaintiffs have always publicly cultivated and publicly promoted that expressive and activist identity as core to their business model.

292.   Plaintiffs are well-known to the postal officials at their local post office, from which Plaintiffs have regularly shipped Movement Ink packages for years.

293.   When national protests erupted in May 2020 following the police killings of George Floyd and Breonna Taylor, Plaintiffs began receiving a much higher volume of orders than usual. Activists and organizers around the country came to Plaintiffs seeking thousands of Covid-protective masks for protests that were happening all over the country every day.

294.   Those protests were controversial. In particular, governmental attitudes and responses to the protestors' messages—including "Black Lives Matter" and "Defund the Police"—were highly critical and often violent.

295.   So while Plaintiffs have for years worked with and been connected to social and

racial justice movements, this was the first time they were connected to such high profile, highly publicized, and highly visible protests, organizers, and apparel, and the first time they were shipping such rapid quantities of apparel in such rapid time.

296.    Covid-protective masks, which all four of Plaintiffs' seized and searched packages contained, were also controversial and subject to governmental and societal disdain.

297.    Plaintiffs' packages were clearly identified as having been shipped from Movement Ink in Oakland to major cities across the country.

298.    Defendants' own internal notes clearly state Defendants' knowledge that Plaintiffs' packages contained, in Defendants' words, "BLM MASKS."

299.    Within days of Plaintiffs' apparent association with and support for the protests in the form of politically emblazoned Covid-protective masks, Defendants seized, searched, detained, and delayed the shipment of Plaintiffs' packages, interfering with Plaintiffs' contractual and business relationships and operations, as well as Plaintiffs' political speech.

300.    Plaintiffs' public association with and support for the protests, their marking of their politically emblazoned Covid-protective masks with Movement Ink identifiers, Defendants' own "BLM MASKS" notation in their internal notes, and the immediacy of Defendants' adverse action against Plaintiffs raise an inference of retaliation.

301.    Therefore, Defendants violated Plaintiffs' clearly established right to be free from retaliation for protected political speech.

302.    Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

303.    Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

304.    Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional

United States District Court
Northern District of California

1    and mental distress to René.

2    305.    Plaintiffs are entitled to compensatory damages for their injuries caused by

3    Defendants' retaliatory conduct.

4                                    **Count 11**
                        **Retaliation in Violation of the First Amendment**
5    **Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2**
                        **Under the Westfall Act (28 U.S.C. § 2679(b)(2)(A))**
6

7    306.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

8    307.    Plaintiffs shipped four packages of their personal property via the United States

     Postal Service. Those packages consisted of Covid-protective masks bearing core political speech,
9
     including phrases such as "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE."
10

11   308.    Retaliation for protected speech is an obvious violation of the First Amendment.

12   309.    It is clearly established and every reasonable postal official has fair warning that

13   seizing, searching, detaining, or delaying personal property or interfering with contractual or

14   business relationships or operations because of the property's or its owner's speech, message,

15   content, viewpoint, association, or affiliation is a violation of the First Amendment.

16   310.    It is clearly established and every reasonable postal official has fair warning that

17   protected speech, adverse government action that might chill an ordinary person from continuing to

18   engage in that speech, and a causal relationship between the two constitute retaliation in violation

     of the First Amendment, and that a government actor's knowledge of the speech and the temporal
19
     proximity of the speech and the adverse government action raise an inference of retaliation.
20

21   311.    Plaintiffs' packages were going to community activists and organizers in four major

     cities where large racial justice demonstrations were happening every day.
22

23   312.    René is a known community activist and organizer with a community and social

     media presence promoting racial and social justice messages.
24

25   313.    Movement Ink is a screen printing business; its commercial activity is expressive in

26   nature. And it is known for its community and social media presence promoting racial and social

27   justice messages.

28

United States District Court
Northern District of California

314.   Plaintiffs' business is more than just a business; it is also an outlet for expressing and helping others express core political speech and activism. Plaintiffs have always publicly cultivated and publicly promoted that expressive and activist identity as core to their business model.

315.   Plaintiffs are well-known to the postal officials at their local post office, from which Plaintiffs have regularly shipped Movement Ink packages for years.

316.   When national protests erupted in May 2020 following the police killings of George Floyd and Breonna Taylor, Plaintiffs began receiving a much higher volume of orders than usual. Activists and organizers around the country came to Plaintiffs seeking thousands of Covid-protective masks for protests that were happening all over the country every day.

317.   Those protests were controversial. In particular, governmental attitudes and responses to the protestors' messages—including "Black Lives Matter" and "Defund the Police"—were highly critical and often violent.

318.   So while Plaintiffs have for years worked with and been connected to social and racial justice movements, this was the first time they were connected to such high profile, highly publicized, and highly visible protests, organizers, and apparel, and the first time they were shipping such rapid quantities of apparel in such rapid time.

319.   Covid-protective masks, which all four of Plaintiffs' seized and searched packages contained, were also controversial and subject to governmental and societal disdain.

320.   Plaintiffs' packages were clearly identified as having been shipped from Movement Ink in Oakland to major cities across the country.

321.   Defendants' own internal notes clearly state Defendants' knowledge that Plaintiffs' packages contained, in Defendants' words, "BLM MASKS."

322.   Within days of Plaintiffs' apparent association with and support for the protests in the form of politically emblazoned Covid-protective masks, Defendants seized, searched, detained, and delayed the shipment of Plaintiffs' packages, interfering with Plaintiffs' contractual and business relationships and operations, as well as Plaintiffs' political speech.

323.   Plaintiffs' public association with and support for the protests, their marking of their

United States District Court
Northern District of California

1   politically emblazoned Covid-protective masks with Movement Ink identifiers, Defendants' own

2   "BLM MASKS" notation in their internal notes, and the immediacy of Defendants' adverse action

3   against Plaintiffs raise an inference of retaliation.

4        324.    Therefore, Defendants violated Plaintiffs' clearly established right to be free from

5   retaliation for protected political speech.

6        325.    Defendants are line-level postal officials operating in the common and recurrent

7   sphere of garden-variety postal inspections and law enforcement with respect to personal property.

8        326.    Plaintiffs have no alternative remedies for their injuries caused by Defendants, and

9   Plaintiffs' claims do not implicate separation of powers, national security considerations, or any

10  other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

11       327.    Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs'

12  packages' intended recipients to sever all ongoing and future contractual and business relationships

13  with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional

14  and mental distress to René.

15       328.    Plaintiffs are entitled to compensatory damages for their injuries caused by

16  Defendants' retaliatory conduct.

17                              **Count 12**
                **Retaliation in Violation of the First Amendment**
18  **Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2**
                        **Under the First Amendment**
19
20       329.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

21       330.    Plaintiffs shipped four packages of their personal property via the United States

22  Postal Service. Those packages consisted of Covid-protective masks bearing core political speech,

23  including phrases such as "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE."

24       331.    Retaliation for protected speech is an obvious violation of the First Amendment.

25       332.    It is clearly established and every reasonable postal official has fair warning that

26  seizing, searching, detaining, or delaying personal property or interfering with contractual or

27  business relationships or operations because of the property's or its owner's speech, message,

United States District Court
Northern District of California

content, viewpoint, association, or affiliation is a violation of the First Amendment.

333.    It is clearly established and every reasonable postal official has fair warning that protected speech, adverse government action that might chill an ordinary person from continuing to engage in that speech, and a causal relationship between the two constitute retaliation in violation of the First Amendment, and that a government actor's knowledge of the speech and the temporal proximity of the speech and the adverse government action raise an inference of retaliation.

334.    Plaintiffs' packages were going to community activists and organizers in four major cities where large racial justice demonstrations were happening every day.

335.    René is a known community activist and organizer with a community and social media presence promoting racial and social justice messages.

336.    Movement Ink is a screen printing business; its commercial activity is expressive in nature. And it is known for its community and social media presence promoting racial and social justice messages.

337.    Plaintiffs' business is more than just a business; it is also an outlet for expressing and helping others express core political speech and activism. Plaintiffs have always publicly cultivated and publicly promoted that expressive and activist identity as core to their business model.

338.    Plaintiffs are well-known to the postal officials at their local post office, from which Plaintiffs have regularly shipped Movement Ink packages for years.

339.    When national protests erupted in May 2020 following the police killings of George Floyd and Breonna Taylor, Plaintiffs began receiving a much higher volume of orders than usual. Activists and organizers around the country came to Plaintiffs seeking thousands of Covid-protective masks for protests that were happening all over the country every day.

340.    Those protests were controversial. In particular, governmental attitudes and responses to the protestors' messages—including "Black Lives Matter" and "Defund the Police"—were highly critical and often violent.

341.    So while Plaintiffs have for years worked with and been connected to social and racial justice movements, this was the first time they were connected to such high profile, highly

United States District Court
Northern District of California

publicized, and highly visible protests, organizers, and apparel, and the first time they were shipping such rapid quantities of apparel in such rapid time.

342.    Covid-protective masks, which all four of Plaintiffs' seized and searched packages contained, were also controversial and subject to governmental and societal disdain.

343.    Plaintiffs' packages were clearly identified as having been shipped from Movement Ink in Oakland to major cities across the country.

344.    Defendants' own internal notes clearly state Defendants' knowledge that Plaintiffs' packages contained, in Defendants' words, "BLM MASKS."

345.    Within days of Plaintiffs' apparent association with and support for the protests in the form of politically emblazoned Covid-protective masks, Defendants seized, searched, detained, and delayed the shipment of Plaintiffs' packages, interfering with Plaintiffs' contractual and business relationships and operations, as well as Plaintiffs' political speech.

346.    Plaintiffs' public association with and support for the protests, their marking of their politically emblazoned Covid-protective masks with Movement Ink identifiers, Defendants' own "BLM MASKS" notation in their internal notes, and the immediacy of Defendants' adverse action against Plaintiffs raise an inference of retaliation.

347.    Therefore, Defendants violated Plaintiffs' clearly established right to be free from retaliation for protected political speech.

348.    Defendants are line-level postal officials operating in the common and recurrent sphere of garden-variety postal inspections and law enforcement with respect to personal property.

349.    Plaintiffs have no alternative remedies for their injuries caused by Defendants, and Plaintiffs' claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for Plaintiffs' injuries.

350.    Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

United States District Court
Northern District of California

351.   Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' retaliatory conduct.

### Count 13
### Trespass to Chattels
### Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2
### Under California Law

352.   Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

353.   Plaintiffs shipped four packages of their personal property via the United States Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests in their packages until the packages were delivered to their intended recipients.

354.   Without consent, cause, or legal authority, Defendants intentionally interfered with Plaintiffs' possession, right to possess, use, right to use, enjoyment, and right to enjoy their personal property by seizing, detaining, and searching Plaintiffs' personal property.

355.   Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

356.   Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' unconstitutional and tortious conduct.

357.   Plaintiffs recognize that this claim may currently be barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.

### Count 14
### Interference with Contractual Relations
### Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2
### Under California Law

358.   Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.

359.   Plaintiffs had contracts with protest organizers for the rush printing and immediate delivery of four packages containing Covid-protective masks emblazoned with political speech.

360.   Defendants knew, should have known, or had reason to know of those contracts, based on Plaintiffs' regular business activities and the packages' shipping information (including

United States District Court
Northern District of California

1  the sender and recipients) that Plaintiffs provided to Defendants.

2       361.   Defendants' intentional seizures, detentions, and searches of the packages, as well as

3  Defendants' "Alert" to the recipients of the packages that the packages were "seized by law

4  enforcement," prevented Plaintiffs' performance of the contracts or made Plaintiffs' performance of

5  the contracts more expensive or difficult.

6       362.   Defendants' intentional seizures, detentions, and searches of the packages, as well as

7  Defendants' "Alert" to the recipients of the packages that the packages were "seized by law

8  enforcement," were certain or substantially certain to prevent Plaintiffs' performance of the

9  contracts or make Plaintiffs' performance of the contracts more expensive or difficult.

10      363.   Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs'

11  packages' intended recipients to sever all ongoing and future contractual and business relationships

12  with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional

13  and mental distress to René.

14      364.   Plaintiffs are entitled to compensatory damages for their injuries caused by

15  Defendants' unconstitutional and tortious conduct.

16      365.   Plaintiffs recognize that this claim may currently be barred by the Westfall Act (28

17  U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.

18                                 **Count 15**
                     **Interference with Prospective Economic Relations**
19      **Against Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2**
                                **Under California Law**
20
        366.   Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 113.
21
        367.   Plaintiffs had contracts and other economic relationships with protest organizers for
22
   the rush printing and immediate delivery of four packages containing Covid-protective masks
23
   emblazoned with political speech and for similar ongoing and regular orders in the future.
24
        368.   Defendants knew, should have known, or had reason to know of those contracts or
25
   those future economic benefits, based on Plaintiffs' regular business activities, the packages'
26
   shipping information (including the sender and recipients) that Plaintiffs provided to Defendants,
27

28

United States District Court
Northern District of California

and the ongoing nature of the need for Covid-protective masks and political protests.

369.    Defendants intentionally seized, detained, and searched the packages and issued an "Alert" to the recipients of the packages that the packages were "seized by law enforcement."

370.    Defendants' intentional seizures, detentions, and searches of the packages, as well as Defendants' "Alert" to the recipients of the packages that the packages were "seized by law enforcement," were certain or substantially certain to prevent Plaintiffs' performance of the contracts or make Plaintiffs' performance of the contracts more expensive or difficult and to disrupt similar ongoing and regular orders in the future.

371.    Defendants' conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to René.

372.    Plaintiffs are entitled to compensatory damages for their injuries caused by Defendants' unconstitutional and tortious conduct.

373.    Plaintiffs recognize that this claim may currently be barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

374.    Declare that Defendant United States of America is liable in damages under the Federal Tort Claims Act for trespasses to Plaintiffs' chattels.

375.    Declare that Defendant United States of America is liable in damages under the Federal Tort Claims Act for interference with Plaintiffs' contractual relations.

376.    Declare that Defendant United States of America is liable in damages under the Federal Tort Claims Act for interference with Plaintiffs' prospective economic relations.

377.    Declare that Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2 are liable in damages under the Constitution, *Bivens*, and the Westfall Act (28 U.S.C. § 2679(b)(2)(A)) for violating Plaintiffs' Fourth Amendment right to be free from unreasonable

United States District Court
Northern District of California

seizures of personal property.

378. Declare that Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2 are liable in damages under the Constitution, *Bivens*, and the Westfall Act (28 U.S.C. § 2679(b)(2)(A)) for violating Plaintiffs' Fourth Amendment right to be free from unreasonable searches of personal property.

379. Declare that Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2 are liable in damages under the Constitution, *Bivens*, and the Westfall Act (28 U.S.C. § 2679(b)(2)(A)) for violating Plaintiffs' First Amendment right to be free from retaliation for political speech.

380. Declare that Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2 are liable in damages under California law for trespasses to Plaintiffs' chattels in violation of Plaintiffs' constitutional rights. (Plaintiffs recognize that this relief may currently be barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.)

381. Declare that Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2 are liable in damages under California law for interference with Plaintiffs' contractual relations in violation of Plaintiffs' constitutional rights. (Plaintiffs recognize that this relief may currently be barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.)

382. Declare that Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2 are liable in damages under California law for interference with Plaintiffs' prospective economic relations in violation of Plaintiffs' constitutional rights. (Plaintiffs recognize that this relief may currently be barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue.)

383. Declare that if there is no remedy available for Plaintiffs' injuries under the Constitution, *Bivens*, the Federal Tort Claims Act, or the Westfall Act, then the Federal Tort Claims Act and the Westfall Act are unconstitutional as applied, and that Defendants Agster, Chan, Fajardo, Hodges, Lee, and Doe Defendants 1 through 2 are liable in damages under California law for their unconstitutional and tortious conduct in violation of Plaintiffs' constitutional rights (trespasses to

United States District Court
Northern District of California

1   Plaintiffs' chattels, interference with Plaintiffs' contractual relations, and interference with

2   Plaintiffs' prospective economic relations).

3         384.    Award Plaintiffs' compensatory damages for Defendants' unconstitutional and

4   tortious conduct, in amounts to be proven at trial.

5         385.    Award Plaintiffs' attorneys' fees, costs, and expenses under 28 U.S.C. § 2412 and

6   any other applicable provisions of law or equity.

7         386.    Award any further legal or equitable relief the Court deems just and proper.

8                     **DEMAND FOR JURY TRIAL**

9        Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6, Plaintiffs demand

10   a jury trial on all issues so triable.

11        Dated: September 21, 2022

s/ Jaba Tsitsuashvili
Jaba Tsitsuashvili (CA Bar No. 309012)
Patrick Jaicomo* (MI Bar No. P-75705)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
jtsitsuashvili@ij.org
pjaicomo@ij.org

*Admitted pro hac vice

Anna M. Barvir (CA Bar No. 268728)
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Phone: (562) 216-4444
Fax: (562) 216-4445
abarvir@michellawyers.com

*Counsel for Plaintiffs*