Jaba Tsitsuashvili (CA Bar No. 309012)
Patrick Jaicomo* (MI Bar No. P-75705)
Trace Mitchell* (DC Bar No. 1780794)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
jtsitsuashvili@ij.org

*Admitted pro hac vice

Anna M. Barvir (CA Bar No. 268728)
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Phone: (562) 216-4444
Fax: (562) 216-4445
abarvir@michellawyers.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

United States District Court
Northern District of California

| | |
|---|---|
| RENÉ QUIÑONEZ and MOVEMENT INK LLC, | 3:22-cv-3195-WHO |
| Plaintiffs, | **PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS (ECF 51, 52)** |
| v. | Hon. William H. Orrick |
| UNITED STATES OF AMERICA; and JEFF AGSTER, EVA CHAN, STEPHEN FAJARDO, MARK HODGES, ROBIN LEE, and DOES 1 through 2, United States Postal Service and United States Postal Inspection Service officials in their individual capacities, | March 8, 2023 2:00 p.m. |
| Defendants. | |

1

United States District Court
Northern District of California

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

ISSUES TO BE DECIDED ................................................................................................ 1

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

STANDARD OF REVIEW ................................................................................................. 6

ARGUMENT ...................................................................................................................... 6

I.     Plaintiffs plausibly plead cognizable tort claims under the FTCA against the Government ........................................................................................................... 7

     A.   The complaint plausibly pleads tort claims ........................................................ 7

     B.   The complaint's tort claims are partially cognizable under the FTCA .............. 10

II.    Plaintiffs plausibly plead cognizable constitutional claims under *Bivens* against the Federal Officials ........................................................................... 13

     A.   The complaint's Fourth Amendment claims are cognizable under *Bivens* ........ 13

     B.   The complaint plausibly pleads clearly established Fourth Amendment violations ......................................................................................................... 16

     C.   The complaint plausibly pleads a clearly established First Amendment violation ......................................................................................................... 21

III.   Plaintiffs plausibly plead cognizable constitutional claims under the Westfall Act pursuant to 28 U.S.C. § 2679(b)(2)(A) against the Federal Officials ................. 22

     A.   The Westfall Act codifies claims against individual federal officials .............. 23

     B.   The complaint's Fourth Amendment claims are cognizable under the Westfall Act ................................................................................................... 24

     C.   The complaint's First Amendment claims are cognizable under the Westfall Act ................................................................................................... 25

     D.   The complaint's tort claims that also amount to constitutional violations are cognizable under the Westfall Act .............................................................. 26

IV.   The FTCA and the Westfall Act are unconstitutional as applied if Plaintiffs' damages claims arising from the misconduct of federal officials in the scope of their employment are not cognizable in any court under any source of law .............. 27

CONCLUSION .................................................................................................................. 30

1

**TABLE OF AUTHORITIES**

2

**PAGE(S)**

3 **CASES**

4
*Ali v. BOP*,
5    552 U.S. 214 (2008) ........................................................................................... 11

6 *Annappareddy v. Pascale*,
   996 F.3d 120 (4th Cir. 2021)........................................................................... 14
7
*Ashcroft v. Iqbal*,
8    556 U.S. 662 (2009) ............................................................................................. 6

9
*Bell Atl. Corp. v. Twombly*,
10    550 U.S. 544 (2007) ............................................................................................. 6

11 *Bethea v. Reid*,
   445 F.2d 1163 (3d Cir. 1971) .......................................................................... 24
12
*Big Cats of Serenity Springs, Inc. v. Rhodes*,
13    843 F.3d 853 (10th Cir. 2016) ......................................................................... 15

14
*Birnbaum v. United States*,
15    588 F.2d 319 (2d Cir. 1978) ............................................................................ 10

16 *Bivens v. Six Unknown Named Agents*,
   403 U.S. 388 (1971) ...................................................................................passim
17
*Borough of Duryea v. Guarnieri*,
18    564 U.S. 379 (2011) ........................................................................................... 29

19
*Brewster v. Beck*,
20    859 F.3d 1194 (9th Cir. 2017) ......................................................................... 11

21 *Bush v. Lucas*,
   462 U.S. 367 (1983) ........................................................................................... 25
22
*Butler v. Collins*,
23    12 Cal. 457 (1859) ................................................................................................ 8

24
*Butz v. Economou*,
25    438 U.S. 478 (1978) ........................................................................................... 25

26 *Carlson v. Green*,
   446 U.S. 14 (1980) ............................................................................................. 15
27
28

*Chappell v. Wallace,*
    462 U.S. 296 (1983) ..................................................................................... 25

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ..................................................................................... 14

*Corr. Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ....................................................................................... 15

*Dolan v. USPS,*
    546 U.S. 481 (2006) ..................................................................................... 10

*Douglas v. United States,*
    814 F.3d 1268 (11th Cir. 2016) .................................................................... 11

*eBay, Inc. v. Bidder's Edge, Inc.,*
    100 F. Supp. 2d 1058 (N.D. Cal. 2000) .......................................................... 8

*Egbert v. Boule,*
    142 S. Ct. 1793 (2022) ......................................................................... passim

*Erie Railroad Co. v. Tompkins,*
    304 U.S. 64 (1938) ....................................................................................... 28

*Ex parte Jackson,*
    96 U.S. 727 (1877) ................................................................................ 15, 18

*Florida v. Royer,*
    460 U.S. 491 (1983) ................................................................................ 20–21

*G.M. Leasing Corp. v. United States,*
    429 U.S. 338 (1977) ..................................................................................... 13

*Galvin v. Hay,*
    374 F.3d 739 (9th Cir. 2004) ....................................................................... 12

*Garcia v. DHS,*
    437 F.3d 1322 (Fed. Cir. 2006) .................................................................... 25

*Gibson v. United States,*
    781 F.2d 1334 (9th Cir. 1986) ........................................................ 21–22, 25, 26

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ..................................................................................... 25

United States District Court
Northern District of California

1

*Hawaii ex rel. Louie v. HSBC Bank Nev., N.A.*,
    761 F.3d 1027 (9th Cir. 2014) ................................................................................ 6, 10

*Hernández v. Mesa*,
    140 S. Ct. 735 (2020) ............................................................................................. passim

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ..................................................................................................... 22

*Hui v. Castaneda*,
    559 U.S. 799 (2010) ..................................................................................................... 23

*Ioane v. Hodges*,
    939 F.3d 945 (9th Cir. 2018) ................................................................................ 13, 15

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ................................................................................................ 9

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) ...................................................................................... 6

*Levy v. Only Cremations for Pets, Inc.*,
    57 Cal. App. 5th 203 (2020) .......................................................................................... 8

*Life Savers Concepts Ass'n of Calif. v. Wynar*,
    387 F. Supp. 3d 989 (N.D. Cal. 2019) ................................................................. 13, 14

*Little v. Barreme*,
    6 U.S. (2 Cranch) 170 (1804) ..................................................................................... 27

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ..................................................................................... 27

*McCoy v. Alamu*,
    141 S. Ct. 1364 (2021) ................................................................................................ 22

*Mejia v. Miller*,
    53 F.4th 501 (9th Cir. 2022) ....................................................................................... 14

*Minecci v. Pollard*,
    565 U.S. 118 (2012) ..................................................................................................... 26

*Mundy v. United States*,
    983 F.2d 950 (9th Cir. 1993) ...................................................................................... 12

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2  *Nieves Martinez v. United States*,
3     997 F.3d 867 (9th Cir. 2021) ................................................................................ 12

4  *Nurse v. United States*,
      226 F.3d 996 (9th Cir. 2000) ................................................................................ 12
5
6  *Oliver v. United States*,
      466 U.S. 170 (1984) ................................................................................................ 8
7
8  *Paton v. La Prade*,
      524 F.2d 862 (3d Cir. 1975) .................................................................................. 24
9
   *People v. Dillon*,
10    1 Cal. App. 2d 224 (1934) ....................................................................................... 8
11
   *Pettibone v. Russell*,
12    -- F.4th --, 2023 WL 1458886 (9th Cir. Feb. 2, 2023) .................................... 14, 16

13 *Ramona Manor Convalescent Hosp. v. Care Enters.*,
      177 Cal. App. 3d 1120 (1986) ................................................................................ 9
14
15 *Rhodes v. Robinson*,
      408 F.3d 559 (9th Cir. 2005) ................................................................................ 22
16
17 *Ross v. Meese*,
      818 F.2d 1132 (4th Cir. 1987) .............................................................................. 25
18
   *Schowengerdt v. Gen. Dynamics Corp.*,
19    823 F.2d 1328 (9th Cir. 1987) .............................................................................. 24
20
   *Schweiker v. Chilicky*,
21    487 U.S. 412 (1988) .............................................................................................. 25

22 *Shin v. ICON Found.*,
      553 F. Supp. 3d 724 (N.D. Cal. 2021) ................................................................... 8
23
   *Snyder & Assocs. Acquisitions LLC v. United States*,
24    859 F.3d 1152 (9th Cir. 2017) ................................................................................ 6
25
   *State Marine Lines, Inc. v. Shultz*,
26    498 F.2d 1146 (4th Cir. 1974) .......................................................................... 24–25
27
   *Taylor v. Riojas*,
28    141 S. Ct. 52 (2020) .............................................................................................. 22

*The Apollon,*
   22 U.S. (9 Wheat.) 362 (1824) ........................................................................ 27

*Torres v. City of Madera,*
   648 F.3d 1119 (9th Cir. 2011) ................................................................... 17, 18

*United States v. Aldaz,*
   921 F.2d 227 (9th Cir. 1990) .................................................................... 17, 19

*United States v. Brown,*
   925 F.3d 1150 (9th Cir. 2019) .................................................................. 17, 19

*United States v. Dass,*
   849 F.2d 414 (9th Cir. 1988) ......................................................................... 20

*United States v. Gaubert,*
   499 U.S. 315 (1991) ...................................................................................... 12

*United States v. Gill,*
   280 F.3d 923 (9th Cir. 2022) ......................................................................... 20

*United States v. Ivers,*
   430 F. App'x 573 (9th Cir. 2011) ................................................................. 20

*United States v. Miguel,*
   368 F.3d 1150 (9th Cir. 2004) ....................................................................... 17

*United States v. Place,*
   462 U.S. 696 (1983) ...................................................................................... 20

*United States v. Smith,*
   499 U.S. 160 (1991) ...................................................................................... 23

*United States v. Stanley,*
   483 U.S. 669 (1987) ...................................................................................... 25

*United States v. Sokolow,*
   490 U.S. 1 (1989) .......................................................................... 17, 18, 19, 21

*United States v. Taylor,*
   2022 WL 5125182 (N.D. Cal. Oct. 4, 2022) ........................................... 17, 19

*United States v. Van Leeuwen,*
   397 U.S. 249 (1970) ................................................................................. 18, 21

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

*Vance v. Barrett*,
  345 F.3d 1083 (9th Cir. 2003) ........................................................................... 22

*Wilkie v. Robbins*,
  551 U.S. 537 (2007) ........................................................................................... 26

*Yiamouyiannis v. Chem. Abstracts Serv.*,
  521 F.2d 1392 (6th Cir. 1975) ........................................................................... 25

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ................................................................................. 14, 15

**STATUTES**

28 U.S.C. § 1331 .................................................................................................. passim

28 U.S.C. § 1346(b) ..................................................................................................... 7

28 U.S.C. § 2671 *et seq.* ......................................................................................... 7, 26

28 U.S.C. § 2674 ........................................................................................................ 10

28 U.S.C. § 2679(b)(2)(A) ................................................................................... passim

28 U.S.C. § 2679(b)(1) .............................................................................................. 26

28 U.S.C. § 2680(a) ............................................................................................. 10, 11

28 U.S.C. § 2680(b) ............................................................................................. 10, 15

28 U.S.C. § 2680(c) ............................................................................................. 10, 11

28 U.S.C. § 2680(h) ............................................................................................. 10, 12

**REGULATIONS**

39 C.F.R. § 233.1(d) .................................................................................................... 8

**RULES**

Fed. R. Civ. P. 8(d)(2) ................................................................................................. 6

Fed. R. Civ. P. 12(b)(1) ............................................................................................... 6

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 6

Fed. R. Civ. P. 55(a) ................................................................................................ 6

**OTHER AUTHORITIES**

Ann Woolhandler & Michael G. Collins,
   *Was Bivens Necessary?*,
   96 Notre Dame L. Rev. 1893 (2021) ................................................................ 29

Black's Law Dictionary (11th ed. 2019) .............................................................. 8, 11

Brief for Institute for Justice as Amicus Curiae,
   *Hernández v. Mesa*, No. 17-1678, 2019 WL 3854459 ........................................ 24

Carlos Manual Vázquez & Stephen I. Vladeck,
   *State Law, the Westfall Act, and the Nature of the Bivens Question*,
   161 U. Pa. L. Rev. 509 (2013) .................................................................... passim

James E. Pfander,
   *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right
   to Pursue Judicial Claims Against the Government*,
   91 Nw. U. L. Rev. 899 (1997) ........................................................................ 29

James E. Pfander & David Baltmanis,
   *Rethinking Bivens: Legitimacy and Constitutional Adjudication*,
   98 Geo. L.J. 117 (2009) ................................................................................ 24

Joseph Story,
   *Commentaries on the Constitution of the United States* § 1639 (1833) ................. 27

Michael G. Collins,
   *'Economic Rights,' Implied Constitutional Actions, and the Scope of Section 1983*,
   77 Geo. L.J. 1493 (1989) ................................................................................ 30

Patrick Jaicomo & Anya Bidwell,
   *Unqualified Immunity and the Betrayal of Butz v. Economou: How the Supreme Court
   Quietly Granted Federal Officials Absolute Immunity for Constitutional Violations*,
   126 Dick. L. Rev. 719 (2022) ............................................................ 24, 25, 27, 28

Richard H. Fallon,
   *Bidding Farewell to Constitutional Torts*,
   107 Calif. L. Rev. 933 (2019) ........................................................................ 28

Stephen A. Higginson, Note,
   *A Short History of the Right to Petition Government for the Redress of Grievances*,
   96 Yale L.J. 142 (1986) .............................................................................. 29–30

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Stephen I. Vladeck,
    *The Inconsistent Originalism of Judge-Made Remedies Against Federal Officers*,
    96 Notre Dame L. Rev. 1869 (2021).........................................................................................29

**ISSUES TO BE DECIDED**

1.      Whether Plaintiffs have plausibly pleaded cognizable Federal Tort Claims Act (FTCA) claims against Defendant United States (the Government). (Counts 1–3.)

2.      Whether Plaintiffs have plausibly pleaded cognizable *Bivens* claims against Defendants Agster, Chan, Fajardo, Hodges, and Lee (the Federal Officials). (Counts 4, 7, 10.)

3.      Whether Plaintiffs have plausibly pleaded cognizable Westfall Act claims pursuant to 28 U.S.C. § 2679(b)(2)(A) ("civil action against an employee of the Government . . . for a violation of the Constitution") against the Federal Officials. (Counts 5–6, 8–9, 11–12, 13–15.)

4.      If no damages remedy is cognizable in federal or state court (under federal or state law) for federal officials' misconduct in the scope of their employment, then are the FTCA and the Westfall Act unconstitutional as applied because foreclosing all judicial remedies violates Article III Section 2's dictate that the federal "judicial power shall extend to all cases, in law and equity, arising under this Constitution," the Fifth Amendment's guarantee of due process of law, the First Amendment right to petition for redress of grievances, or 28 U.S.C. § 1331's grant of jurisdiction to hear "all civil actions arising under the Constitution, laws, or treaties of the United States"?

**INTRODUCTION**

René Quiñonez owns a small, family-run screen-printing business in Oakland, California called Movement Ink. As its name implies, the company works with grassroots social justice organizers, printing political speech on everything from onesies to hoodies. It is a labor of love; Mr. Quiñonez spent years cultivating those relationships and the company's reputation as a trusted ally and apparel provider. So, in 2020, at the height of the Covid-19 pandemic and daily national protests against police violence, organizers around the country turned to Movement Ink to print thousands of Covid-protective face masks emblazoned with political speech. Mr. Quiñonez's family and community worked around the clock to hand-print and package the masks for overnight deliveries from his local post office—where Movement Ink's large rush shipments had become a mainstay.

But Mr. Quiñonez's and Movement Ink's reputation and business prospects were dashed. Federal postal officials seized four of their packages without even the pretense of an investigation,

1    apparently searched the packages, and simply left the packages to languish—revisiting them only

2    after Mr. Quiñonez and his clients saw a cryptic alert on the postal service tracker saying the political

3    mask shipments had been "seized by law enforcement" and their story made national news.

4        Having done nothing to verify the propriety of the initial seizures, their ongoing detention,

5    or their search, the officials finally confirmed what even a cursory investigation would have

6    immediately revealed: there was never any reason to take the packages out of the mail stream, and

7    certainly no reason to leave them sitting uninvestigated and undelivered. Indeed, as explained in

8    more detail below, the officials' own notes confirm that the only reasons for the packages' seizure,

9    detention, and search were (1) self-contradictory (initially claiming to be based on an inchoate hunch

10   about the packages' city of origin that could have been immediately dispelled, then claiming, post

11   hoc, to be based on the packages' originating from a known frequent shipper, with no explanation

12   as to why that anodyne business practice should be suspicious) and (2) based on the fact that the

13   packages had "green handwriting" and were well-taped (the suspiciousness of either characteristic

14   explained nowhere, and the latter characteristic being *in accordance with the postal service's own*

15   *publicly posted guidance*). Those same notes confirm that the officials knew the packages contained,

16   in the officials' own words, "BLM MASKS."

17       With their reputations tarnished (and their prospects for national apparel distribution

18   shattered), Mr. Quiñonez and Movement Ink sued for the violation of their rights. They brought

19   California tort claims against the Government under the FTCA and federal constitutional claims

20   against the Federal Officials under *Bivens*, the Westfall Act, and the Constitution.

21       The Defendants have moved to dismiss. They argue that no cause of action exists in any

22   court, under any source of law, for their violations of Plaintiffs' rights—no matter how blatant or

23   clearly established. Specifically, they argue that Plaintiffs' claims are foreclosed by various statutory

24   exceptions to the FTCA, the Supreme Court's narrowing of *Bivens*, and their construction of the

25   Westfall Act as foreclosing damages claims against federal officials under federal or state law. In

26   short, the Government is asking this Court to hold that no court, federal or state, can do anything

27   about the Federal Officials' torts or constitutional violations.

28

United States District Court
Northern District of California

The Court should reject that invitation. As Plaintiffs explain below, they have, at a minimum, access to justice under the FTCA for their trespass to chattels and interference with prospective economic relations claims (section I); under *Bivens* for their Fourth Amendment claims (section II); and under the Westfall Act for their tort claims and their constitutional claims (section III).

If, however, the Court agrees with Defendants and finds that the courthouse doors are closed by the FTCA's exceptions, the narrowing of *Bivens*, and their construction of the Westfall Act, the Court should hold that this denial of any judicial forum for redress is itself unconstitutional. Since the founding, judicial review and remedy of federal officials' harms to ordinary people has been a cornerstone and hallmark of our constitutional order. If the FTCA and the Westfall Act are now construed to eliminate that bulwark against government abuse, the Court should hold that the statutory scheme is unconstitutional as applied, in violation of Article III Section 2's dictate that the federal "judicial power shall extend to all cases, in law and equity, arising under this Constitution," the Fifth Amendment's guarantee of due process of law, the First Amendment right to petition for redress of grievances, or 28 U.S.C. § 1331's grant of jurisdiction to hear "all civil actions arising under the Constitution, laws, or treaties of the United States" (*see* section IV).

## BACKGROUND

The salient facts of this case are simple: Postal officials seized, detained, and searched innocuous packages without any investigation and for no legitimate reason (seemingly because of the packages' political messages) and then proceeded to let the packages languish, again without any investigation into the propriety of their seizure or detention, causing unjustifiable delays in the packages' arrival and predictably derailing the senders' existing and future business relationships.

1.      During the summer 2020 confluence of the Covid-19 pandemic and daily national protests against police violence, Plaintiff René Quiñonez, through his screen-printing company (Plaintiff Movement Ink LLC), did what he has for years: shipped large, securely bound, priority-mail packages in a rush from his local Oakland post office to various American cities. These packages contained Covid-protective face masks on which Mr. Quiñonez printed political speech (e.g., "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE"). To get these thousands of

United States District Court
Northern District of California

1   protective protest masks out the door as quickly as possible, Mr. Quiñonez, his family, his

2   employees, and even his competitors spent sleepless nights hand-printing and packaging the cloth

3   apparel for overnight deliveries. Such rush shipments by Mr. Quiñonez and Movement Ink from

4   their local post office were commonplace. Pls.' First Am. Compl., ECF 33 (FAC) ¶¶ 26–27, 31.

5       2.      Without even the pretense of an investigation, postal officials seized the packages

6   because, in the officials' own words, the packages were "four big boxes" with "green handwriting"

7   that were "overlabeled with DHQ's address" and may have been "sent from Eureka"—whence

8   packages containing contraband had supposedly been discovered in the past—a hunch that even a

9   cursory glance at Mr. Quiñonez's "overlabeled" packages would have dispelled. FAC ¶¶ 84, 157.

10      3.      Any possibility that the packages came from Eureka or contained contraband was

11  further belied by Plaintiffs' "regular practice . . . to write on each box that it came from Movement

12  Ink and what it contained, such as 'masks.'" FAC ¶ 32; FAC ¶ 36 ("As usual, all of the political

13  mask shipments were marked or identified with Movement Ink as the sender, and likely had their

14  contents handwritten on the side, in accordance with René's and Movement Ink's regular practice.").

15      4.      Faced with their non-reasons for seizing the packages, the postal officials attempted

16  additional post hoc (but equally hollow) justifications. They wrote in their internal notes, obtained

17  by Mr. Quiñonez via FOIA, that the packages: (1) were taped on all sides (in accordance with the

18  postal service's *own public shipping guidance*); (2) had bulging contents (like any cloth shipment

19  might); (3) came from a frequent sender or address (as any business might do, and in *direct*

20  *contradiction* to the original, easily dispelled guess that the packages could have come from Eureka);

21  and (4) were going from a supposed drug source area to supposed drug trafficking areas (that is,

22  apparently: from one American city to other American cities). FAC ¶¶ 89, 91–98 (parentheticals by

23  Plaintiffs).

24      5.      After seizing the packages without anything approaching reasonable suspicion, the

25  postal officials did absolutely nothing to confirm or dispel whether the initial seizure or the ongoing

26  detention of the packages were or could be justified. Instead, the officials left the packages to

27  languish, uninvestigated. The packages remained that way until Mr. Quiñonez (and his clients) saw

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   an alert on the USPS tracking website that the packages were "seized by law enforcement" and the

2   story made national news. Only at that point did the officials finally revisit the neglected packages—

3   after doing nothing for more than 24 hours. Upon doing so, they immediately acknowledged that

4   there was not—and never had been—anything suspicious about the packages or their sender. FAC

5   ¶¶ 66–73, 76, 103–104, 110–111.

6          6.     Indeed, the postal officials immediately acknowledged that "it was not possible the

7   parcels were sent from Eureka." And they still identified no other conceivable reason to suspect the

8   packages or their sender of anything illegal. FAC ¶ 87.

9          7.     Nevertheless, the officials still failed to immediately release the packages. Instead,

10  the officials kept the packages detained even longer and searched them. FAC ¶ 103.

11         8.     The postal officials knew that the packages contained, in the officials' own words,

12  "BLM MASKS." It is unclear how or when the officials discovered that. If it was before seizing the

13  packages, the clear inference is that they did so to suppress quintessential political speech. If it was

14  after seizing the packages, the clear inference is that they searched the packages without a warrant

15  or any articulable reason to suspect the packages or their sender of anything illegal. FAC ¶¶ 77–80.

16         9.     The postal officials' misconduct had a predictable effect: In the eyes of their clients,

17  the event cast a pall of suspicion on Mr. Quiñonez and Movement Ink, shattering overnight a

18  reputation built over years for quality work on behalf of social justice causes. Apparently wanting

19  nothing to do with potential ongoing governmental interference and investigation, the clients cut

20  ties with Plaintiffs and called off plans for national screen-printing and distribution contracts. FAC

21  ¶¶ 43–54, 112.

22         10.    Mr. Quiñonez and Movement Ink sought and were denied redress from the postal

23  service (the very agency responsible for their harms) pursuant to FTCA claim-processing

24  procedures. FAC ¶ 113.

25         11.    Mr. Quiñonez and Movement Ink filed this lawsuit seeking compensatory damages

26  from the Government under the FTCA and from the Federal Officials under *Bivens*, the Westfall

27  Act (28 U.S.C. § 2679(b)(2)(A)), the Constitution, and state tort law. FAC ¶¶ 114–386.

28

1     12.     The Defendants filed two motions to dismiss Plaintiffs' claims in their entirety,

2  arguing that Mr. Quiñonez and Movement Ink have no remedy in any judicial forum for Defendants'

3  blatant violations of their constitutional, statutory, and common law rights. *See* ECF 51 (motion to

4  dismiss by the Government), 52 (motion to dismiss by four of the five named Federal Officials).[1]

5     13.     Mr. Quiñonez and Movement Ink now respond to both motions simultaneously.

6                                   **STANDARD OF REVIEW**

7     In evaluating Defendants' motions to dismiss under Federal Rules of Civil Procedure

8  12(b)(1) and 12(b)(6), the Court must "accept as true all facts alleged in the complaint and construe

9  them in the light most favorable to" Plaintiffs. *Snyder & Assocs. Acquisitions LLC v. United States*,

10  859 F.3d 1152, 1156–57 (9th Cir. 2017). The Court resolves a "facial attack" under Rule 12(b)(1)

11  by "determin[ing] whether the allegations are sufficient as a legal matter to invoke the court's

12  jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). The Court must deny

13  Defendants' Rule 12(b)(6) arguments if the complaint contains "sufficient factual matter, accepted

14  as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

15  (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs may plead in the

16  alternative, and if they "make[] alternative statements, the pleading is sufficient if any one of them

17  is sufficient." Fed. R. Civ. P. 8(d)(2). And Plaintiffs are "master of [the] complaint for jurisdictional

18  purposes." *Hawaii ex rel. Louie v. HSBC Bank Nev., N.A.*, 761 F.3d 1027, 1040 (9th Cir. 2014).

19                                      **ARGUMENT**

20     The Government and the Federal Officials ask this Court to hold that no remedy exists for

21  their violations of Plaintiffs' rights—no matter how blatant or clearly established—in any court,

22  under any source of law, federal or state. Specifically, they argue that Plaintiffs' claims are

23  foreclosed by statutory exceptions to the FTCA, the Supreme Court's narrowing of *Bivens*, and their

24  misconstruction of the Westfall Act as foreclosing all damages claims against federal officials.

25     For the reasons explained below, Defendants are wrong: Plaintiffs have, at a minimum,

26

27  _____
   [1] Defendant Fajardo has failed to respond to the complaint in any way. So "the clerk must enter
28  [Defendant Fajardo's] default." Fed. R. Civ. P. 55(a).

access to justice under the FTCA for their trespass to chattels claims and their interference with prospective economic relations claims (Counts 1, 3; *see* section I); under *Bivens* for their Fourth Amendment claims (Counts 4, 7; *see* section II); and under the Westfall Act for their tort claims and their constitutional claims (Counts 5, 8, 11, 13, 14, 15; *see* section III). (As explained below, Plaintiffs currently concede but preserve for appeal Counts 2, 6, 9, 10, and 12.)

If, however, the Court agrees with Defendants and finds that the courthouse doors are closed on all 15 of Plaintiffs' claims by the FTCA's exceptions, the narrowing of *Bivens*, and their construction of the Westfall Act, the Court should hold that this denial of any judicial forum for redress is itself unconstitutional. Since the founding, judicial review and remedy of federal officials' harms to ordinary people has been a cornerstone and hallmark of our constitutional order. If the FTCA and the Westfall Act are now construed to eliminate that bulwark against abuse, the Court should hold that the statutory scheme is unconstitutional as applied, in violation of Article III Section 2's dictate that the federal "judicial power shall extend to all cases, in law and equity, arising under this Constitution," the Fifth Amendment's guarantee of due process of law, the First Amendment right to petition for redress of grievances, or 28 U.S.C. § 1331's grant of jurisdiction to hear "all civil actions arising under the Constitution, laws, or treaties of the United States" (*see* section IV).

## I.    Plaintiffs plausibly plead cognizable tort claims under the FTCA against the Government.

### A.    The complaint plausibly pleads tort claims.

Counts 1 through 3 plead three California torts against the Government under the FTCA, arising from the Federal Officials' misconduct: trespass to chattels, interference with contractual relations, and interference with prospective economic relations. Unless a statutory exception applies, the FTCA waives sovereign immunity and makes the Government liable for these torts because the Federal Officials committed them within the scope of their employment. 28 U.S.C. §§ 1346(b), 2671 *et seq.* The Government wrongly argues that Plaintiffs have not adequately pleaded these claims. *See* ECF 51 at 11–14.

***The complaint plausibly pleads trespass to chattels.*** Arguing for dismissal of Count 1, the Government posits that "[a] person who voluntarily deposits mail in the United States mail for

1    delivery retains a limited possessory interest in the mailed item," and that trespass to chattels

2    requires "unauthorized" interference. *See* ECF 51 at 11 (quoting cases). But then, with no grounding

3    in any of its cited authority, the Government draws the alarming conclusion that postal officials

4    cannot, as a matter of law, commit trespass to chattels because their interference with mailed items

5    is necessarily authorized. That is not the law. To the contrary, "California does recognize a trespass

6    claim where the defendant exceeds the scope of the consent." *eBay, Inc. v. Bidder's Edge, Inc.*, 100

7    F. Supp. 2d 1058, 1070 (N.D. Cal. 2000) (citation omitted). And "conduct that does not amount to

8    a substantial interference with possession, but which consists of intermeddling with or use of

9    another's personal property, is sufficient to establish a cause of action for trespass to chattel." *Id.*

10       Obviously, by mailing their packages, Plaintiffs did not consent to or authorize the packages

11   being removed from the mail stream, searched, detained, or left to languish indefinitely, all without

12   a valid basis or any investigation. So that conduct, independently and together, intermeddled with

13   Plaintiffs' personal property beyond the scope of authorization granted by lawful use of the postal

14   service—and therefore constitutes trespass to chattels. *Butler v. Collins*, 12 Cal. 457, 463 (1859)

15   (bailee's interference with property is tortious); *People v. Dillon*, 1 Cal. App. 2d 224, 229 (1934)

16   ("appropriation *by a custodian or servant of property in his custody . . .* is a trespass") (emphasis

17   added)[2]; *Levy v. Only Cremations for Pets, Inc.*, 57 Cal. App. 5th 203, 216–17 (2020) (California

18   trespass to chattels claim against transferee of plaintiff's property who treated it in an unauthorized

19   manner); *Shin v. ICON Found.*, 553 F. Supp. 3d 724, 733–36 (N.D. Cal. 2021) (same).[3]

20          ***The complaint plausibly pleads interference with contractual relations and interference***

21   _____

22   [2] Appropriation is simply "exercise of control over property, esp. without permission." Black's Law
     Dictionary (11th ed. 2019).

23   [3] The Government's other arguments are easily disposed of: (1) Plaintiffs are not complaining that
24   postal officials violated their "privacy" by examining the "outside of the parcels," *see* ECF 51 at 12,
     but rather that the officials physically removed the packages from the mail stream, searched them,
25   and detained them; (2) 39 C.F.R. § 233.1(d) permits postal inspectors to "maintain custody" while
     "conducting any investigation," *see* ECF 51 at 12, but the complaint explains—based on the
26   officials' own documents—that no investigation occurred at the time of seizure or in the course of
     detention, FAC ¶¶ 69–73; and (3) even if the officials' conduct did not violate the Fourth
27   Amendment (which it did, *see infra* section II), none of the Government's cited authority, *see* ECF
     51 at 12, suggests that the trespass and constitutional inquiries are coterminous. *Cf. Oliver v. United*
28   *States*, 466 U.S. 170, 183 (1984) (trespass may occur even without Fourth Amendment violation).

United States District Court
Northern District of California

*with prospective economic relations.* Arguing for dismissal of Counts 2 and 3, the Government posits only that Plaintiffs have inadequately alleged the postal officials' knowledge of the existence of Plaintiffs' contractual and economic relations, and that the claims have a specific intent requirement. *See* ECF 51 at 12–14. (The Government does not challenge the claims' other elements.) But the Government's legal assertions are wrong. Its own cited authority makes clear that the "specific identity or name" of the parties to the relationships need not be pleaded. *Ramona Manor Convalescent Hosp. v. Care Enters.*, 177 Cal. App. 3d 1120, 1133 (1986). And the California Supreme Court made clear that "specific intent is not a required element of the tort of interference with prospective economic advantage. . . . [A] plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1154 (2003). As the Government itself recognizes, that is what Plaintiffs have pleaded. *See* ECF 51 at 14 (quoting FAC ¶¶ 135–136).

Reading the complaint's allegations in the light most favorable to Plaintiffs and drawing all inferences in their favor, the postal officials plausibly knew—given the postal officials' familiarity with Plaintiffs and their business—that Plaintiffs were shipping the packages as part of Plaintiffs' usual and regular screen-printing and distribution contracts and economic relations. Indeed, the postal officials' own notes make clear that they knew the packages came from a frequent shipper and that they were "BLM MASKS." Moreover, "[a]s usual, all of the political mask shipments were marked or identified with Movement Ink as the sender, and likely had their contents handwritten on the side, in accordance with René's and Movement Ink's regular practice." FAC ¶¶ 31–32, 36, 91. Given (1) those allegations regarding the postal officials' knowledge of Plaintiffs' business generally and the shipments at issue in particular, (2) the lack of any valid reason for the postal officials' intermeddling with the packages (*see infra* section II), and (3) the erroneous statements of law on which the Government bases its arguments against the viability of Counts 2 and 3, the Court should hold that they are plausibly pleaded.[4]

---

[4] As explained below, Plaintiffs concede that Count 2 (interference with contractual relations) is likely foreclosed by one of the FTCA's statutory exceptions, but not necessarily Count 3 (interference with prospective economic relations).

**B.     The complaint's tort claims are partially cognizable under the FTCA.**

The Government argues that Counts 1 through 3 are statutorily foreclosed in their entirety by various exceptions to the FTCA's waiver of sovereign immunity for torts committed by federal officials: the postal exception (28 U.S.C. § 2680(b)); the detention of goods exception (28 U.S.C. § 2680(c)); the discretionary function exception (28 U.S.C. § 2680(a)); and the intentional tort exception (28 U.S.C. § 2680(h)). *See* ECF 51 at 7–11. As explained below, Plaintiffs concede the exceptions' partial applicability, but none of them foreclose Counts 1 through 3 in their entirety.

***The postal exception does not apply.*** The FTCA's postal exception excludes claims "arising out of the loss, miscarriage, or negligent transmission of . . . postal matter." 28 U.S.C. § 2680(b). Plaintiffs' claims of intermeddling and interference do not trigger the exception because they are not based on "loss," "miscarriage," or "negligent transmission." As the Government concedes, to determine § 2680(b)'s applicability, the Supreme Court distinguishes between "torts where the United States would be liable 'in the same manner and to the same extent as a private individual under like circumstances,'" versus "actions directly related to the processing and delivery of mail." *See* ECF 51 at 7–8 (citing *Dolan v. USPS*, 546 U.S. 481, 485–88 (2006); 28 U.S.C. § 2674). Under that framework, there is a difference between (1) claims "for redress because of the temporary removal and treatment of the package" (which do not fall within the exception), and (2) claims for a package's subsequent loss (which do fall within the exception). *Birnbaum v. United States*, 588 F.2d 319, 328 n.20 (2d Cir. 1978).

Plaintiffs are, of course, "master of [their] complaint for jurisdictional purposes." *Hawaii ex rel. Louie*, 761 F.3d at 1040. And their claims, as pleaded, fall in the first category (temporary, targeted removal, search, and detention of their packages beyond the scope of authorization and in interference with contractual and economic relations). Plaintiffs are not complaining that a logistical, administrative, technical, or other snafu led to the loss, misprocessing, miscarriage, or late delivery of their packages. Rather, they are complaining that postal officials, as bailees, intermeddled with, searched, and detained *Plaintiffs' property in particular*. Such targeted intermeddling and interference are not "actions directly related to the processing and delivery of mail." They are actions for which any private bailee of personal property is liable in tort under

California law; so ultimately, the Government's argument that the postal exception applies here stems from its mistaken view that postal officials can intermeddle and interfere with mail absent any reason or limitation. *See supra* section I.A (explaining that bailees or transferees may be liable for trespass to chattels and interference with contractual and economic relations under California law).

> **The detention of goods exception does not apply to the claims in their entirety.** The Government wrongly argues that the FTCA's detention of goods exception forecloses Counts 1 through 3 in their entirety. *See* ECF 51 at 9–10. Plaintiffs concede that their claims are partially foreclosed by the Supreme Court's interpretation of the exception in *Ali v. BOP*, 552 U.S. 214 (2008)—but only insofar as Plaintiffs' claims arise from the "detention" of their property.[5] Under *Ali* itself, "[i]t bears emphasis . . . that § 2680(c), far from maintaining sovereign immunity for the entire universe of claims against law enforcement officers, does so only for claims 'arising in respect of' the 'detention' of property." *Id.* at 228 (maj. op.). "From the face of the complaint, [Plaintiffs have] not raised a claim [solely] about 'detention' of property." *Douglas v. United States*, 814 F.3d 1268, 1279 (11th Cir. 2016). Plaintiffs also complain of the unlawful initial seizure and search of their packages, both of which are distinct from complaints arising from the packages' prolonged detention. *Compare* FAC ¶¶ 84–85, 87, 103–104 (complaining of seizure and search of packages), *with* FAC ¶¶ 105–111 (complaining of detention of packages); *compare Seizure*, Black's Law Dictionary ("act or instance of taking possession of [] property"), *with Detention*, Black's Law Dictionary ("[c]ustody of property"), *and Detention of Goods*, Black's Law Dictionary ("withholding of another's personal property"); *accord Brewster v. Beck*, 859 F.3d 1194, 1196 (9th Cir. 2017) (distinctly analyzing lawfulness of initial seizure and subsequent detention). In short, the "detention" exception does not apply to the distinct acts of unlawful seizures or searches, both of which Plaintiffs allege here.

> **The discretionary function exception does not apply.** Contrary to the Government's arguments, *see* ECF 51 at 9–10, the Ninth Circuit has long made clear that § 2680(a) (which excludes

---

[5] Plaintiffs preserve for appellate reconsideration whether the detention of goods exception has been erroneously extended beyond the tax or customs context. *See Ali*, 552 U.S. at 228–43 (Kennedy, J., dissenting), 243–47 (Breyer, J., dissenting).

claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function") is not a license to lawlessness. "Even if the [postal officials'] actions involved elements of discretion, [they] do not have discretion to violate the Constitution." *Nieves Martinez v. United States*, 997 F.3d 867, 877 (9th Cir. 2021) (citing *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004)). "[G]overnmental conduct cannot be discretionary if it violates a legal mandate," and "[t]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply." *Galvin*, 374 F.3d at 758 (quoting *Nurse v. United States*, 226 F.3d 996, 1002 & n.2 (9th Cir. 2000)). Therefore, because Plaintiffs have plausibly alleged that the postal officials' seizure, detention, and search of their packages violated the Fourth Amendment and the First Amendment (*see infra* section II), the discretionary function exception does not apply.[6]

**_Plaintiffs concede that the intentional tort exception likely applies to Count 2, but not Count 3._** The Government argues that Counts 2 and 3 should be dismissed under § 2680(h) because they are "claim[s] arising out of . . . interference with contract rights." *See* ECF 51 at 10–11. While the Government misunderstands the nature of these tort claims (*see supra* section I.A), Plaintiffs concede that the statute's exception for "interference with contract rights" likely encompasses "interference with contractual relations," thus foreclosing Count 2. But Plaintiffs do not concede that Count 3 is foreclosed, because "interference with contract rights" does not necessarily encompass "interference with prospective economic relations"—as "prospective" relations may not yet be vested contract "rights," which they were yet to be in Plaintiffs' case. FAC ¶¶ 47–51; *accord Mundy v. United States*, 983 F.2d 950, 953 (9th Cir. 1993) (not every claim for which "the damages . . . are similar to those obtainable on an interference claim" is "simply an extension of a claim for interference with contractual relations") (quotation marks omitted).

---

[6] Worth noting is Defendants' effort to have it both ways: The Government argues that the Federal Officials' conduct was entirely discretionary, ECF 51 at 9–10, while the Federal Officials argue that they were executing "the Postal Service's 'drug package profile,'" ECF 52 at 12. Given these shell games, Plaintiffs also preserve for appellate reconsideration whether the discretionary function should be "confined to the policy or planning level" and has been erroneously extended to the "operational level." *See United States v. Gaubert*, 499 U.S. 315, 325–26 (1991).

## II.   Plaintiffs plausibly plead cognizable constitutional claims under *Bivens* against the Federal Officials.

"Before reaching the issue of qualified immunity, the first question [the Court] must address is whether [Plaintiffs] may bring a *Bivens* suit against [the Federal Officials]." *Ioane v. Hodges*, 939 F.3d 945, 951 (9th Cir. 2018) (citations omitted) (first conducting *Bivens* analysis, then assessing viability of Fourth Amendment violation, then assessing clearly established requirement).

To start, Plaintiffs concede (but preserve for appellate reconsideration) that: (1) their First Amendment *Bivens* claims (Count 10) are not cognizable under *Egbert v. Boule*, 142 S. Ct. 1793 (2022); and (2) their Fourth Amendment and First Amendment claims arising directly under the Constitution (Counts 6, 9, 12) have yet to be recognized by the Supreme Court (but should be cognizable as such pursuant to Article III Section 2 and 28 U.S.C. § 1331, *see Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 398–411 (1971) (Harlan, J., concurring in the judgment)).

But Plaintiffs' Fourth Amendment *Bivens* claims (Counts 4, 7) are cognizable. And Plaintiffs have plausibly pleaded clearly established Fourth Amendment and First Amendment violations.[7]

### A.   The complaint's Fourth Amendment claims are cognizable under *Bivens*.

*The Federal Officials wrongly argue that Movement Ink cannot bring Bivens claims simply because it is a corporation.* The only authority they cite does not stand for that proposition. *See* ECF 52 at 10 (quoting *Life Savers Concepts Ass'n of Calif. v. Wynar*, 387 F. Supp. 3d 989, 999 (N.D. Cal. 2019)). *Life Savers* stressed that it was declining to allow a corporation "to bring *Bivens* suits *on behalf of employees*" because the employees could file their own suits. 387 F. Supp. 3d at 999 (emphasis added). Here, by contrast, Movement Ink's claims arise from its *own* Fourth Amendment rights in personal property and free speech (which no one disputes it has). There is no reason that Movement Ink's identity should determine whether it can vindicate those rights. *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 353–54 (1977) (collecting cases establishing corporations' Fourth Amendment rights and discussing contexts where they may be curtailed, none

---

[7] As explained in section III below, Plaintiffs' Fourth Amendment and First Amendment claims are all separately cognizable under the Westfall Act (Counts 5, 8, 11), regardless of whether they are cognizable as *Bivens* claims or directly under the Constitution.

of which apply here); *Citizens United v. FEC*, 558 U.S. 310, 342–43 (2010) (collecting cases establishing corporations' First Amendment rights and discussing contexts where they may be curtailed, none of which apply here).

To the contrary: *Bivens* is concerned with the identity of the perpetrator, not the victim; its "purpose . . . is to deter the *officer*." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860 (2017) (citation omitted; emphasis in original). Accordingly, Movement Ink's corporate status is a meaningless basis on which to conduct the *Bivens* analysis, at least with respect to the types of claims at issue here: warrantless, offsite seizure, detention, and search of a corporation's personal property, brought on the corporation's own behalf. *Life Savers* is inapposite, as are other cases denying corporations' *Bivens* claims. *Cf. Annappareddy v. Pascale*, 996 F.3d 120 (4th Cir. 2021) (corporation's *Bivens* claims arising from *warrant-based search* of its *real property* not cognizable).

***Plaintiffs' Fourth Amendment claims (Counts 4, 7) do not, as the Federal Officials argue, see ECF 52 at 8, present a new Bivens context.*** The Supreme Court's recent *Bivens* decisions are "not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose. *Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere." *Ziglar*, 137 S. Ct. at 1856–57. If those principles mean anything, it is that everyday drug-law enforcement cases akin to *Bivens* itself—like this one—do not present a new context. Indeed, the Supreme Court's and the Ninth Circuit's recent decisions finding new contexts did not arise in the "common and recurrent sphere of [drug] law enforcement," so they do not support a new context finding as to Plaintiffs' everyday Fourth Amendment claims. *Cf. Ziglar*, 137 S. Ct. 1843 (9/11 response); *Hernández v. Mesa*, 140 S. Ct. 735 (2020) (cross-border shooting implicating international relations); *Egbert*, 142 S. Ct. 1793 (border immigration enforcement); *Mejia v. Miller*, 53 F.4th 501 (9th Cir. 2022) (vehicle chase); *Pettibone v. Russell*, -- F.4th --, 2023 WL 1458886 (9th Cir. Feb. 2, 2023) (mass protests). So the Court need not conduct a special factors analysis;

Plaintiffs' Fourth Amendment claims should proceed.

> **Even if Plaintiffs' Fourth Amendment claims present a new context, the Federal Officials' proffered "special factors," see ECF 52 at 9–10, do not justify foreclosing a Bivens remedy.** The Federal Officials' invocation of theoretical "system-wide consequences" could be levied against any Fourth Amendment *Bivens* claim. *See* ECF 52 at 9. But even the *Egbert* Court recognized that courts may continue to extend *Bivens* remedies for Fourth Amendment violations in the "common and recurrent sphere of law enforcement." 142 S. Ct. at 1805 (quoting *Ziglar*, 137 S. Ct. at 1857). Because, like the officials in *Bivens* itself, the Federal Officials here invoke their authority to enforce drug laws, the violation of Plaintiffs' Fourth Amendment rights in the course of that endeavor present "garden-variety" abuse that the federal judiciary has adjudicated for more than 50 years under the *Bivens* regime (and for more than 150 years generally). *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 864 (10th Cir. 2016); *see Ex parte Jackson*, 96 U.S. 727 (1877) (Fourth Amendment protection against unreasonable postal inspections); *accord Ioane*, 939 F.3d 945 (Fourth Amendment claims against IRS agents did not even present new *Bivens* context).

Indeed, as explained in section III below, it is against the backdrop of that commonplace adjudication that Congress authorized, through the Westfall Act, a "civil action against an employee of the Government . . . for a violation of the Constitution." 28 U.S.C. § 2679(b)(2)(A). Moreover, it is "'crystal clear' that Congress intended the FTCA and *Bivens* to serve as 'parallel' and 'complementary' sources of liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (quoting *Carlson v. Green*, 446 U.S. 14, 19–20 (1980)). Therefore, Congress's decision to create an express but narrow "postal exception" to the FTCA, *see* 28 U.S.C. § 2680(b)—and take no other action in that sphere except to generally authorize civil actions against federal officials under the Westfall Act—is best understood as leaving to the *Bivens* regime the vindication of constitutional rights against individual postal officials. *See* Carlos Manual Vázquez & Stephen I. Vladeck, *State Law, the Westfall Act, and the Nature of the Bivens Question*, 161 U. Pa. L. Rev. 509, 571 & n.327 (2013) (House Report "makes clear that the [Westfall] Act 'would not affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their

United States District Court
Northern District of California

constitutional rights'") (citation omitted)[8]; *see infra* section III.

In short, Congress has "weigh[ed] . . . the costs and benefits," *see* ECF 52 at 9, and created a system in which the Government assumes liability for a subset of torts committed by postal officials while leaving individual *Bivens* suits to vindicate postal officials' constitutional violations.

**B.    The complaint plausibly pleads clearly established Fourth Amendment violations.**

Qualified immunity does not protect the Federal Officials from suit for their Fourth Amendment violations. Without even the pretense of an investigation, they seized Plaintiffs' packages because, in the officials' own words, the packages were "four big boxes" with "green handwriting" that were "overlabeled with DHQ's address" and may have been "sent from Eureka"— a hunch that even a cursory glance at the "overlabeled" packages would have dispelled. Indeed, the green handwriting itself dispelled it because "[a]s usual, all of the political mask shipments were marked or identified with Movement Ink as the sender, and likely had their contents handwritten on the side, in accordance with René's and Movement Ink's regular practice." FAC ¶ 36.

Faced with their non-reasons for seizing the packages, the Federal Officials attempted additional post hoc (but equally hollow) justifications for doing so. They wrote in their internal notes that the packages: (1) were taped on all sides (*in accordance with the postal service's own public shipping guidance*); (2) had bulging contents (like any cloth shipment might); (3) came from a frequent sender or address (as any business might do, and in direct contradiction to the original, easily dispelled guess that the packages could have come from Eureka); and (4) were going from a supposed drug source area to supposed drug trafficking areas (that is, apparently: from one American city to other American cities). FAC ¶¶ 89, 91–98 (parentheticals by Plaintiffs).

Then, the Federal Officials left the packages to languish without any investigation into the propriety of their initial seizure or continued detention. And they searched the packages, documenting that they contained "BLM MASKS." FAC ¶¶ 77, 110.

---

[8] Accordingly, the "grievance procedure" discussed by the Federal Officials, *see* ECF 52 at 9 & n.3, does not change the outcome, especially because they do not assert that it allows for "corrective action." *Cf. Pettibone*, 2023 WL 1458886, at *7. Regardless, that procedure cannot be squared with congressional intent or *Bivens*'s deterrence function.

United States District Court
Northern District of California

As detailed below, all of those actions (the seizure, the detention, and the search) independently and together violate the Fourth Amendment's clearly established proscriptions.

***The complaint plausibly pleads that the Federal Officials seized the packages without reasonable suspicion.*** "Postal authorities may seize and detain packages if they have a reasonable and articulable suspicion of criminal activity." *United States v. Aldaz*, 921 F.2d 227, 229 (9th Cir. 1990). The "reasonable and articulable" standard is not, as the Federal Officials apparently understand it, meaningless. It is a fact intensive, case by case inquiry based on the "totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

1. It is clearly established that that picture must be one of criminality—not mere unusualness. *Id.* at 8–10. Accordingly, the seizing officials must not only show their work, but also justify it; they "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Id.* at 7 (cleaned up). They must show "some minimal level of objective justification." *Id.*

That means officials may not proceed blindly; any reliance on a purported mistake of fact must be justified. *United States v. Miguel*, 368 F.3d 1150, 1154 (9th Cir. 2004), *overruled on other grounds*. "Not all errors in perception or judgment are reasonable. . . . [W]e ask whether a reasonable officer would have or should have accurately perceived that fact." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (cleaned up). And the inquiry is based on "the information available to" the seizing official. *Aldaz*, 921 F.2d at 229. So a "post hoc rationale" may not backfill a narrative of insufficient facts or unverified hunches, or replace the actual facts relied on at the time of seizure. *United States v. Brown*, 925 F.3d 1150, 1154–55 (9th Cir. 2019); *United States v. Taylor*, 2022 WL 5125182, at *8 (N.D. Cal. Oct. 4, 2022).

2. Under those clearly established standards, the seizure of Plaintiffs' packages cannot be justified. The only reasons the Federal Officials gave for initially seizing the packages were: they were "four big boxes" with "green handwriting" that were "overlabeled with DHQ's address" and may have been "sent from Eureka." FAC ¶ 84.

For starters, none of the Federal Officials' cited authority, *see* ECF 52 at 11–15, suggests that those anodyne characteristics are sufficient to clear the reasonable suspicion threshold. In all of

those cases, such common characteristics were *in combination with* a tip or an individualized, articulable basis to suspect that the particular sender or recipient of the packages was engaged in criminal behavior (which the Federal Officials' own records show was not true of Mr. Quiñonez, Movement Ink, or the packages' recipients). The Supreme Court clearly established the need for such individualized corroboration of unusual characteristics in *United States v. Van Leeuwen*, 397 U.S. 249 (1970). The Court permitted the seizure and temporary detention of postal packages based not on a hunch that they were "suspicious," but a bevy of additional facts making that suspicion individualized and articulable. *Id.* at 250–53; *see id.* at 251 ("It has long been held that first-class mail such as letters and sealed packages subject to letter postage . . . is free from inspection by postal authorities, except in the manner provided by the Fourth Amendment.") (citing *Ex parte Jackson*, 96 U.S. at 733).

The Federal Officials had no such articulable suspicion. Their assumption that the packages may have come from Eureka is the only one that even purports to show "some minimal level of objective justification." *Sokolow*, 490 U.S. at 7. But it remained a baseless and inchoate hunch or an unreasonable mistake of fact, because even a cursory attempt at verification would have immediately dispelled it. That is, they "*should* have accurately perceived that" their hunch was wrong. *Torres*, 648 F.3d at 1124. Instead, they chose to proceed blindly. But just a glance at the "overlabel[ing]" on which the officials apparently placed so much stock could have confirmed the packages' actual origin. FAC ¶ 84. Even if it did not, Plaintiffs' "regular practice was to write on each box that it came from Movement Ink and what it contained, such as 'masks.'" FAC ¶ 32; *see also* FAC ¶ 36 ("As usual, all of the political mask shipments were marked or identified with Movement Ink as the sender, and likely had their contents handwritten on the side, in accordance with René's and Movement Ink's regular practice."). In short, the actual reasons given for the packages' seizure were clearly unreasonable.

3. The Federal Officials are not saved by their post hoc attempt to backfill the anodyne characteristics and inchoate hunch that formed the basis for the packages' unjustifiable seizure. *See* FAC ¶¶ 89–91. First, those are not the facts actually relied on for the packages' seizure, so they are

1    irrelevant to the reasonable suspicion analysis. *Aldaz*, 921 F.2d at 229; *Brown*, 925 F.3d at 1154–

2    55; *Taylor*, 2022 WL 5125182, at *8.

3        Second, the post hoc justifications are not only just as anodyne as the actual ones, but they

4    *contradict* the actual ones because they indicate that the officials *knew* who sent the packages.

5    *Compare* FAC ¶ 84 (packages may have come from Eureka), *with* FAC ¶ 91 (packages came from

6    frequent shipper). And if the officials did know who the packages came from, their removal from

7    the mail stream based on the identity of those senders (whom the officials never had any reason to

8    suspect of anything unlawful) is even more unreasonable and unjustifiable. It cannot be an

9    "objective justification." *Sokolow*, 490 U.S. at 7. If anything, Movement Ink's "frequent" mailing

10   of packages from the same address and the same post office *without ever having been suspected of*

11   *anything unlawful* indicated a ho-hum screen-printing business, *not* a basis for reasonable suspicion.

12   FAC ¶ 91.

13       Finally, why compliance with the postal service's own publicly posted packaging guidelines

14   could or should form a basis for reasonable suspicion is anyone's guess. *See* FAC ¶ 98 ("Indeed,

15   one of Defendants' assertions purporting to justify the packages' seizures, detentions, and

16   searches—i.e., that the packages were 'taped or glued on all seams'—purports to deem it suspicious

17   if a shipper complies with the Postal Service's own public guidance, which advises: 'If you are

18   mailing a very heavy or very dense item, start with a sturdy box, pack the contents securely with a

19   strong material for bracing to prevent shifting, and *tape all the edges with reinforced tape*'")

20   (emphasis added).

21       4. For these reasons, when assessing either the actual reasons for the packages' seizure or

22   the post hoc justifications, Plaintiffs' allegations plausibly plead that the Federal Officials took the

23   packages out of the mail stream based on anodyne characteristics and inchoate hunches, not—as the

24   Fourth Amendment requires—some combination of suspicious characteristics and verified

25   knowledge about the unlawful activities of sender or recipient.

26       ***The complaint plausibly pleads that the Federal Officials kept the packages detained for***

27   ***over 24 hours without any investigation or justification for their delay.*** Even where reasonable

28

United States District Court
Northern District of California

suspicion exists to justify an investigatory package seizure, it is clearly established that the subsequent detention may not exceed the time actually and reasonably necessary to conduct the investigation. *United States v. Dass*, 849 F.2d 414, 414–16 (9th Cir. 1988). That means officials must show they "acted diligently *and offered a reasonable explanation for any delay*." *United States v. Ivers*, 430 F. App'x 573, 575 (9th Cir. 2011) (emphasis added). Indeed, the officials have an obligation to "minimize[] the intrusion on . . . Fourth Amendment interests." *United States v. Place*, 462 U.S. 696, 709 (1983). And the investigation may not be conducted at a "leisurely pace." *United States v. Gill*, 280 F.3d 923, 929 (9th Cir. 2022). So it is clearly unreasonable for officials to seize packages and then proceed to do *nothing* to verify or justify the need for their detention for over 24 hours. FAC ¶¶ 69–73; *see Place*, 462 U.S. at 709–10 (detention as short as 90 minutes violates the Fourth Amendment if the record contains no specific, articulated reasons actually justifying the duration of the detention).

As the complaint explains, after seizing the packages, the Federal Officials admit that they did indeed do nothing to investigate or verify the propriety of detaining them. That is not "act[ing] diligently." *Ivers*, 430 F. App'x at 575. The Federal Officials' own notes contain no "explanation for any delay," let alone a "reasonable explanation." *Id.* To the contrary, their notes make clear that they left the packages to languish indefinitely until Plaintiffs' story made national news. FAC ¶ 57 (quoting postal service letter making clear that the packages were ignored until the news story broke). In other words, they certainly did not "minimize[] the intrusion on [Plaintiffs'] Fourth Amendment interests." *Place*, 462 U.S. at 709. If an unexplained detention for 90 minutes is unreasonable, *id.* at 708–10, so is the Federal Officials' detention of Plaintiffs' packages "for over 24 hours without efforts to confirm or dispel whatever assumptions attended their seizures of the packages." FAC ¶ 76. So, even if the packages' initial seizure was reasonable (which it was not), their subsequent detention without any action or explanation for delay was clearly unreasonable.

**The complaint plausibly pleads that the Federal Officials searched the packages without a warrant.** It is clearly established that a search of seized packages requires more than reasonable suspicion; it requires probable cause *plus* either a warrant or showing of exigency. *Florida v. Royer*,

460 U.S. 491, 497 (1983) (plurality opinion); *Van Leeuwen*, 397 U.S. at 253 ("search warrant needed for [detained packages'] inspection"). Here, no warrant was ever obtained, and the Federal Officials' lack of any action for more than 24 hours belies any possibility of exigency. FAC ¶¶ 93, 97. And yet, the complaint plausibly pleads that the Federal Officials searched Plaintiffs' packages. The Federal Officials' own "notes make clear that [they] knew the contents of the package were, in [their] words, 'BLM MASKS.'" FAC ¶ 77. Drawing all inferences in Plaintiffs' favor, that notation plausibly indicates that the Federal Officials searched the packages. If, instead, the Federal Officials would have the Court draw the inference that this notation was entered only after national news coverage prompted them to revisit the languishing packages, they have only reinforced Plaintiffs' argument above regarding the post hoc nature of the Postal Officials' effort to justify the packages' seizure—as that justification appears in the same "Parcel Detail Worksheets" as the "BLM MASKS" notation. FAC ¶¶ 77, 89.

*In sum:* Clearly established Fourth Amendment law requires the Federal Officials to adequately justify their seizure, detention, and search of Plaintiffs' packages. Instead, they ask the Court to hold that incanting the words "drug package profile" in legal briefing can make Plaintiffs' well-pleaded Fourth Amendment claims disappear. No case permits this sort of magic-words approach to the Fourth Amendment. A "court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to [a] conclusion" that specific facts fit a drug "profile." *Sokolow*, 490 U.S. at 10. The Federal Officials' own notes make clear they have not done so. Plaintiffs' detailed allegations regarding the Federal Officials' own explanations for their conduct plausibly plead clearly established Fourth Amendment violations at the time of the packages' initial seizure, their subsequent detention, and their warrantless search.

> ## C. The complaint plausibly pleads a clearly established First Amendment violation.

While *Egbert* forecloses Plaintiffs' First Amendment *Bivens* claims, those claims are plausibly pleaded (and cognizable directly under the Westfall Act, *see infra* section III).

For decades, federal officials have known that "action designed to retaliate against and chill political expression strikes at the heart of the First Amendment," and that they can be held personally

liable for such misconduct. *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986) (recognizing First Amendment retaliation claims under *Bivens*). Every reasonable government official knows that adverse or retaliatory action for core political speech—such as Plaintiffs'— "obvious[ly]" violates the First Amendment. *Hope v. Pelzer*, 536 U.S. 730, 738, 745 (2002). For such "inherent[ly]" unconstitutional conduct, *id.* at 745, requiring "precedent specifically on point," *Vance v. Barrett*, 345 F.3d 1083, 1094 (9th Cir. 2003), would be "flatly inconsistent with the concept of qualified immunity," *Rhodes v. Robinson*, 408 F.3d 559, 570 (9th Cir. 2005). *See Taylor v. Riojas*, 141 S. Ct. 52 (2020) (no qualified immunity for obvious constitutional violations even under novel circumstances); *McCoy v. Alamu*, 141 S. Ct. 1364 (2021) (mem.) (same).

As the complaint explains, the Federal Officials' "notes make clear that [they] knew the contents of the package[s] were, in [their] words, 'BLM MASKS.'" FAC ¶ 77. That notation, combined with (1) the "controversial" nature of Plaintiffs' speech from law enforcement's perspective, FAC ¶ 317; (2) postal officials' familiarity with Plaintiffs' business, FAC ¶¶ 30–31; (3) the officials' acknowledgment in their notes that they apparently knew who mailed the packages, FAC ¶ 91; (4) the packages' labeling, FAC ¶¶ 32, 36; and (5) the lack of any valid reason to seize, detain, or search the packages, *see supra* section II.B, all plausibly suggest that the Federal Officials either seized, detained, and searched the packages for no reason or in retaliation for Plaintiffs' political speech. At this stage, Plaintiffs are not expected to know exactly what happened or to prove their case, and they may plead in the alternative. Accordingly, they have adequately pleaded that if the Federal Officials "knew that the packages contained—in [their] words—'BLM MASKS' before seizing the packages, [they] violated the First Amendment by seizing packages because of their political messages" FAC ¶ 79.

### III.    Plaintiffs plausibly plead cognizable constitutional claims under the Westfall Act pursuant to 28 U.S.C. § 2679(b)(2)(A) against the Federal Officials.

In 1988, Congress passed the Westfall Act and codified damages claims against individual federal officials. Plaintiffs maintain that the Act, properly understood, makes such claims generally available. But the Supreme Court says it only codifies pre-1988 *Bivens* claims.

Even under that narrower construction, Plaintiffs' Fourth Amendment and First Amendment

United States District Court
Northern District of California

1    claims remain cognizable directly under the Act.

2          Moreover, the Act is best understood as preserving the availability of state tort claims against

3    federal officials if those claims also amount to federal constitutional violations—thereby preserving

4    Plaintiffs' claims for trespass to chattels and interference with contractual and economic relations,

5    which simultaneously constitute Fourth Amendment and First Amendment violations, for the

6    explained in sections I and II above.

7          **A.       The Westfall Act codifies claims against individual federal officials.**

8          The Federal Officials argue that "creating a cause of action is a legislative endeavor." ECF

9    52 at 10 (quoting *Egbert*, 142 S. Ct. at 1802). Congress engaged in that endeavor via the Westfall

10   Act, which expressly provides for a "civil action against an employee of the Government . . . for a

11   violation of the Constitution." 28 U.S.C. § 2679(b)(2)(A). The Supreme Court previously

12   acknowledged that the Act "preserv[ed] employee liability for *Bivens* actions." *United States v.*

13   *Smith*, 499 U.S. 160, 166–67, 173 (1991); *see id.* at 182 (Stevens, J., dissenting) (quoting DOJ's

14   explanation that the Act "ma[d]e explicit what [Congress] had assumed all along: that victims of

15   constitutional violations would remain free to pursue a remedy against the individual employee");

16   *see also Hui v. Castaneda*, 559 U.S. 799, 806–07 (2010) (Westfall Act "provided an exception [to

17   exclusiveness of FTCA remedies] for constitutional violations").

18         But in *Hernández v. Mesa*, the Court said that the Act—which speaks of no exceptions or

19   limitations—"simply left *Bivens* where it found it" in 1988. 140 S. Ct. at 748 n.9. The Court was

20   not asked whether the statute itself creates a cause of action—i.e., whether the right to bring

21   constitutional claims against federal officials has been legislatively codified, such that claims

22   brought directly under the Act itself are cognizable, independent of the *Bivens* regime. *Compare*

23   FAC Counts 5, 8, 11, 13–15 (constitutional claims directly under the Act), *with* FAC Counts 4, 7,

24   10 (constitutional claims under *Bivens*). Plaintiffs acknowledge that the Court seemingly reached

25   out and decided that question anyway. *Hernández*, 140 S. Ct. at 748 n.9 (§ 2679(b)(2)(A) did not

26   "abrogate *Bivens*"). In doing so, the Court narrowed the statute's scope but did recognize the

27   statute's codification of at least some constitutional claims.

28

United States District Court
Northern District of California

Plaintiffs preserve for appellate consideration the statute's proper meaning and scope, which Congress intended to be broad and protective. *See, e.g.*, Vázquez & Vladeck, *supra*, at 570–82; Brief for Institute for Justice as Amicus Curiae, *Hernández v. Mesa*, No. 17-1678, 2019 WL 3854459, at *21–23. Properly understood, the "Act assumes the routine availability of a *Bivens* remedy." James E. Pfander & David Baltmanis, *Rethinking Bivens: Legitimacy and Constitutional Adjudication*, 98 Geo. L.J. 117, 134 (2009). Therefore, in assessing the viability of claims against federal officials, the default presumption should be that Congress understood them to be "generally available," not artificially limited by the happenstance of time or context. Patrick Jaicomo & Anya Bidwell, *Unqualified Immunity and the Betrayal of Butz v. Economou: How the Supreme Court Quietly Granted Federal Officials Absolute Immunity for Constitutional Violations*, 126 Dick. L. Rev. 719, 756 (2022); *see also* Pfander & Baltmanis, *supra*, at 123 n.28 (collecting cases illustrating the diverse actions available against federal officials, which Congress was aware of when it codified the general availability of *Bivens* claims through the Westfall Act).

But regardless of the proper meaning and scope of § 2679(b)(2)(A), *Hernández* makes clear that the statute preserves, at minimum, the constitutional claims against federal officials that were recognized by the federal judiciary before the statute's enactment in 1988—such as Plaintiffs'.

### B.  The complaint's Fourth Amendment claims are cognizable under the Westfall Act.

Before 1988, when Congress codified constitutional claims against individual federal officials, not only did *Bivens* itself recognize the right to sue federal officials for Fourth Amendment violations; the Ninth Circuit and other circuits routinely recognized that Fourth Amendment claims were cognizable against individual federal officials in a broad range of circumstances. For example, the Ninth Circuit had just authorized such claims against Navy personnel, and even private actors working with them, arising from the seizure of personal property at a federal workplace. *Schowengerdt v. Gen. Dynamics Corp.*, 823 F.2d 1328 (9th Cir. 1987). Indeed, the federal judiciary treated the cognizability of Fourth Amendment claims in general and claims arising from the seizure of personal property in particular as all but "settled" under *Bivens*. *Paton v. La Prade*, 524 F.2d 862, 869 (3d Cir. 1975); *see also, e.g.*, *Bethea v. Reid*, 445 F.2d 1163 (3d Cir. 1971); *State Marine Lines,*

*Inc. v. Shultz*, 498 F.2d 1146 (4th Cir. 1974); *Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987).

"Congress is presumed to enact legislation with knowledge of the law," so "a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts." *Garcia v. DHS*, 437 F.3d 1322, 1335–36 (Fed. Cir. 2006) (collecting Supreme Court cases). And Congress did not limit judicial recognition and expansion of Fourth Amendment *Bivens* claims when it enacted § 2679(b)(2)(A). So Counts 5 and 8—which bring Fourth Amendment claims directly under § 2679(b)(2)(A)—remain cognizable, even if the corresponding claims under *Bivens* and directly under the Constitution (Counts 4, 6, 7, 9) are not cognizable. *Hernández*, 140 S. Ct. at 748 n.9.[9]

### C.   The complaint's First Amendment claims are cognizable under the Westfall Act.

In 1986, the Ninth Circuit joined other circuits "in holding that" "*Bivens* claims based on the First Amendment" are "properly cognizable." *Gibson*, 781 F.2d at 1342 (collecting cases); *see also, e.g.*, *Yiamouyiannis v. Chem. Abstracts Serv.*, 521 F.2d 1392, 1393 (6th Cir. 1975). Indeed, the general availability of First Amendment claims against federal officials was so accepted that the Supreme Court felt compelled to tamp down their effects by inventing qualified immunity. *See Butz v. Economou*, 438 U.S. 478 (1978); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); Jaicomo & Bidwell, *supra*, at 744–47. Accordingly, as discussed above with respect to Fourth Amendment claims, because Congress knew the state of the law when it enacted § 2679(b)(2)(A) and did not limit the reach of *Gibson* or any other First Amendment *Bivens* cases, Count 11—which brings First Amendment claims directly under § 2679(b)(2)(A)—remains cognizable, even if the corresponding claims under *Bivens* and directly under the Constitution (Counts 10, 12) are not cognizable. *Hernández*, 140 S. Ct. at 748 n.9.[10]

---

[9] The pre-1988 Supreme Court decisions cited in *Egbert* as examples of the Supreme Court declining to expand *Bivens* arose under different constitutional provisions and therefore do not alter the result. *See* 142 S. Ct. at 1799 (citing *Chappell v. Wallace*, 462 U.S. 296 (1983); *Bush v. Lucas*, 462 U.S. 367 (1983); *United States v. Stanley*, 483 U.S. 669 (1987); *Schweiker v. Chilicky*, 487 U.S. 412 (1988).

[10] *Bush v. Lucas*, in which the Supreme Court declined to recognize a First Amendment *Bivens* claim in the government employment context in the year 1983, does not alter the result because the circuit court cases cited above postdated—and had to be consistent with—*Bush*'s limited holding in that particular context of government employment, as contrasted to the claims brought by ordinary

**D.** **The complaint's tort claims that also amount to constitutional violations are cognizable under the Westfall Act.**

In addition to pleading state tort claims against the Government under the FTCA in Counts 1 through 3, Plaintiffs claim in Counts 13 through 15 that the Federal Officials "are liable in damages under California [tort] law for [the Federal Officials' commission of the three torts] in violation of Plaintiffs' constitutional rights." FAC ¶¶ 352–373, 380–382. The Government argues that these counts "should be dismissed as duplicative because the United States is the only proper defendant for these claims." *See* ECF 51 at 14–15. As noted in the complaint, Plaintiffs "recognize that [these claims] may currently be barred by the Westfall Act (28 U.S.C. § 2679(b)(1)), but Plaintiffs preserve the issue." FAC ¶¶ 357, 365, 373, 380–382.

Plaintiffs submit that "the Westfall Act could be read to preserve . . . state tort remedies in cases alleging a violation of the Constitution by federal officials." Vázquez & Vladeck, *supra*, at 570–77. As Professors Vázquez and Vladeck explain: "[I]n *Wilkie v. Robbins*, a case decided after the enactment of the Westfall Act, the Court assumed the continued availability of common law tort remedies against federal officials alleged to have violated the Constitution." *Id.* at 570–71 (citing 551 U.S. 537, 551 (2007)). But, as the professors also explain, "The Supreme Court in *Pollard* has instead read the Westfall Act to preempt all state tort remedies against federal officials acting within the scope of their employment." *Id.* at 582–83; *see Minecci v. Pollard*, 565 U.S. 118, 126 (2012) ("Prisoners ordinarily *cannot* bring state-law tort actions against employees of the Federal Government.") (citing 28 U.S.C. §§ 2671, 2679(b)(1)).

In agreement with Professors Vázquez and Vladeck, and to avoid the serious constitutional concerns that would arise if all of Plaintiffs' avenues for relief were foreclosed (*see infra* section IV), this Court should hold that the *Wilkie* reading of the Westfall Act is superior to the *Pollard* reading, and that Counts 13 through 15 may proceed because they plead state torts committed in simultaneous violation of the Constitution (i.e., trespass to chattels and interference with contractual and prospective economic relations in violation of the Fourth and First Amendments).

---

persons exercising their political speech rights in *Gibson*, the other cited cases, and this case.

IV.     **The FTCA and the Westfall Act are unconstitutional as applied if Plaintiffs'
damages claims arising from the misconduct of federal officials in the scope of
their employment are not cognizable in any court under any source of law.**

If the Court holds—as Defendants urge—that none of Plaintiffs' claims are cognizable under

the FTCA, *Bivens*, the Westfall Act, directly under the Constitution, or under state tort law, the

Court should hold that the FTCA and the Westfall Act are unconstitutional as applied because they

deprive Plaintiffs of any judicial forum to redress injuries caused by federal officials in the scope of

their employment. If no damages remedy is cognizable in either federal or state court for a tort or

constitutional violation committed by a federal official, such foreclosing of remedies violates Article

III Section 2's dictate that the federal "judicial power shall extend to all cases, in law and equity,

arising under this Constitution," the Fifth Amendment's guarantee of due process of law, the First

Amendment right to petition for redress of grievances, or 28 U.S.C. § 1331's grant of jurisdiction

to hear "all civil actions arising under the Constitution, laws, or treaties of the United States."

"The very essence of civil liberty certainly consists in the right of every individual to claim

the protection of the laws, whenever he receives an injury. One of the first duties of government is

to afford that protection." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). Article III

Section 2 affords that protection by guaranteeing the right of federal judicial review for "all cases,

in law and equity, arising under this Constitution." That provision "appeals to, and adopts, the

common law to the extent of making it a rule in the pursuit of remedial justice in the courts of the

Union." Joseph Story, *Commentaries on the Constitution of the United States* § 1639 (1833).

Accordingly, at the founding, federal officials who committed constitutional violations were

deemed stripped of any immunities and held liable in tort, like any private individual. *Little v.

Barreme*, 6 U.S. (2 Cranch) 170 (1804). And the "Supreme Court issued a steady series of decisions

throughout the 19th and early 20th centuries confirming these foundational concepts of

constitutional accountability." Jaicomo & Bidwell, *supra*, at 724–29 (collecting cases).

Writing for the Court, Justice Story explained that the Constitution's separation of powers

compels the federal judiciary to provide "a suitable redress" for harms suffered at the hands of

federal officials. *The Apollon*, 22 U.S. (9 Wheat.) 362, 367 (1824). "Under this conception of the

separation of powers, an executive branch official could act outside his legal authority in emergency

circumstances, but the victims of his actions were still entitled to a legal remedy *from the official*. If the executive actions were justified, Congress addressed any policy concerns arising out of individual liability by indemnifying the official, as it commonly did." Jaicomo & Bidwell, *supra*, at 728 n.49 (citations omitted).

In short: "Judge-made tort law that furnishes remedies for official wrongdoing, including constitutional violations, is as old as the Constitution itself." Richard H. Fallon, *Bidding Farewell to Constitutional Torts*, 107 Calif. L. Rev. 933, 935 (2019). "The Framers assumed the existence of a going regime of common law and equitable remedies through which government officials could be held accountable for unlawful conduct, including constitutional violations." *Id.* at 942.

Of course, *Erie Railroad Co. v. Tompkins* eliminated general federal common law and required federal courts to apply state common law. *See* 304 U.S. 64, 71–73 (1938). And state common law remedies against federal officials are now generally understood as eliminated by the Westfall Act. *See* 28 U.S.C. § 2679(b). So, in this case, the current state of affairs leaves six possibilities as to Plaintiffs' claims:

(1) the founding-era conception of the federal judiciary's obligation to redress federal officials' constitutional violations is cognizable under the Constitution itself—a notion the Supreme Court rejected in *Egbert*;

(2) Plaintiffs' claims are cognizable under the *Bivens* regime—which they argue remains true at least for their Fourth Amendment claims, *see supra* section II, but which Defendants argue are entirely foreclosed by *Egbert*;

(3) the Westfall Act codifies constitutional claims against federal officials by providing a "civil action against an employee of the Government . . . for a violation of the Constitution," 28 U.S.C. § 2679(b)(2)(A)—a construction the Supreme Court artificially narrowed in *Hernández*, but which Plaintiffs maintain still covers their Fourth Amendment and First Amendment claims, *see supra* section III;

(4) the Westfall Act preserves state tort remedies to the extent they also amount to constitutional violations—which Professors Vázquez & Vladeck persuasively argue is the best

1   reading of the Act, but is likely foreclosed by the Supreme Court's current construction of it, *see*

2   *supra* section III (citing Vázquez & Vladeck, *supra*, at 570–77, 582–83);

3   (5) the FTCA "supplies . . . remedies against the United States," arguably rendering the need

4   for a cause of action against individual officials "less necessary," Ann Woolhandler & Michael G.

5   Collins, *Was Bivens Necessary?*, 96 Notre Dame L. Rev. 1893, 1919 (2021)—the former

6   proposition Plaintiffs agree with, the latter not; or

7   (6) all of these avenues for redressing Plaintiffs' injuries are congressionally and judicially

8   foreclosed by the FTCA's exceptions, the Westfall Act, and *Egbert*—as Defendants argue.

9   Obviously, for the reasons explained in sections I through III above, Plaintiffs maintain that

10   at least one—indeed, several—avenues of redress are open. But if the Court agrees with Defendants

11   and holds that all courthouse doors are closed under any source of law for the misconduct of federal

12   officials in the scope of their employment, the statutory scheme is unconstitutional as applied. It

13   violates:

14   (1) the founding-era conception and original intent of Article III Section 2 discussed above,

15   *see* Stephen I. Vladeck, *The Inconsistent Originalism of Judge-Made Remedies Against Federal*

16   *Officers*, 96 Notre Dame L. Rev. 1869, 1872 (2021) ("the Supreme Court's modern hostility to

17   judge-made damages remedies against federal officers, in contrast to its solicitude toward judge-

18   made injunctive relief, is not just inconsistent with the original understanding; it is, *because* of that

19   defect, affirmatively *antithetical* to originalism as a modality of constitutional interpretation");

20   (2) the Fifth Amendment's guarantee of due process of law, *see* Vázquez & Vladeck, *supra*,

21   at 574–77 (collecting substantial judicial and scholarly authority recognizing that a lack of any

22   judicial remedy for injuries caused by government officials would violate due process);

23   (3) the First Amendment's guarantee of the right to petition for redress of grievances, which

24   is "essential to freedom," *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 382 (2011); *see generally*

25   James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right*

26   *to Pursue Judicial Claims Against the Government*, 91 Nw. U. L. Rev. 899 (1997); Stephen A.

27   Higginson, Note, *A Short History of the Right to Petition Government for the Redress of Grievances*,

28

United States District Court
Northern District of California

96 Yale L.J. 142, 142–43 (1986) ("original design of the First Amendment petition clause . . . included a governmental duty to consider petitioners' grievances"); and

(4) 28 U.S.C. § 1331's grant of jurisdiction for federal courts to hear "all civil actions arising under the Constitution, laws, or treaties of the United States," *see Bivens*, 403 U.S. at 405 (Harlan, J., concurring) (if federal question jurisdiction is "adequate to empower a federal court to grant equitable relief for all areas of subject-matter . . . the same statute is sufficient to empower a federal court to grant a traditional remedy at law") (citations omitted); Michael G. Collins, *'Economic Rights,' Implied Constitutional Actions, and the Scope of Section 1983*, 77 Geo. L.J. 1493 (1989).

In sum: Either Plaintiffs are right and the courthouse doors are open, or Defendants are right and their original violation of Plaintiffs' constitutional rights is being compounded by yet another.

## CONCLUSION

The Court should enter Defendant Fajardo's default, deny the other Defendants' motions to dismiss, and order the parties to begin discovery.

Alternatively, if the Court holds that no damages remedy is cognizable in either federal or state court (under federal or state law) for the misconduct of federal officials in the scope of their employment, the Court should hold that the FTCA and the Westfall Act are unconstitutional as applied, because foreclosing all judicial remedies violates Article III Section 2's dictate that the federal "judicial power shall extend to all cases, in law and equity, arising under this Constitution," the Fifth Amendment's guarantee of due process of law, the First Amendment right to petition for redress of grievances, or 28 U.S.C. § 1331's grant of jurisdiction to hear "all civil actions arising under the Constitution, laws, or treaties of the United States."

United States District Court
Northern District of California

February 10, 2023

Respectfully submitted,

s/ Jaba Tsitsuashvili
Jaba Tsitsuashvili (CA Bar No. 309012)
Patrick Jaicomo* (MI Bar No. P-75705)
Trace Mitchell* (DC Bar No. 1780794)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
jtsitsuashvili@ij.org
pjaicomo@ij.org
tmitchell@ij.org

*Admitted pro hac vice

Anna M. Barvir (CA Bar No. 268728)
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Phone: (562) 216-4444
Fax: (562) 216-4445
abarvir@michellawyers.com

*Counsel for Plaintiffs*