UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RENE QUINONEZ, et al.,

   Plaintiffs,

  v.

UNITED STATES OF AMERICA, et al.,

   Defendants.

Case No.  22-cv-03195-WHO

**ORDER GRANTING MOTIONS TO DISMISS**

Re: Dkt. Nos. 51, 52

Defendants the United States of America and four United States Postal Service or United States Postal Inspection Service employees, Jeff Agster, Eva Chan, Mark Hodges, and Robin Lee ("the individual defendants"), move to dismiss claims brought by plaintiffs René Quiñonez and Movement Ink LLC ("Movement Ink"), who allege that the defendants unlawfully seized, detained, and searched four packages containing masks screen-printed with political messages. The motions are GRANTED with limited leave to amend.  Most of the claims against the individual defendants assert constitutional violations under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), the Westfall Act, and the First and Fourth Amendments; none of them provide a cause of action.  The claims against the United States arising under the Federal Tort Claims Act ("FTCA") fall within one or more exceptions to the FTCA's waiver of sovereign immunity.  They are dismissed for lack of jurisdiction.  And the state law tort claims may not be asserted against the individual defendants and may only proceed against the United States under the FTCA; they are dismissed as duplicative.

## BACKGROUND

Quiñonez is the majority owner and manager of Movement Ink, a small screen-printing business "known for its brand of activism-inspired business practices and relationships."  First

United States District Court
Northern District of California

Am. Compl. ("FAC") [Dkt. No. 33] ¶¶ 9, 14.  The FAC alleges that for years, "activist movements, organizations, nonprofits, and individual organizers" regularly ordered screen-printed products, such as T-shirts and sweatshirts, from Quiñonez and Movement Ink.  *Id.* ¶ 17.

From March to May 2020—the start of the COVID-19 pandemic—Movement Ink saw an increase in orders for screen-printed masks.  *Id.* ¶ 24.  When the police killings of George Floyd and Breonna Taylor prompted protests in late May and early June 2020, the FAC alleges that Movement Ink was "the supplier of choice when organizers around the country began ordering COVID-protective masks bearing political messages."  *See id.* ¶¶ 25-26.  The FAC alleges that Quiñonez and Movement Ink printed and shipped three orders for thousands of face masks to organizers in Atlanta, Los Angeles, and Oakland.  *See id.* ¶¶ 26, 29.  The masks bore messages such as "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE."  *Id.* ¶ 27.

On June 3, 2020, about a week after the plaintiffs sent the shipments to Atlanta, Los Angeles, and Oakland, they mailed four packages of masks from Oakland, California, to New York City, Washington, D.C., Minneapolis, and St. Louis.  *See id.* ¶¶ 34, 38, 40, 104.  The FAC alleges that the packages were "neatly taped, nondescript brown boxes with the identities and locations of the sender and the recipients clearly labeled."  *Id.* ¶ 63.  Although the plaintiffs shipped these packages using priority mail express overnight shipping, they were not delivered on time.  *See id.* ¶¶ 37-38.

Instead, Quiñonez and the intended recipients received an alert via the Postal Service's online tracking system, which stated that the packages were "seized by law enforcement."  *Id.* ¶ 41.  The four packages did not arrive at their destinations until June 6—or, as the FAC alleges, "two days and several protests late."  *Id.* ¶ 42.  The FAC alleges that the defendants held the packages "without reasonable suspicion, probable cause, or a warrant for more than 24 hours."  *Id.*

Quiñonez sought information about the incident via Representative Barbara Lee, whose office submitted an official inquiry to the Postal Service.  *Id.* ¶ 56.  In response, the Postal Service said that the packages "were detained solely because the external physical characteristics of the parcels were consistent with parcels in other non-related instances that were confirmed to contain nonmailable matter, specifically controlled substances."  *Id.* ¶ 57.  The letter denied that the

packages were detained "based on the sender or recipient, because they were associated with organizations involved in protests," or "because it was known" that they contained masks or "any articles containing statements supporting any group or position." *Id*. The letter also stated that "there were no external characteristics of the parcels that indicated they contained masks or were associated with any specific organization." *Id*. According to the letter, once the Postal Inspection Service became aware of news stories about the shipment on June 5, it "immediately took action to rectify the situation" and placed the packages back in the mail stream. *Id*.

Quiñonez sought additional information about the packages via Freedom of Information Act ("FOIA") requests made to the Postal Service. *Id*. ¶ 74. According to the FAC, the defendants' notes (obtained via the FOIA requests) "make clear that defendants knew the contents of the package were, in defendants' words, 'BLM MASKS.'" *Id*. ¶ 77. But, the FAC alleges, "[i]t is not clear whether defendants knew that the packages contained . . . 'BLM MASKS' before seizing" them. *Id*. ¶ 78.

According to the FAC, these notes further show that defendant Chan "initially seized, detained, and searched the packages" because they were "four big boxes" with "green handwriting," "overlabeled" with an address, and believed to be sent from Eureka, California. *See id*. ¶¶ 82, 84. The FAC further alleges that defendants Agster and Lee "kept the packages seized and detained for approximately 24 hours"; that defendant Hodges ordered that they be searched before being returned to the mail stream; and that Hodges completed "Parcel Detail Worksheets" for each package. *Id*. ¶¶ 86-88. Those worksheets allegedly stated that the packages were suspicious because: (1) of their "bulging contents"; (2) they were "taped or glued on all seams"; (3) there were "frequently mailed parcels from the same sender/address"; (4) the "parcel destination is a known drug trafficking area"; and (5) the "parcel [was] mailed from a known drug source area." *Id*. ¶ 91.

The plaintiffs filed suit in June 2022. Dkt. No. 1. The FAC, filed in September of that year, asserts 15 claims, including: trespass to chattels, interference with contractual relations, and interference with prospective economic relations in violation of the FTCA and California law; unreasonable seizure in violation of the Fourth Amendment; and retaliation in violation of the

First Amendment.  *See generally* FAC.  Defendants filed two motions to dismiss: one by the United States, the other by the individual defendants.  Dkt. Nos. 51, 52.[1]  Alternatively, the motions seek to strike certain forms of relief from the FAC.  Dkt. Nos. 51, 52.

## LEGAL STANDARD

### I.       RULE 12(B)(1)

A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested.  *Id.*

A challenge pursuant to Rule 12(b)(1) may be facial or factual.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  The challenger asserts that the allegations in the complaint "are insufficient on their face to invoke federal jurisdiction."  *See Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  To resolve facial attacks, the court assumes that the allegations in the complaint are true and draws all reasonable inferences in favor of the party opposing dismissal.  *See Wolfe*, 392 F.3d at 362.

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Safe Air*, 373 F.3d at 1039.  To resolve factual attacks, the court "need not presume the truthfulness of the plaintiff's allegations."  *Id.* (citation omitted).  Instead, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment."  *Id.* (same).  Once the moving party has made a factual challenge by offering affidavits or other evidence to dispute the allegations in the complaint, the party opposing the motion must "present affidavits or any other

United States District Court
Northern District of California

---

[1] Although another individual defendant, Stephen Fajardo, is named in the FAC and has been served, he did not file either of the pending motions.  *See* Dkt. Nos. 51, 52.

evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *see also Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

## II.     RULE 12(B)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts his allegations as true and draws all reasonable inferences in his favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## DISCUSSION

### I.     UNITED STATES MOTION TO DISMISS

The United States argues that the claims arising under the FTCA (trespass to chattels,

interference with contractual relations, and interference with prospective economic relations) must be dismissed because they fall within various exceptions to the Act's limited waiver of sovereign immunity. United States Mot. to Dismiss ("USA MTD") [Dkt. No. 51] 2:2-13. Even if these claims could proceed, the government asserts, they are not adequately pleaded. *Id*. at 2:14-21.

### A. The FTCA and Sovereign Immunity

The FTCA waives the sovereign immunity of the United States for "certain torts committed by federal employees acting within the scope of their employment." *Brownback v. King*, 141 S. Ct. 740, 746 (2021) (citation and quotation marks omitted). There are, however, exceptions to this waiver. *Myles v. United States*, 47 F.4th 1005, 1011 (9th Cir. 2022) ("The sovereign immunity waiver in the FTCA is subject to several exceptions."); 28 U.S.C. § 2680 (listing exceptions). "If one of the exceptions applies, the bar of sovereign immunity remains." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 485 (2006).

### 1. Postal Exception

The United States invokes four exceptions to the FTCA. USA MTD at 2:2-13. The first is the postal exception, which provides that the FTCA does not apply to "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter." 28 U.S.C. § 2680(b).

In *Dolan*, the Supreme Court offered some guidance on this exception's terms, writing that "mail is 'lost' if it is destroyed or misplaced and 'miscarried' if it goes to the wrong address." 546 U.S. at 487. The Court then adopted a relatively limited view of the term "negligent transmission," finding that "[t]he phrase does not comprehend all negligence occurring in the course of mail delivery." *Id*. at 486-87. The Court drew a distinction between the type of negligence covered by the phrase and that at issue, where the plaintiff tripped and fell over mail left by postal employees on her porch. *See id*. at 483, 488-489.

> We think it more likely that Congress intended to retain immunity, as a general rule, only for injuries arising, directly or consequentially, because mail either fails to arrive at all or arrives late, in damaged condition, or at the wrong address. Illustrative instances of the exception's operation, then, would be personal or financial harms arising from nondelivery or late delivery of sensitive materials or information (e.g., medicines or a mortgage foreclosure notice) or from negligent handling of a mailed parcel (e.g., shattering of shipped china). Such harms, after all, are the sort primarily identified with the Postal Service's function of

United States District Court
Northern District of California

transporting mail throughout the United States.

*Id*. at 489.

Relying on *Dolan*, the United States argues that the plaintiffs' allegations "are squarely of the type that Congress excluded from the FTCA's waiver of sovereign immunity: injuries stemming from the late delivery of a parcel by the Postal Service." USA MTD at 7:15-8:12. Accordingly, it argues, the postal exception applies, meaning the United States retains sovereign immunity and the FTCA claims should be dismissed. *See id*. at 8:11-12.

The plaintiffs do not allege that the four packages were lost (i.e., destroyed or misplaced) or miscarried (i.e., sent to the wrong address), as defined by the Supreme Court in *Dolan*. *See* FAC ¶¶ 114-138. The question is whether the alleged torts (trespass to chattels, interference with contractual relations, and interference with prospective economic relations) amount to a "negligent transmission." I agree with the United States that under *Dolan*, this covers the packages' late delivery. But the plaintiffs' tort claims are premised on more than just the packages' late delivery. The trespass to chattels claim alleges that the defendants "intentionally interfered with plaintiffs' possession, right to possess, use, right to use, enjoyment, and right to enjoy their personal property by seizing, detaining, and searching plaintiffs' personal property." *Id*. ¶ 118. The remaining tort claims also take issue with the defendants' "intentional seizures, detentions, and searches of the packages." *Id*. ¶¶ 126, 136. Moreover, the plaintiffs allege intentional acts by the defendants, when *Dolan* expressly considered the late delivery of mail in the context of negligence. *See* 546 U.S. at 486-87.

Given the nature of the allegations underlying the plaintiffs' tort claims, namely that they describe intentional acts beyond the late delivery of mail, I agree with the plaintiffs that the postal exception does not apply.

### 2. Detention of Goods Exception

The United States next invokes the detention of goods exception, which excludes from the FTCA's waiver of sovereign immunity "[a]ny claim arising in respect of the . . . detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer." USA MTD at 8:13-9:12; 28 U.S.C. § 2680(c). The Supreme Court adopted

a broad reading of this language, holding that it covers "any claim 'arising out of' the detention of goods, and includes a claim resulting from negligent handling or storage of detained property" by "law enforcement officers of whatever kind," not just those enforcing customs or excise laws. *See Kosak v. United States*, 465 U.S. 848, 854 (1984); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 220 (2008). The United States argues that because of this broad interpretation, and "[b]ecause plaintiffs allege that their property was unlawfully seized and detained by law enforcement officers (here, postal inspectors), the detention of goods exception applies" and the claims are barred. USA MTD at 9:10-12.

The plaintiffs "concede that their claims are partially foreclosed" by *Ali*, "but only insofar as plaintiffs' claims arise from the 'detention' of their property." Oppo. [Dkt. No. 57] 11:7-9. They argue that their claims also arise from the allegedly unlawful seizure and search of the packages, which they contend "are distinct from complaints arising from the packages' prolonged detention." *See id*. at 11:14-16 (citing in part FAC ¶¶ 105-111).[2]

But the plaintiffs overlook *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1124-25 (9th Cir. 2019), where, as the United States notes, the Ninth Circuit reiterated that the detention of goods exception also covers seizures—at least within this Circuit. As the court wrote:

> We recognize that other courts have confined section 2680(c) to bar only those suits arising out of the temporary custody or withholding of goods. Our court has concluded otherwise. In our view, that statute has "effectively bar[red] any remedy for intentional torts with respect to seizures," notably treating "seizures" as covered by the detention exception in section 2680(c). . . . The exception also applies whether or not the property was seized as part of a criminal investigation.

*Id*. (citing in part *Gasho v. United States*, 39 F.3d 1420, 1433 (9th Cir. 1994)). The detention of goods exception therefore applies to claims arising from the seizure or detention of the packages.

What is left is the alleged search of the packages. Given the Supreme Court's caution that section 2680(c) does not preserve sovereign immunity "for the entire universe of claims against law enforcement officers" and "only for claims 'arising in respect of' the 'detention' of property," I am not inclined to find that this exception extends to any search. *See Ali*, 552 U.S. at 228.

---

[2] The plaintiffs "preserve for appellate reconsideration whether the detention of goods exception has been erroneously extended beyond the tax or customs context." *See* Oppo. at 11 n.5.

Whether the FAC adequately alleges that the packages were searched, however, merits a closer look, as it also impacts whether the claims can proceed under the discretionary function exception or, alternatively, whether the plaintiffs have adequately alleged trespass to chattels.

### 3. Discretionary Function Exception

Under section 2680(a), known as the discretionary function exception, the United States does not waive sovereign immunity for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Ninth Circuit uses a two-step test in deciding whether the exception applies. *Nieves Martinez v. United States*, 997 F.3d 867, 876 (9th Cir. 2021). First, the court must ask "whether the challenged actions involve an element of judgment or choice." *Id.* (citations and quotation marks omitted). If a federal statute, regulation, or policy "specifically prescribes a course of action for an employee to follow, the act is not discretionary because the employee has no rightful option but to adhere to the directive." *Id.* (same). If the court determines that the challenged actions involve an element of judgment or choice, it then must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* (same). "[I]f the judgment involves considerations of social, economic, or political policy, the exception applies." *Id.* (citation omitted).

Both parties sidestep this two-part test and focus on whether the challenged actions were discretionary. *See* USA MTD at 9:13-10:11; Oppo. at 11:24-12:10. The United States argues that postal inspectors have the authority to conduct postal inspections and investigations, including by making seizures of property. USA MTD at 9:20-25 (citing 18 U.S.C. § 3061; 39 C.F.R. 233.1(a)). Moreover, they contend, "[t]his authority contains no requirement that postal inspections be conducted in a specific manner" or mandate "the use of any specific techniques or course of action in postal inspections." *Id.* at 9:23-25.

That argument is undisputed. Postal inspectors are expressly empowered to "investigate criminal matters related to the Postal Service" and specifically, to "make seizures of property as provided by law." *See* 18 U.S.C. § 3061; 39 C.F.R. 233.1(a). Although these provisions allow

1  postal inspectors to make seizures "as provided by law," there is no specific course of action for

2  inspectors to follow in doing so, meaning they have an element of judgment or choice in

3  determining how to carry out seizures.  *See id.*

4       The plaintiffs point to Ninth Circuit case law that imposes a constitutional limit on the

5  discretionary function exception.  *See Nieves Martinez*, 997 F.3d at 877 ("Even if the agents'

6  actions involved elements of discretion, agents do not have discretion to violate the

7  Constitution.")).  They then argue that "because [they] have plausibly alleged that the postal

8  officials' seizure, detention, and search of their packages violated the Fourth Amendment and the

9  First Amendment . . . the discretionary function exception does not apply."  Oppo. at 12:8-10.

10       This argument turns on whether the FAC adequately alleges violations of the Fourth and

11  First Amendments, specifically on whether a search is plausibly alleged (because any claims

12  arising from the detention or seizure of the packages is barred by the detention of goods

13  exception).  The primary basis of the plaintiffs' Fourth Amendment claims is that the defendants

14  seized, detained, and searched the packages without probable cause or reasonable suspicion.  *See*

15  FAC ¶¶ 74-75, 80, 85.  The United States points out, however, that while the FAC "alleges that the

16  packages were seized, it contains no specific allegation that the packages were opened and

17  searched."  USA MTD at 4:6-7.

18       The FAC references the "seizures and searches" of the packages numerous times.  *See,*

19  *e.g.,* FAC ¶¶ 3-5, 21-23, 31.  But it is void of factual allegations supporting that any search

20  actually occurred.  The cursory references to "seizures and searches" are conclusory.  Even the

21  more specific allegations assume, without asserting, that the searches took place.  For example, the

22  plaintiffs allege that the defendants "asserted" in their letter to Representative Lee's office "that

23  they could seize, search, and hold for over 24 hours" the packages.  *See id.* ¶¶ 65-66.  But the

24  excerpts of the letter cited in the FAC do not mention any search; instead, they discuss the

25  packages' detention.  *See id.* ¶ 57.  As pleaded, the letter also stated that the Postal Inspection

26  Service "became aware of the media stories on the matter and what the contents of the parcels

27  were" on June 5, which suggests that the defendants knew about the packages' contents through

28  the press.  *See id.*  This does not plausibly show that a search in fact occurred.

United States District Court
Northern District of California

10

The FAC also references the "defendants' own notes regarding the seizures and searches" of the packages, obtained by the plaintiffs via FOIA.  *Id*. ¶ 74.  According to the FAC, notes from Hodges "explain that defendant Chan initially seized, detained, and searched the packages" and that his reasons for doing so were because they were "four big boxes" with "green handwriting" that were "overlabeled," and because she thought they were "sent from Eureka."  *Id*. ¶¶ 82-84.  The FAC also alleges that Hodges "ordered" that the packages be searched.  *See, e.g., id*. ¶ 103.

But elsewhere, the FAC uses language that only speculates that a search occurred.  It alleges that the defendants' notes "make clear that defendants knew the contents of the package[s] were, in defendants' words, 'BLM MASKS,'" but admits that "[i]t is not clear whether defendants knew that the packages contained . . . 'BLM MASKS' before seizing the packages."  *Id*. ¶¶ 77-78.  The FAC goes on to allege that "[i]f defendants learned the contents of the packages after seizing them, by searching them, defendants violated the Fourth Amendment" by searching them without consent, probable cause, or exigent circumstances.  *Id*. ¶ 80.  Later, the FAC alleges that the defendants "searched the packages *and/or* left the packages unattended for more than 24 hours." *Id*. ¶ 110 (emphasis added).  This language is equivocal; it alleges that *if* the packages were searched, the Fourth Amendment was violated, but does not plausibly allege that the packages were in fact searched.

Moreover, the FAC does not allege that when the packages reached their final destinations, there were any indications that the boxes had been opened.  *See generally id.*  This would support an inference that a search occurred, particularly given the plaintiffs' apparent close contact with the recipients as these events unfolded.  *See id*. ¶¶ 43-45.

Without more, the FAC makes only conclusory allegations that the packages were searched.  The plaintiffs have not plausibly shown a Fourth Amendment violation that would exceed the bounds of the discretionary function exception.

Nor have the plaintiffs plausibly alleged a violation of the First Amendment that would do the same.  The FAC alleges that "[i]f defendants knew that the packages contained . . . 'BLM MASKS' before seizing the packages, defendants violated the First Amendment by seizing packages because of their political messages."  *Id*. ¶ 79.  This language is also equivocal.  And

although the plaintiffs allege that the defendants knew the packages contained "BLM MASKS," there is no factual support for this in the FAC.  *See, e.g., id*. ¶¶ 3, 77, 298.  The plaintiffs do not cite fuller excerpts of these notes (as they do with the letter to Representative Lee's office) or otherwise explain their context to indicate how the defendants knew this.  Even if these particular defendants knew Quiñonez and his business, and knew that the packages contained masks (assuming the plaintiffs indeed wrote "masks" on the packages), the FAC does not plausibly allege that the defendants knew that the packages contained masks with *political messages* that caused them to retaliate against the plaintiffs on that basis.  *See id*. ¶¶ 31, 36.  Instead, the most specific allegation about the defendants' knowledge comes from the letter to Representative Lee's office, which states that the Postal Inspection Service "became aware of . . . what the contents of the parcels were" through the media.  *See id*. ¶ 57.

Because the plaintiffs have not plausibly alleged a constitutional violation, their argument against the application of the discretionary function exception fails.  Postal inspectors are authorized to "investigate criminal matters related to the Postal Service" without a specifically prescribed course of action, meaning that the defendants had an element of judgment or choice in deciding how to carry out that investigation, including by seizing the packages.  *See* 18 U.S.C. § 3061; 39 C.F.R. 233.1(a).  Although neither party directly addressed the second step of the analysis articulated in *Nieves Martinez*, I find that the discretionary judgment at issue—how to carry out investigations of criminal matters related to the Postal Service—involves policy considerations that prompt the exception's application.

In *Nieves Martinez*, the Ninth Circuit reiterated that "[b]ecause the investigation of crime involves policy judgments at the core of the executive branch, the court presumes" that acts carrying out a criminal investigation "are grounded in policy.  *See* 997 F.3d at 880-81 (citation and quotation marks omitted).  It then held that because the agents "were carrying out a criminal investigation" when they detained the plaintiffs, and "the investigation of crime involves policy judgments at the core of the executive branch, the nature of the agents' conduct at issue here clearly involves the type of policy judgment protected by the discretionary function exception." *Id*. at 881 (same).  The same is true here, as the FAC alleges the postal officials detained and

United States District Court
Northern District of California

United States District Court
Northern District of California

1    seized the packages because their "external physical characteristics . . . were consistent with

2    parcels in other non-related instances that were confirmed to contain nonmailable matter,

3    specifically controlled substances."  FAC ¶ 57.  Accordingly, the discretionary function exception

4    applies.

5                              **4.  Intentional Torts Exception**

6            The final exception at issue covers "[a]ny claim arising out of" certain intentional torts,

7    including "interference with contract rights."  28 U.S.C. § 2680(h).  The United States argues that

8    Count 2, which alleges that the United States interfered with the plaintiffs' contractual relations,

9    and Count 3, which alleges that it interfered with the plaintiffs' prospective economic relations,

10   must be dismissed under the intentional torts exception because they "aris[e] out of . . .

11   interference with contract rights" that was allegedly intentional.  *See* USA MTD at 10:13-17, 11:5-

12   9 (citing in part FAC ¶¶ 126-27, 135-36).  In support, the government points to cases within this

13   Circuit where courts have dismissed such claims as barred under section 2680(h).  *See id.* at

14   10:19-28 (citing cases).

15           The plaintiffs concede that the intentional torts exception "likely encompasses" the

16   interference with contractual relations claim, but "does not necessarily encompass 'interference

17   with prospective economic relations'" because "'prospective' relations may not yet be vested

18   contract 'rights,' which they were yet to be in plaintiffs' case."  Oppo. at 12:13-19.  As the

19   California Supreme Court has explained in distinguishing claims for interference with contractual

20   relations and interference with prospective economic relations, "[t]he two torts are related but

21   distinct" and "[e]conomic relationships short of contractual . . . should stand on a different legal

22   footing as far as the potential for tort liability is reckoned."  *Ixchel Pharma, LLC v. Biogen, Inc.*, 9

23   Cal. 5th 1130, 1141-42 (2020).  This is because "relationships that have ripened into agreements"

24   merit stronger protection, while "relationships short of that subsist in a zone where the rewards

25   and risks of competition are dominant."  *Id.* at 1142 (citation omitted).  Notably, tortious

26   interference with prospective economic advantage "does not depend on the existence of a legally

27   binding contract."  *Id.* at 1141.

28           Although the United States points to two cases within this Circuit where claims for

                                             13

1    intentional interference with prospective economic relations were dismissed as barred under

2    section 2680(h), neither consider the exception in depth nor analyze the distinction that the

3    plaintiffs make.  In *Forsythe v. Holder*, No. C-08-5160-MMC, 2009 WL 10710602, at *4 (N.D.

4    Cal. Nov. 30, 2009), the court said only that the plaintiffs' claim for intentional interference with

5    prospective business relationships "would be futile for the reason that the United States has not

6    waived its sovereign immunity with respect to" that tort and others, citing section 2680(h).  And in

7    *Powerturbine, Inc. v. United States*, No. 14-CV-0435, 2014 WL 12160753, at *13 (S.D. Cal. Dec.

8    15, 2014), although the plaintiffs did not expressly assert an interference with prospective

9    economic advantage claim, instead alluding to it in their prayer for relief and opposition, the court

10   found that "any duties underlying these allegations or claims for damages arise out of interference

11   with contract rights" and thus "barred by section 2680(h)."

12        That said, even if the plaintiffs' interference with prospective economic relations claim

13   does not "aris[e] out of . . . interference with contract rights," the claim as pleaded cannot proceed.

14   As I explain next, the plaintiffs have not plausibly alleged an essential element of the claim.  *See*

15   28 U.S.C. § 2680(h).

16        **B.  Whether the FTCA Claims are Adequately Pleaded**

17        The United States next argues that even if the plaintiffs' interference claims are not barred

18   by one of the above-mentioned exceptions, they must be dismissed for failure to state a claim.

19   USA MTD at 11:11-15.[3]  I agree.

20        To state a claim for intentional interference with contractual relations, a plaintiff must

21   allege: (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge

22   of that contract; (3) intentional acts by the defendant designed to induce a breach or disruption of

23   the contractual relationship; (4) actual breach or disruption of that contractual relationship; and (5)

24   resulting damage.  *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1149 (N.D. Cal.

25   2019) (citation omitted).

26

27   [3] The United States also makes this argument regarding the trespass to chattels claim.  *See* USA
     MTD at 11:15-12:16.  I need not address this point because the detention of goods and

28   discretionary function exceptions cover the detention and seizure of the packages, and because the
     FAC does not plausibly allege that they were searched.

United States District Court
Northern District of California

1    The elements of tortious interference with prospective economic relations are substantially

2    similar, requiring a plaintiff to show: (1) an economic relationship between the plaintiff and a third

3    party, with the probability of future economic benefit to the plaintiff; (2) the defendant's

4    knowledge of that relationship; (3) intentional acts by the defendant designed to disrupt the

5    relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff

6    proximately caused by the defendant's acts.  *CRST Van Expedited, Inc. v. Werner Enters., Inc.*,

7    479 F.3d 1099, 1107-08 (9th Cir. 2007) (citation omitted).  In addition, a plaintiff alleging

8    interference with prospective economic relations must "allege an act that is wrongful independent

9    of the interference itself."  *Id*. at 1108 (same).

10    These claims require the plaintiff to show knowledge by the defendant, either of a contract

11    or an economic relationship between the plaintiffs and a third party.  The United States argues that

12    these claims fail because the FAC does not plausibly allege that the defendants had knowledge of

13    either.  USA MTD at 12:17-13:26.

14    The plaintiffs argue that the FAC adequately alleges that "the postal officials plausibly

15    knew—given the postal officials' familiarity with plaintiffs and their business—that plaintiffs

16    were shipping the packages as part of the plaintiffs' usual and regular screen-printing and

17    distribution contracts and economic relations."  Oppo. at 9:13-16.  They point to allegations about

18    the defendants' notes, which they contend "make clear that they knew the packages came from a

19    frequent shipper and that they were 'BLM MASKS,'" and that the packages were "marked or

20    identified with Movement Ink as the sender, and likely had their contents handwritten on the side,

21    in accordance with [the plaintiffs'] regular practice."  *Id*. at 9:13-20 (citing FAC ¶¶ 31-32, 36, 91).

22    This does not plausibly allege that the defendants knew of any contract or economic

23    relationship between the plaintiffs and a third party.  The FAC alleges that the plaintiffs used the

24    same post office and "[t]he postal officials at that postal facility know [Quiñonez] and his

25    business," and "used to joke about [his] and Movement Ink's last-minute rush shipments and the

26    high prices he paid for next-day deliveries."  FAC ¶¶ 30-31.  But the FAC does not allege that the

27    individual defendants (Agster, Chan, Hodges, and Lee) were the same postal officials that knew

28    Quiñonez and his business.  *See id*.  Nor does the FAC plausibly allege anything about the exterior

United States District Court
Northern District of California

15

of the packages that would indicate to the defendants that they were being sent to the plaintiffs' customers. As pleaded, the packages were "nondescript, securely packaged, cleanly taped boxes." *Id.* ¶ 35. The FAC alleges that they were marked with Movement Ink as the sender, but only that they were being sent to "organizers in Brooklyn, DC, Minneapolis, and St. Louis." *See id.* ¶¶ 36, 40. It does not allege anything about how these recipients were identified on the packages (or on the ones sent to Atlanta, Los Angeles, and Oakland the week before) that would indicate to the defendants that a contract existed between Movement Ink and the recipients. *See id.* ¶ 34. And although the FAC alleges that the four packages at issue "*likely* had their contents handwritten on the side," writing "masks" on the outside of the packages would not be enough to indicate a contract between the plaintiffs and the packages' recipients. *See id.* ¶¶ 32, 36.

Nor have the plaintiffs plausibly alleged that the defendants knew of an economic relationship between the plaintiffs and a third party with the probability of future economic benefit to the plaintiffs, as required to plead interference with prospective economic relations. *See CRST Van Expedited*, 479 F.3d at 1107-08. The FAC alleges that the defendants knew or should have known this based on the plaintiffs' "regular business activities, the packages' shipping information (including the sender and recipients) . . . and the ongoing nature of the need for COVID-protective masks and political protests." *See* FAC ¶ 134. The first two categories of allegations are too thin to be plausible, as I have explained. And the plaintiffs have not sufficiently alleged how the general need for masks translates into the defendants' knowledge that the plaintiffs had engaged in "talks for future orders" or that another economic relationship existed. *See id.* ¶ 51.

The plaintiffs have not plausibly alleged that these defendants knew of any valid contract or economic relationship giving rise to their interference claims. Even if they could proceed under one of the aforementioned exceptions, Counts 2 and 3 fail to state a claim. They are DISMISSED.

### C.  Counts 13, 14, and 15

Counts 13, 14, and 15 allege the same torts against the individual defendants under California law. FAC ¶¶ 352-373. The United States argues that these claims should be dismissed as duplicative, because the plaintiffs must assert individual capacity state law claims as FTCA claims against the United States, which Counts 1, 2, and 3 already do. USA MSJ at 14:14-15:10.

1    Understanding the government's argument requires a brief overview of the Westfall Act,

2    which "accords federal employees absolute immunity from common-law tort claims arising out of

3    acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229

4    (2007). The Supreme Court in *Osborn* succinctly explained the Act's impact on such claims:

> When a federal employee is sued for wrongful or negligent conduct, the Act
> empowers the Attorney General to certify that the employee "was acting within the
> scope of his office or employment at the time of the incident out of which the claim
> arose. Upon the Attorney General's certification, the employee is dismissed from
> the action, and the United States is substituted as defendant in place of the
> employee. The litigation is thereafter governed by the Federal Tort Claims Act.

*Id.* at 229-30 (citing 28 U.S.C. § 2679(d)(1), (2)). As the Ninth Circuit has stated, "[t]he

substitution leads, in effect, to a single avenue of recovery against the United States under the

Federal Tort Claims Act." *Wilson v. Horton's Towing*, 906 F.3d 773, 780-81 (9th Cir. 2018)

(citation and quotation marks omitted).

    Along with its motion to dismiss, the United States submitted a certification from the

United States Attorney's Office for the Northern District of California, certifying that the

individual defendants were acting within the scope of their employment with the Postal Service at

all times material to the incidents alleged in the FAC. *See* USA MTD, Ex. A. This triggers the

dismissal of Counts 13, 14, and 15 against the individual defendants, the substitution of the United

States as a defendant, and the further litigation of these claims under the FTCA. *See Osborn*, 549

U.S. at 229-30.

    The plaintiffs acknowledge in the FAC that Counts 13, 14, and 15 "may currently be

barred by the Westfall Act," but "preserve the issue." FAC ¶¶ 357, 365, 373. In their opposition,

the plaintiffs contend that the Westfall Act "*could be read* to preserve . . . state tort remedies in

cases alleging a violation of the Constitution by federal officials," citing a law review article for

their interpretation. *See* Oppo. at 26:10-19.

    *Osborn* and *Wilson* make no such caveat to the Westfall Act, and I will not create one now.

Counts 13, 14, and 15 must proceed against the United States under the FTCA. Because Counts 1,

2, and 3 assert the same torts against the United States, Counts 13, 14, and 15 are duplicative and

DISMISSED with prejudice.

United States District Court
Northern District of California

Of the counts against the United States, I will grant the plaintiffs leave to amend Counts 1 and 3. If the plaintiffs plausibly allege that the defendants searched the packages or interfered with their prospective economic relations, they may be able to avoid the application of the above-mentioned exceptions to the FTCA's waiver of sovereign immunity. Count 2, however, is barred by the intentional torts exception, which the plaintiffs concede. *See* Oppo. at 12:11-16. It is dismissed with prejudice.

## II.    INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

The individual defendants contend that none of the plaintiffs' claims for violations of the First and Fourth Amendments may be asserted under the causes of action invoked: the *Bivens* claims because they arise in a new context and special factors counsel against extending *Bivens*; and the remaining claims because neither the Westfall Act nor the Constitution provide a cause of action. Individual Defs.' Mot. to Dismiss ("Individual Defs.' MTD") [Dkt. No. 52] 2:10-3:12.

### A. *Bivens* Claims

In *Bivens*, the Supreme Court created a private right of action for damages claims against federal officials for alleged Fourth Amendment violations. 403 U.S. at 397. *Bivens* is critical to bringing claims of constitutional violations against federal officials, as Congress "has not created a general cause of action to redress violations of the Constitution by federal officers." *See Pettibone v. Russell*, 59 F.4th 449, 454 (9th Cir. 2023).

In the decades since *Bivens*, the Supreme Court has significantly limited its application, recognizing only two additional causes of action under the Constitution: for a former congressional staffer's Fifth Amendment sex-discrimination claim and a federal prisoner's Eighth Amendment inadequate-care claim. *See Egbert v. Boule*, 142 S. Ct. 1793, 1802 (2022). In the vast majority of cases, the Court has declined to extend *Bivens* to claims arising under these and other constitutional provisions. *See id.* at 1799 ("Over the past 42 years . . . we have declined 11 times to imply a similar cause of action for other alleged constitutional violations.") (citing cases); *see also Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (stating that a *Bivens* claim may not be allowed "even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized") (citing cases). Indeed, "expanding the *Bivens*

1   remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)

2   (citation omitted).

3       There is a two-step inquiry for analyzing claims brought under *Bivens*. *See Egbert*, 142 S.

4   Ct. at 1803. The court must first ask whether the claim "arises in a new context or involves a new

5   category of defendants." *Hernandez*, 140 S. Ct. at 743 (citation and quotation marks omitted).

6   The Supreme Court has cautioned that "our understanding of a 'new context' is broad," and that a

7   context is "new" "if it is different in a meaningful way from previous *Bivens* cases decided by this

8   Court." *Id.* (same).

9       If the claim arises in a new context, the court then asks "whether there are any special

10  factors that counsel hesitation" about extending *Bivens* to that new context. *Id.* (citations and

11  modifications omitted). If the court has "reason to pause before applying *Bivens* in a new context

12  or to a new class of defendants," the request to extend *Bivens* is denied. *Id.* The Supreme Court

13  has not set forth an exhaustive list of what those reasons might be, but generally considers whether

14  there are "special factors indicating that the judiciary is at least arguably less equipped than

15  Congress to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 142

16  S. Ct. at 1803 (citation and quotation marks omitted). "[A] single reason to pause" is enough to

17  decide against extending *Bivens*. *See id.* (same).

18      When a plaintiff asserts a claim under *Bivens* that has not previously been recognized, the

19  two-step inquiry essentially asks "a single question: whether there is any reason to think that

20  Congress might be better equipped to create a damages remedy." *Id.*

21          **a.  First Amendment**

22      Count 10 alleges retaliation in violation of the First Amendment. FAC ¶¶ 283-305. The

23  Supreme Court held in *Egbert* that "there is no *Bivens* action for First Amendment retaliation."

24  142 S. Ct. at 1807; *see also Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never

25  held that *Bivens* extends to First Amendment claims."). The plaintiffs concede this, "but preserve

26  for appellate reconsideration." Oppo. at 13:6-8; *see also id.* at 21:25-26 (acknowledging that

27  "*Egbert* forecloses plaintiffs' First Amendment *Bivens* claim[]"). Count 10 is DISMISSED.

28

United States District Court
Northern District of California

### b. Fourth Amendment

Counts 4 and 7 allege violations of the Fourth Amendment for the alleged seizure and search of the four packages. FAC ¶¶ 139-164, 217-238. The individual defendants argue that these claims should be dismissed because: (1) they arise in a new context and involve a new category of defendants, as "[t]he *Bivens* remedy has never been extended to claims brought against postal inspectors or postal workers for seizure of parcels"; and (2) special factors counsel against extending *Bivens* to such a context because doing so "would have system-wide consequences that Congress is better suited to address" and alternative remedies exist. Individual Defs.' MTD at 7:23-10:8.

The plaintiffs respond that their Fourth Amendment claims do not present a new *Bivens* context because they arise in the "common and recurrent sphere of law enforcement." Oppo. at 14:12-15:1 (citing *Ziglar*, 137 S. Ct. at 1856-57). Even if the claims do present a new context, the plaintiffs contend, because the defendants "invoke their authority to enforce drug laws, the violation of plaintiffs' Fourth Amendment rights in the course of that endeavor present 'garden-variety' abuse that the federal judiciary has adjudicated for more than 50 years under the *Bivens* regime." *Id*. at 15:8-14.

*Ziglar* did not provide a carte blanche *Bivens* remedy to all Fourth Amendment claims relating to law enforcement, as the plaintiffs suggest. The quote that the plaintiffs rely upon comes from *Ziglar*'s explanation of the Court's evolving view of *Bivens*:

> Indeed, in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today. To be sure, no congressional enactment has disapproved of these decisions. And it must be understood that this opinion is not intended to cast doubt on the continued force, or even necessity, of *Bivens* in the search-and-seizure context in which it arose. *Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere.

*Ziglar*, 582 U.S. at 134.

But *Ziglar* does not hold that *Bivens* applies to *all* Fourth Amendment claims arising in law

United States District Court
Northern District of California

enforcement.  If there was any doubt, in *Egbert* (which was decided after *Ziglar*) the Court rejected a lower court's view that the Fourth Amendment claim was "conventional" and that the Supreme Court had not "cast doubt on extending *Bivens* within the common and recurrent sphere of law enforcement."  *Egbert*, 142 S. Ct. at 1805 (citation and quotation marks omitted).  *Egbert* held that although the case before it and *Bivens* "involve similar allegations of excessive force and thus arguably present 'almost parallel circumstances' or a similar 'mechanism of injury,' these superficial similarities are not enough to support the judicial creation of a cause of action."  *Id.* (citing *Ziglar*, 582 at 138-39).

Other recent *Bivens* cases from the Supreme Court reinforce this.  In *Hernandez*, the Court stated that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized."  140 S. Ct. at 743.  And in *Ziglar*, the Court noted that even though the instant case had "significant parallels" to one of its previous *Bivens* cases (in that both involved claims of prisoner mistreatment), it sought to extend *Bivens* to a new context because it implicated a different constitutional right: the Fifth Amendment rather than the Eighth.  582 U.S. 147-48.  The Court wrote: "even a modest extension is still an extension."  *Id.* at 147.

In arguing that all Fourth Amendment claims arising from law enforcement may be brought under *Bivens*, plaintiffs ask me to ignore the Supreme Court's narrow approach of *Bivens* and its express instruction that a claim may present a new *Bivens* context even if it is significantly parallel to one in which a *Bivens* claim was previously recognized.  Considering the Supreme Court's clear guidance, the claims presented here arise in a new context, primarily because they involve the alleged search and seizure of packages by postal employees.  *Bivens* itself provides the closest context, as the other recognized *Bivens* causes of action involved the Fifth and Eighth Amendments.  *See Egbert*, 142 S. Ct. at 1802.  But the facts of *Bivens* are vastly different than those alleged here.  In *Bivens*, the plaintiff accused federal narcotics agents of entering his apartment, handcuffing and arresting him, threatening to arrest his family, searching his apartment, and then interrogating, booking, and strip searching the plaintiff at a federal courthouse, all without probable cause.  403 U.S. at 389.  The plaintiffs' claims involving the alleged search and

1   seizure of mailed packages by Postal Service employees stand in stark contrast.  Moreover, the

2   plaintiffs' claims involve a new category of defendants—postal officials—which constitutes a new

3   context on its own.  *See Hernandez*, 140 S. Ct. at 743.  The plaintiffs have not identified any cases

4   where the Supreme Court has recognized a *Bivens* claim against postal workers.  *See* Oppo. at

5   14:12-15:1.

6          Because the plaintiffs' claims present a new context, the next question is whether any

7   special factors counsel hesitation about extending *Bivens* to it.  At minimum, one does: the Postal

8   Service's grievance procedure.[4]

9          In *Egbert*, the Supreme Court reiterated that "a court may not fashion a *Bivens* remedy if

10  Congress already has provided, or has authorized the Executive to provide, 'an alternative

11  remedial structure.'"  *Egbert*, 142 S. Ct. at 1804 (citing *Ziglar*, 582 U.S. at 137).  As the Court

12  explained in *Ziglar*:

13             If Congress has created any alternative, existing process for protecting the injured
               party's interest that itself may amount to a convincing reason for the Judicial
14             Branch to refrain from providing a new and freestanding remedy in damages.

15  582 U.S. at 137 (citations and modifications omitted).  The Ninth Circuit has recognized that these

16  processes "can take many forms, including administrative, statutory, equitable, and state law

17  remedies."  *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018).  In *Hernandez* and *Egbert*,

18  the Court declined to extend *Bivens* in part because alternative remedial structures—in the form of

19  grievance processes—were in place and had been utilized.  *See Egbert*, 142 S. Ct. at 1806.

20         The Office of Inspector General for the United States Postal Service, "an independent

21  oversight agency, separate from the U.S. Postal Service [and] U.S. Postal Inspection Service"

22

23  ─────────────────────

24  [4] The individual defendants ask me to take judicial notice of the United States Postal Service
    Office of Inspector General Hotline, available at https://www.uspsoig.gov/hotline.  Individual
25  Defs.' MTD at 9 n.3.  I will do so, as the facts within are not subject to reasonable dispute because
    they can be accurately and readily determined from sources whose accuracy cannot reasonably be
26  questioned.  *See* Fed. R. Evid. 201(b).  "Matters of public record, including public information
    contained on government websites, are judicially noticeable as long as the facts underlying such
27  records are not subject to reasonable dispute."  *Brown v. Van's Int'l Foods, Inc.*, No. 22-CV-
    00001-WHO, 2022 WL 1471454, at *5 n.2 (N.D. Cal. May 10, 2022) (citing *MGIC Indemnity*
28  *Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986))).

investigates matters including the "theft, delay, or destruction of mail by Postal Service employees and contractors" and "employee misconduct." *See* File an Online Complaint, https://www.uspsoig.gov/hotline (last visited April 3, 2023). It accepts complaints from the public for investigation and review. *See id.* The plaintiffs do not dispute that Congress provided an alternative remedial structure via the Office of Inspector General, or that their claims would fall within its purview. *See* Oppo. at 15:2-16:1.[5] At most, they make a cursory argument that the defendants "do not assert" that the grievance procedure "allows for 'corrective action'" and the procedure "cannot be squared with congressional intent or *Bivens*'s deterrence function." *See id.* at 16 n.8. But that argument requires me to second-guess Congress's determination that this remedial process sufficiently deters unconstitutional acts by postal officials, which the Supreme Court made clear in *Egbert* is impermissible.

> [T]he question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts. So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy. That is true even if a court independently concludes that the government's procedures are not as effective as an individual damages remedy.

*Egbert*, 142 S. Ct. at 1807 (citation omitted).

The plaintiffs seek to extend *Bivens* to a new context: searches and seizures by postal service employees. A special factor, the grievance procedure carried out by the Office of Inspector General, counsels hesitation about extending *Bivens* to this new context. Because a single reason to pause is enough to decide against extending *Bivens*, I decline to do so here. *See Egbert*, 142 S. Ct. at 1803. Counts 4 and 7 are therefore DISMISSED.[6]

---

[5] Although the individual defendants do not expressly make this connection in their briefing, Congress established the Inspector General of the United States Postal Service, stating that it "shall have oversight responsibility for all activities of the Postal Inspection Service." *See* 5a U.S.C. § 8G(f)(2). This office "is responsible for detecting and preventing fraud, waste, and abuse in the programs and operations of the Postal Service, including, investigating all allegations of violations of postal laws or misconduct by postal employees." 39 C.F.R. § 230.1(d).

[6] Because these claims cannot proceed under *Bivens*, I need not consider the parties' arguments on qualified immunity. *See* Individual Defs.' MTD at 10:19-15:7. I also need not consider the individual defendants' alternative argument that any claims for declaratory relief under *Bivens* must be struck because *Bivens* does not provide such a remedy. *See id.* at 17:8-23.

United States District Court
Northern District of California

**B.  Westfall Act Claims**

The plaintiffs also assert their constitutional violations under the Westfall Act in Counts 5, 8, and 11.  FAC ¶¶ 165-190, 239-260, 306-328.  Although the Westfall Act shields federal officials from common-law tort claims arising out of acts undertaken in the course of their official duties, that immunity does not extend to suits brought for constitutional violations.  *See Saleh v. Bush*, 848 F.3d 880, 888-89 (9th Cir. 2017) (citing in part 28 U.S.C. § 2679(b)(2)(A)).  The Act expressly states that immunity "does not extend or apply to a civil action against an employee of the government which is brought for a violation of the Constitution of the United States."  28 U.S.C. § 2679(b)(2)(A).

The plaintiffs read the Westfall Act as codifying damages claims against individual federal officials.  Oppo. at 22:24-27.  However, they acknowledge that the Supreme Court addressed the Westfall Act in *Hernandez*, finding that section 2679(b)(2)(A) "was not attempting to abrogate *Bivens*" and "simply left *Bivens* where it found it."  *See id*. at 23:18-27 (citing 140 S. Ct. at 748 n.9).  The plaintiffs then "preserve for appellate consideration the statute's proper meaning and scope."  *Id*. at 24:1-2.

At the district level, I am bound by the authority of the Supreme Court and Ninth Circuit.  Neither has adopted the novel reading of the Westfall Act proffered by the plaintiffs.  In *Hernandez*, for example, the Court wrote that "no statute expressly creates a *Bivens* remedy."  *See* 140 S. Ct. at 742.  In *Wilkie v. Robbins*, 551 U.S. 537, 585 (2007), Justice Ginsberg's concurrence in part acknowledged that "[i]f Congress wishes to codify and further define the *Bivens* remedy, it may do so at anytime."  In *Hui v. Castaneda*, 559 U.S. 799, 806-07 (2010), the Court described section 2679(b)(2) as an "explicit exception for *Bivens* claims," rather than providing a separate cause of action.  And in *Pettibone*—decided just last month—the Ninth Circuit reiterated that although Congress provided a cause of action for constitutional violations by state officials under 42 U.S.C. § 1983, "it has not created a general cause of action to redress violations of the Constitution by federal officers."  *See* 59 F.4th at 454.  All of these cases postdate the enactment of the Westfall Act in 1988, indicating that they did not consider the Westfall Act (or any other statute) to provide a cause of action for constitutional violations by federal officers.  *See Saleh*,

848 F.3d at 888 n.6 (describing the full title of the Westfall Act as the Federal Employees Liability Reform and Tort Compensation Act of 1988). *Hernandez* is particularly compelling, as it expressly considered the Westfall Act, was decided only three years ago, and wrote that "no statute expressly creates a *Bivens* remedy." *See* 140 S. Ct. at 742.

The plaintiffs ask me to venture where the Supreme Court and Ninth Circuit have not, to find that the Westfall Act provides a cause of action for their constitutional claims against the defendants. I decline to do so. Counts 5, 8, and 11 are DISMISSED.[7]

### C. Constitutional Claims

The Constitution itself does not provide plaintiffs a direct cause of action against federal officers. *See, e.g., Arpin v. Santa Clara Valley Trans. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) ("a litigant complaining of a violation of a constitutional right does not have a direct cause of action under the United States Constitution"). That was the point of *Bivens*: the Supreme Court implied a cause of action under the Fourth Amendment because a direct cause of action was not available. *See Ziglar*, 582 U.S. at 130 ("[I]n the 100 years leading up to *Bivens*, Congress did not provide a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the federal government.").

The individual defendants argue that Counts 6, 9, and 12—which assert violations of the First and Fourth Amendments directly under those amendments—must be dismissed because neither provides the plaintiffs a private right of action. Individual Defs.' MTD at 16:4-12. Instead, they argue, these claims must be asserted under *Bivens* and fail for the reasons articulated above. *See id.* at 16:8-12. The plaintiffs concede that "their Fourth Amendment and First

---

[7] The plaintiffs also argue that, regardless of section 2679(b)(2)(A)'s scope, "*Hernandez* makes clear that the statute preserves, at minimum, the constitutional claims against federal officials that were recognized by the federal judiciary before the statute's enactment in 1988—such as plaintiffs.'" Oppo. at 24:14-16. Their basic argument appears to be this: Because "Congress is presumed to enact legislation with knowledge of the law" and "a newly enacted statute is presumed to be harmonious with existing law and judicial concepts," because First and Fourth Amendment *Bivens* claims were recognized when the Westfall Act was enacted in 1988, and because section 2679(b)(2)(A) did not limit the recognition of those claims, they may be asserted under the Westfall Act. *See id.* at 24:17-25:22 (citations omitted). If this were so, *Hernandez*— which considered a Fourth Amendment claim—would not have stated that "no statute expressly creates a *Bivens* remedy." *See* 140 S. Ct. at 742.

Amendment claims arising directly under the Constitution (Counts 6, 9, 12) have yet to be recognized by the Supreme Court."  Oppo. at 13:6-9.  Claims 6, 9, and 12 are DISMISSED.

Finally, the plaintiffs contend that if I find that none of their claims are cognizable under the FTCA, *Bivens*, the Westfall Act, the Constitution, or state tort law, I should declare the FTCA and Westfall Act unconstitutional as applied because they "deprive plaintiffs of any judicial forum to redress injuries caused by federal officials in the scope of their employment."  Oppo. at 27:1-7.  But *Bivens* and its progeny, and the immunity provided via the Westfall Act, show, as the individual defendants argue, that "there is no indication that Congress intended for every violation of a right to be compensated by money damages."  Individual Defs.' Reply [Dkt. No. 59] 9:10-22.

Of the claims against the individual defendants, Counts 5, 8, and 11 (alleging violations of the First and Fourth Amendments under the Westfall Act) and Counts 6, 9, and 12 (alleging the same directly under the Constitution) are dismissed with prejudice.  Neither the Westfall Act nor the Constitution itself provides the plaintiffs a cause of action for asserting these claims.  The plaintiffs concede this with respect to Counts 6, 9, and 12, but preserve the issue for appeal.  *See* Oppo. at 13:8-10.  Count 10 is also dismissed with prejudice; the plaintiffs recognize that their First Amendment *Bivens* claim is not cognizable under *Egbert*, but again preserve for appellate consideration.  *See id.* at 13:6-8.  As I have already stated, Counts 13, 14, and 15 are dismissed with prejudice because they must proceed as FTCA claims against the United States.

I will allow the plaintiffs the chance to amend Counts 4 and 7, which allege violations of the Fourth Amendment under *Bivens*.  Although these claims present a new *Bivens* context and the alternative remedial structure cautions against extending *Bivens* to it, the plaintiffs may be able to add allegations to an amended complaint or make arguments in future motion work that rebut this.  I will give them the opportunity to do so.

## CONCLUSION

As set forth above, the motions to dismiss are GRANTED with leave to amend Counts 1,

3, 4, and 7.  Any amended complaint is due by May 3, 2023.

**IT IS SO ORDERED.**

Dated: April 3, 2023



William H. Orrick
United States District Judge