UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENE QUINONEZ, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>   Defendants. | Case No. 22-cv-03195-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 64, 65 |

The defendants, the United States of America and four United States Postal Service or Postal Inspection Service employees, Jeff Agster, Eva Chan, Mark Hodges, and Robin Lee ("the individual defendants"), again move to dismiss claims brought by plaintiffs René Quiñonez and Movement Ink LLC ("Movement Ink"), who allege that the defendants unlawfully seized, detained, and searched four packages containing masks screen-printed with political messages.[1] The plaintiffs have now alleged enough to plausibly show that the packages were searched without a warrant, placing their trespass to chattels claim beyond the discretionary function exception to the Federal Tort Claims Act ("FTCA"). That claim may proceed based on the alleged search. They have also adequately alleged that one of the defendants, Lee, knew Quiñonez and his business, and thus that an economic relationship existed between the plaintiffs and a third party when he mailed the packages. This supports their interference with prospective economic relations claim, as asserted under the FTCA. That claim may proceed, but only based upon the alleged acts of Lee and the Postal Service employees; the plaintiffs do not plausibly allege that the Postal Inspection Service employees knew about their business.

---

[1] Although another defendant, Stephen Fajardo, is named in the SAC and has been served, he did not file either of the pending motions. *See* Dkt. Nos. 63, 64, 65.

1   However, the individual defendants' motion to dismiss is GRANTED.  Counts 4 and 7
2 allege violations of the Fourth Amendment under *Bivens v. Six Unknown Federal Narcotics*
3 *Agents*, 403 U.S. 388 (1971), but the plaintiffs have not alleged nor argued anything that changes
4 my previous decision declining to extend *Bivens* to their claims.  These claims present a new
5 *Bivens* context (the search and seizure of packages by postal workers), and special factors counsel
6 against extending *Bivens* to this context (the available grievance procedure and potential
7 systemwide consequences that such a decision would have on the Postal Service).  They are
8 dismissed with prejudice, as no other facts could plausibly save the claims.

## BACKGROUND

Quiñonez owns and manages Movement Ink, a small screen-printing business "known for its brand of activism-inspired business practices and relationships."  Second Am. Compl. ("SAC") [Dkt. No. 63] ¶¶ 9, 14.  The SAC alleges that "social justice and activism movements, organizations, nonprofits, and individual organizers" regularly ordered screen-printed products, such as T-shirts and sweatshirts, from Quiñonez and Movement Ink for years.  *Id*. ¶¶ 15-17.

During the beginning of the COVID-19 pandemic, Movement Ink saw an increase in orders for screen-printed face masks.  *Id*. ¶ 24.  When the police killings of George Floyd and Breonna Taylor prompted nationwide protests in late May and early June 2020, the SAC alleges, the plaintiffs "were the supplier of choice" when organizers "began ordering COVID-protective masks bearing political messages."  *Id*. ¶¶ 25-26.  The masks that Quiñonez and Movement Ink printed bore "core political messages, such as 'STOP KILLING BLACK PEOPLE' and 'DEFUND POLICE.'"  *Id*. ¶ 27.

The plaintiffs printed and shipped three orders of masks to organizers in Atlanta, Los Angeles, and Oakland.  *Id*. ¶ 29.  Quiñonez mailed these orders "from the same postal facility and using similar packaging methods as he has done for years on behalf of Movement Ink."  *Id*. ¶ 30.  The SAC states that "[t]he postal officials at that facility know [Quiñonez] and his business," "were friendly with each other," and "used to joke about [his] and Movement Ink's last-minute rush shipments and the high prices he paid for next-day deliveries."  *Id*. ¶ 31.

About a week after those shipments, on June 3, 2020, Quiñonez shipped the four packages

now at issue. *See id*. ¶¶ 35, 39. Those packages, which also contained masks, were mailed to organizers in New York City, Washington, D.C., Minneapolis, and St. Louis. *See id*. ¶ 41. The SAC says that the packages were "nondescript, securely packaged, cleanly taped boxes," marked or identified with Movement Ink as the sender, and shipped using priority mail express overnight shipping. *Id*. ¶¶ 36-38.

But the packages were allegedly not delivered on time. *Id*. ¶ 39. Instead, Quiñonez and the intended recipients received an alert via the Postal Service's online tracking system, which stated that the packages were "seized by law enforcement." *Id*. ¶¶ 41-42. The packages did not arrive at their destinations until June 6 ("two days and several protests late," according to the SAC). *Id*. ¶ 43.

The plaintiffs allege that the defendants seized, detained, and searched the packages not because they had a lawful reason to do so, but because the packages contained masks with political statements—and in doing so, defendants hurt the plaintiffs' business. *See id*. ¶¶ 2-5, 65. They contend that, based on their "regular interactions" with Quiñonez and his shipment of the three other packages the week before, "Postal Service Defendants Does 1 and 2" knew the plaintiffs, "the political and ongoing nature of [their] business," and that they "had no reason to ship the packages except for ongoing economic relations with existing and potential customers." *Id*. ¶ 64.

Quiñonez later obtained some information about the incident via an official inquiry through Representative Barbara Lee's office. *Id*. ¶ 59. In response, the Postal Inspection Service said that the packages "were detained solely because the external physical characteristics of the parcels were consistent with parcels in other non-related instances that were confirmed to contain nonmailable matter, specifically controlled substances." *Id*. ¶ 60. The letter denied that the packages were detained because of the sender or recipient, "because they were associated with organizations involved in protests," or "because it was known" that they "contained masks or any articles containing statements supporting any group or position." *Id*. The letter further stated that once the Postal Inspection Service became aware of news stories about the shipment on June 5, it "immediately took action to rectify the situation" and returned the packages to the mail stream. *Id*.

3

1    Quiñonez sought additional information via Freedom of Information Act ("FOIA")
2   requests, which returned the defendants' notes about the incident. *Id.* ¶ 61. According to the
3   SAC, those notes "explain that the Inspection Service knew that the packages contained, in their
4   words, 'BLM MASKS' (indicating that one or more defendants opened and searched the
5   packages)." *Id.* The SAC also alleges that these notes indicated that the packages were
6   considered suspicious because: (1) of their "bulging contents"; (2) they were "taped or glued on all
7   seams"; (3) there were "frequently mailed parcels from the same sender/address"; (4) the "parcel
8   destination is a known drug trafficking area"; and (5) the "parcel [was] mailed from a known drug
9   source area." *Id.* ¶ 78.

The plaintiffs filed suit in June 2022, and their First Amendment Complaint ("FAC") in September of that year. Dkt. Nos. 1, 33. Upon separate motions from the United States and the individual defendants, I dismissed all the claims with limited leave to amend only four: trespass to chattels and interference with prospective economic relations (against the United States under the FTCA), and two Fourth Amendment claims (against the individual defendants under *Bivens*). *See* Order Granting Mots. to Dismiss ("First MTD Order") [Dkt. No. 62] 26:25-27:1.

The plaintiffs filed the SAC in May 2023, which the United States and individual defendants again separately moved to dismiss. Dkt. Nos. 63, 64, 65.

**LEGAL STANDARD**

I.     **RULE 12(B)(1)**

A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *Id.*

A Rule 12(b)(1) challenge may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The challenger asserts

4

that the allegations in the complaint "are insufficient on their face to invoke federal jurisdiction." *See Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). To resolve facial attacks, the court assumes that the allegations in the complaint are true and draws all reasonable inferences in favor of the party opposing dismissal. *See Wolfe*, 392 F.3d at 362.

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air*, 373 F.3d at 1039. To resolve factual attacks, the court "need not presume the truthfulness of the plaintiff's allegations." *Id*. (citation omitted). Instead, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id*. (same). Once the moving party has made a factual challenge by offering affidavits or other evidence to dispute the allegations in the complaint, the party opposing the motion must "present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *see also Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

**II.     RULE 12(B)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts his allegations as true and draws all reasonable inferences in his favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or

5

unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## DISCUSSION

It is worth noting at the outset that although I dismissed most the plaintiffs' previous claims with prejudice, the SAC asserts the same 15 claims that the FAC did. *Compare* SAC ¶¶ 97-356 *with* FAC [Dkt. No. 33] ¶¶ 114-373. My thinking on the previously dismissed claims has not changed, and I incorporate by reference the relevant analysis in my first Order dismissing those claims here. *See generally* First MTD Order. Only Counts 1 and 3 (against the United States) and 4 and 7 (against the individual defendants) remain at issue. *See id*. at 26:25-27:1.

### I. UNITED STATES' MOTION TO DISMISS

The plaintiffs bring Counts 1 and 3 for trespass to chattels and interference with prospective economic relations under the FTCA. SAC ¶¶ 97-103, 113-121. The FTCA waives the sovereign immunity of the United States for "certain torts committed by federal employees acting within the scope of their employment." *Brownback v. King*, 141 S. Ct. 740, 746 (2021) (citation and quotations omitted). That waiver, however, "is subject to several exceptions." *Myles v. United States*, 47 F.4th 1005, 1011 (9th Cir. 2022); *see also* 28 U.S.C. § 2680 (listing exceptions). "If one of the exceptions applies, the bar of sovereign immunity remains." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 485 (2006).

I previously dismissed the plaintiffs' additional claim arising under the FTCA, for interference with contractual relations, as barred by the intentional torts exception, which covers "[a]ny claim arising out of" certain intentional torts, including "interference with contract rights." *See* First MTD Order at 13:5-14:15 (citing in part 28 U.S.C. § 2680(h)). It was unclear, however,

6

1    whether this exception also encompassed the plaintiffs' interference with prospective economic

2    relations claim, given the differences between the two torts. *See id*. Regardless, I found that even

3    if the prospective economic relations claim was not barred, it failed because the plaintiffs did not

4    plausibly allege that the defendants knew of an economic relationship between the plaintiffs and a

5    third party with the probability of future economic benefit to the plaintiffs. *See id*. at 16:11-23.

6    That is one of the issues that remains.

7          The second is whether the plaintiffs have adequately alleged that the packages were

8    searched. I previously found that to the extent that the trespass to chattels claim arose from the

9    alleged seizure or detention, it was barred by the detention of goods exception. *Id*. at 7:24-9:3

10   (citing in part 28 U.S.C. § 2680(c)). But I determined that the plaintiffs only made conclusory

11   allegations that the packages were searched, and therefore did not plausibly show a Fourth

12   Amendment violation that might exceed the bounds of another exception, the discretionary

13   function exception. *See id*. at 11:22-24.

14         The United States focuses on these two issues in its motion to dismiss, arguing that the

15   plaintiffs have again failed to plausibly allege that a search occurred in order to avoid the

16   discretionary function's application to their trespass to chattels claim, and also have not stated a

17   claim for interference with prospective economic relations. *See* USA Mot. to Dismiss ("USA

18   MTD") [Dkt. No. 64] 7:4-10:14. I address each argument in turn.

19         **A. Trespass to Chattels and the Discretionary Function Exception**

20         Under the discretionary function exception to the FTCA, the United States does not waive

21   sovereign immunity for "[a]ny claim . . . based upon the exercise or performance or the failure to

22   exercise or perform a discretionary function or duty on the part of a federal agency or an employee

23   of the government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The

24   Ninth Circuit uses a two-step test in deciding whether the exception applies. *Nieves Martinez v.*

25   *United States*, 997 F.3d 867, 876 (9th Cir. 2021). First, the court must ask "whether the

26   challenged actions involve an element of judgment or choice." *Id*. (citations and quotations

27   omitted). "If a federal statute, regulation, or policy specifically prescribes a course of action for an

28   employee to follow, the act is not discretionary because the employee has no rightful option but to

7

adhere to the directive." *Id*. (same). If the court determines that the challenged action involves "an element of choice or judgment," it then must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id*. (same). "[I]f the judgment involves considerations of social, economic, or political policy, the exception applies." *Id*. (citation omitted).

However, there is a limit to the discretionary function exception. The Ninth Circuit has written that even if a federal agent's action "involved elements of discretion, agents do not have discretion to violate the Constitution." *Id*. at 877 (citation omitted). As the Third Circuit recently stated: "The reason is simple: because government officials never have discretion to violate the Constitution, unconstitutional government conduct is per se outside the discretionary function exception." *Xi v. Haugen*, 68 F.4th 824, 839 (3d Cir. 2023). Whether the discretionary function exception bars the plaintiffs' trespass to chattels claim arising under the FTCA depends on whether they plausibly alleged a search that exceeds the bounds of the Constitution, i.e., the Fourth Amendment.

The United States argues that the allegations within the SAC still fall short. It contends that the SAC provides "no factual allegations regarding said search" and instead makes assertions that undermine the plaintiffs' claim. *Id*. at 7:28-8:17. It notes that according to the SAC, Quiñonez "does not know what condition the packages at issue in this case were in when they finally arrived at their destinations," as his clients allegedly "sever[ed] all ties with him" following the incident. *See id*. at 8:7-12 (citing SAC ¶ 54). And it argues that the internal notes provided "indicate only that 'BLM MASKS' were in the parcels" rather than reflect the actual slogans printed on the masks, which it contends is "consistent with USPS learning of the contents of the parcels through media reports describing the masks generally . . . rather than by opening the parcels to see the actual messages emblazoned on the masks." *Id*. at 8:12-17 (citing SAC ¶¶ 27, 55, 60).

8

The United States also takes aim at the plaintiffs' allegation that "no document provided by defendants or the government indicates that the packages arrived unopened," proffering the "parcel detail worksheets" summarizing the packages' handling. *See id*. at 8:18-24 (citing Keough Decl., Ex. A at 6-9; SAC ¶ 54). It contends that these documents are incorporated by reference into the complaint, and that although they "include details of the seizures that appear throughout the SAC, the box to indicate that a search occurred . . . was left blank." *Id*. at 8:18-9:7. That box is shown here:



*See id.* (citing Keough Decl., Ex. A at 6). According to the government, "the most plausible reading of these allegations is that no search occurred." *Id*. at 9:8-9.

In response, the plaintiffs remind the government that they need not prove their case at the pleadings stage, and argue that a "possible alternative explanation does not destroy" the plausibility of their claims." Oppo. at 9:27-10:5 (citing *Hough v. Big Heart Pet Brands, Inc.*, No. 19-CV-03613-WHO, 2020 WL 7227198, at *4 (N.D. Cal. Dec. 8, 2020)). They contend that the SAC plausibly alleges that a search occurred, pointing to allegations that "on information and belief supported by defendants' internal notes showing that defendants knew the specific contents of the packages ('BLM MASKS,' in their words), defendants opened and searched the packages." *See id.* at 14:15-28 (citing in part SAC ¶ 55).

The plaintiffs' allegations are thin, but even thin allegations may nudge a claim past the pleadings stage, so long as they are plausible. Unlike the prior iteration of the complaint, the plaintiffs no longer include equivocal language that only speculated that a search occurred. *See* First MTD Order at 11:7-17 (describing allegations such as "[i]t is not clear whether defendants knew that the packages contained . . . 'BLM MASKS' before seizing the packages" and that the

9

defendants "searched the packages *and/or* left the packages unattended for more than 24 hours") (emphasis in original). Although the plaintiffs do not make any allegations concerning the condition of the boxes when they arrived at their final destinations—which I previously stated could support an inference that a search occurred—they now allege that Quiñonez does not know this because his clients "sever[ed] all ties with him" after the packages were detained and delayed. *See id*. at 11:18-21; *see also* SAC ¶ 54. The plaintiffs are thus left with the defendants' notes indicating that the packages contained "BLM MASKS." *See* SAC ¶ 61. Although it is possible that the defendants learned this because of the press coverage of the incident, as the plaintiffs note, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *See id*. ¶ 60; *see also* Oppo. at 10:8-10 (citing *Twombly*, 550 U.S. at 556). Based on what is alleged in the SAC, it is plausible that the defendants knew that the packages contained "BLM MASKS" (as reflected in their internal notes) by searching them.[2]

The SAC also alleges that the packages were searched without a warrant, and the United States does not argue that any exception to the warrant requirement applies that would support the constitutionality of the search. *See* SAC ¶ 2; *see generally* USA MTD. As a result, the plaintiffs have plausibly alleged that the packages were searched in violation of the Fourth Amendment, placing the alleged search beyond the discretionary function exception to the FTCA's waiver of sovereign immunity. *See Nieves Martinez*, 997 F.3d at 877 ("Even if the agents' actions involved elements of discretion, agents do not have discretion to violate the Constitution.").

The plaintiffs' trespass to chattels claim arising under the FTCA may proceed against the United States, based on the alleged search. The motion to dismiss this claim is DENIED.

**B. Tortious Interference With Prospective Economic Relations**

To state a claim for tortious interference with prospective economic relations, a plaintiff must plausibly show: (1) an economic relationship between the plaintiff and a third party, with the

---

[2] The plaintiffs contest the accuracy of the parcel detail worksheets proffered by the United States, asserting that they do not match the documents provided to them under FOIA. Oppo. at 15:19-16:21. I need not determine the accuracy of these documents now, as the parties' arguments about what they do and do not show are fact-based and more suited for summary judgment.

1  probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of that
2  relationship; (3) intentional acts by the defendant designed to disrupt the relationship; (4) actual
3  disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the
4  defendant's acts. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107-08 (9th
5  Cir. 2007) (citation omitted). In addition, a plaintiff alleging interference with prospective
6  economic relations must "allege an act that is wrongful independent of the interference itself." *Id*.
7  at 1108 (same).

8  In the prior iteration of this claim, the plaintiffs did not adequately allege that the
9  individual defendants "were the same postal officials that knew Quiñonez and his business," nor
10 anything about the packages' exterior that would plausibly indicate to the defendants that they
11 were being sent to the plaintiffs' customers. *See* First MTD Order at 15:22-16:2. Their allegation
12 that "the ongoing nature of the need for COVID-protective masks and political protests" also did
13 not translate into "the defendants' knowledge that the plaintiffs had engaged in 'talks for future
14 orders' or that another economic relationship existed." *Id*. at 16:11-20 (citing FAC ¶ 51).

15 The United States argues that the plaintiffs still have not stated their claim because they
16 again "failed to plausibly allege that the defendants knew about potential economic relationships
17 between plaintiffs and third parties." USA MTD at 9:20-22. The government notes that the
18 plaintiffs "do not name the third parties with whom they were supposedly expecting future
19 economic relationships and do not allege that defendants knew who these third parties were,
20 either," and contends that the plaintiffs make "only a vague and factually unsupported allegation"
21 that the defendants knew about the plaintiffs' business activities based on the shipping information
22 on the packages. *See id*. at 9:22-10:14 (citing in part SAC ¶ 117).

23 In response, the plaintiffs seize on a document attached to the United States' motion: an
24 unredacted "Memorandum to File" authored by Hodges that describes the incident at hand. *See*
25 Oppo. at 10:20-12:6 (citing USA MTD, Keough Decl., Ex. B at 3). That document states that
26 "Lee was the clerk who conducted the retail window transactions" on the four packages at issue,
27 "sent the parcels to the Inspection Service," and "recognized the sender as a mailer who had
28 mailed multiple suspicious parcels in the past." *See* USA MTD, Keough Decl., Ex. B at 3.

11

According to the plaintiffs, this shows "for the first time" that Lee was one of the previously unnamed postal officials who allegedly worked at the post office that Quiñonez shipped the packages from, knew Quiñonez "and his business," "used to joke about [Quiñonez's] and Movement Ink's last-minute rush shipments," and knew that he was "shipping their political packages for ongoing economic gain, just as they had done" with packages mailed from the same facility the week before and in the years leading up to the incident. Oppo. at 11:5-18 (citing SAC ¶¶ 29-32).³ According to the plaintiffs, Lee is one of "Postal Service Defendants Does 1 and 2." *See id*. at 5:3-19, 11:19-12:6; *see also* SAC ¶ 64.

The government's primary response is that the unredacted memo does not indicate that Lee knew the political nature of the plaintiffs' business or that the packages were part of it. *See* USA Reply [Dkt. No. 73] 6:8-7:4. This argument is fact-based and not suitable for this early stage of litigation, where the plaintiffs need not prove their claims.

The plaintiffs' allegations connect at least one of the individual defendants, Lee, to the Postal Service officials who purportedly knew Quiñonez, his business, and his purpose in shipping the packages at issue. *See* SAC ¶¶ 30-32, 64. This plausibly supports the allegation that one of the defendants knew of an economic relationship between the plaintiffs and a third party (the package recipients) with the probability of future economic benefit to the plaintiffs. *See CRST Van Expedited*, 479 F.3d at 1107-08. Although the SAC asserts that it was Doe Defendants 1 and 2, rather than Lee, who knew this, the core allegations are found within the SAC.

But the plaintiffs have not plausibly alleged that the Postal Inspection Service employees knew Quiñonez and his business. The Doe defendants are identified as "Postal Service Defendants Does 1 and 2," and the SAC's allegations indicate it was postal workers at Quiñonez's

---

³ The plaintiffs also argue that these allegations about Lee support Count 4, which alleges that the individual defendants seized the packages in violation of the Fourth Amendment under *Bivens*, along with their claims based on the alleged search and First Amendment violations. Oppo. at 11:1-4. But the issue with Count 4 is that *Bivens* does not provide a cause of action for the alleged seizure or searches, regardless of whether they are plausibly pleaded. I explain this in greater detail later. And there is no viable cause of action for the plaintiffs' First Amendment claims, as I have already explained. *See* First MTD Order at 26:10-18. I decline the plaintiffs' invitation to reconsider my decision on the First Amendment claims for this reason. *See* Oppo. at 13:10-15.

12

1  local post office who knew him and his business, not the inspectors who allegedly handled the

2  packages later. *See* SAC ¶¶ 30-32, 64. To the extent that the interference claim depends on the

3  acts of Postal Inspection Service defendants, it is DISMISSED with prejudice.

4  I grant the plaintiffs leave to amend their pleading to substitute Lee's name for one of the

5  Doe defendants. Otherwise, the claim may proceed as pleaded based upon the alleged acts of the

6  Postal Service defendants.[4]

## II. INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

In *Bivens*, the Supreme Court created a private right of action for damages claims against federal officials for alleged Fourth Amendment violations. 403 U.S. at 397. But the Court has significantly limited its application in the decades since, recognizing only two additional causes of action under the Constitution: for a former congressional staffer's Fifth Amendment sex-discrimination claim and a federal prisoner's Eighth Amendment inadequate-care claim. *See Egbert v. Boule*, 142 S. Ct. 1793, 1802 (2022). "[E]xpanding the *Bivens* remedy is now a 'disfavored' judicial activity," and the Supreme Court has repeatedly declined to extend it to claims arising under these and other constitutional provisions. *See Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (citation omitted); *see also Egbert*, 142 S. Ct. at 1799 (citing cases). Counts 4 and 7, alleging violations of the Fourth Amendment for the alleged seizure and search of the packages, are brought under *Bivens*.

There is a two-step inquiry for analyzing *Bivens* claims. *Egbert*, 142 S. Ct. at 1803. The court must first ask whether the claim "arises in a new context or involves a new category of defendants." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (citation and quotations omitted). The Supreme Court has cautioned that "our understanding of a 'new context' is broad," and that a context is "new" "if it is different in a meaningful way from previous Bivens cases decided by this Court." *Id.* (same).

---

[4] Because two of the FTCA claims may proceed, I will also grant the government's motion to strike Paragraphs 357-359 from the SAC, which seek declaratory relief under the FTCA. *See* USA MTD at 12:5-27. As the government notes in its motion, "the only relief provided for in the FTCA is money damages." *See id.*; *see also Westbay Steel, Inc. v. United States*, 970 F.2d 648, 651 (9th Cir. 1992) (cleaned up); 28 U.S.C. § 1346(b)(1). The plaintiffs do not provide any authority to the contrary or otherwise address the government's argument. *See generally* Oppo.

If the claim arises in a new context, the court then asks "whether there are any special factors that counsel hesitation" about extending *Bivens* to that new context. *Id*. (citations omitted and cleaned up). If the court has a "reason to pause before applying *Bivens* in a new context or to a new class of defendants," the request to extend *Bivens* is denied. *Id*. The Supreme Court has not set forth an exhaustive list of what those reasons might be, but generally considers whether there are "special factors indicating that the judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 142 S. Ct. at 1803 (citation and quotations omitted). "[A] single reason to pause" is enough to decide against extending *Bivens*. *See id*. (same). When a plaintiff asserts a claim under Bivens that has not previously been recognized, the two-step inquiry essentially asks "a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id*.

I previously dismissed Counts 4 and 7 after finding that they presented a new context (the alleged search and seizure of packages by postal employees) and because "[a]t minimum," one special factor counseled against extending *Bivens* to it (the Postal Service's grievance procedure). First MTD Order at 21:17-23:22. I granted the plaintiffs leave to amend these claims on the chance that they "may be able to add allegations to an amended complaint or make arguments in future motion work" that rebutted my findings. *See id*. at 26:19-23.

The individual defendants now argue that the SAC "provides no reason to deviate from this holding" and that I should again dismiss the *Bivens* claims. Individual Defs.' Mot. to Dismiss ("Individual Defs.' MTD") [Dkt. No. 65] 6:21-22. I agree.

Counts 4 and 7 present a new *Bivens* context for the reasons I explained in my previous Order and incorporate by reference here. *See* First MTD Order at 20:1-22:6. The plaintiffs again try to cast these as "garden-variety Fourth Amendment claims" or an "everyday drug-law enforcement case" akin to *Bivens*, an argument that I have already addressed and rejected. *See* Oppo. at 27:12-28; *see also* First MTD Order at 20:10-22:5. The plaintiffs ignore the Supreme Court's strict construction of *Bivens* and its express instruction that a claim may present a new *Bivens* context even if it has "significant parallels" to one in which a *Bivens* claim was previously recognized. *See Ziglar*, 582 U.S. at 147-48.

14

If anything, the individual defendants offer another point distinguishing this matter from *Bivens* itself, which provides the closest context because it too involved an alleged Fourth Amendment violation. *See* Individual Defs.' MTD at 8:15-28. In *Bivens*, the search and arrest occurred inside the plaintiff's home, which typically receives a high level of protection under the Fourth Amendment. 403 U.S. at 389; *see also Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.") (citation and quotations omitted). As I wrote before, "the alleged search and seizure of mailed packages by Postal Service employees stand in stark contrast." *See* First MTD Order at 21:28-22:1. The plaintiffs still have not cited cases where the Supreme Court has recognized a *Bivens* claim against postal workers, or for the alleged search and seizure of mailed goods. *See* Oppo. at 27:12-27. Their claims present a new *Bivens* context.

Special facts also counsel hesitation about extending *Bivens* to this context, including the alternative remedial structure in the form of the Post Office's grievance process. The plaintiffs now allege that their complaints "do not fall within the purview of the Postal Service Office of Inspector General Hotline, which states expressly that it 'generally does not handle individual issues, except for whistleblower reprisal complaints and related executive investigations.'"[5] SAC ¶ 96. The plaintiffs argue that this is a "black box OIG complaint system" that does not handle individual issues, "has no authority to provide any monetary compensation" and "expressly disclaims any obligation to even investigate any given complaint." Oppo. at 29:13-23.

The plaintiffs' selection of a single sentence from the Inspector General's website does not persuade me that this grievance procedure is inadequate—and even if it did, the Supreme Court has stated that this question is not one for the federal courts to decide. *See Egbert*, 142 S. Ct. at 1807 ("[T]he question [of] whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts. So long as Congress or the Executive has created

---

[5] I previously took judicial notice of this website, which can be found at https://www.uspsoig.gov/hotline, and will do so again here. *See* First MTD Order at 22 n.4; Individual Defs.' MTD at 9 n.6. The specific portion that the plaintiffs reference can be found at https://www.uspsoig.gov/about-us/frequently-asked-questions.

15

1  a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts

2  cannot second-guess that calibration by superimposing a *Bivens* remedy."). The same webpage

3  states that the Office of Inspector General accepts complaints about "alleged violations of laws,

4  rules, or regulations," which would cover the plaintiffs' alleged constitutional violations.[6]

5         In addition, I agree with the individual defendants that there would likely be "systemwide

6  consequences" of extending *Bivens* to searches and seizures of mailed packages by postal

7  employees. *See* Individual Defs.' MTD at 9:1-9; *see also Egbert*, 142 S. Ct. at 1803-04 ("Even in

8  a particular case, a court likely cannot predict the 'systemwide' consequences of recognizing a

9  cause of action under *Bivens*. That uncertainty alone is a special factor that forecloses relief.")

10  (citations omitted). The individual defendants contend that these include consequences for the

11  Postal Service and Postal Inspection Service's ability to "provide timely and cost-effective

12  delivery while also preventing the transportation of illegal substances through the mail," and that

13  "Congress, not the courts, is best suited to weigh these policy goals against the costs and benefits

14  of allowing a *Bivens* right of action" against postal workers. Individual Defs.' MTD at 9:6-9. I

15  cannot predict the systemwide consequences of extending *Bivens* in this manner, which counsels

16  against doing so, as stated in *Egbert*. But commonsense leads one to believe that extending

17  liability to postal workers based on their handling of mailed packages will impact their ability to

18  move those packages in a timely, efficient, and cost-effective way.

19         In short, the plaintiffs have not provided me any reason to depart from my prior decision.

20  Their claims arise in a new *Bivens* context, and special factors counsel against extending *Bivens* to

21  that context. Claims 4 and 7 are DISMISSED with prejudice. The individual defendants' motion

22  to dismiss is GRANTED.[7]

---

[6] As noted in my previous Order, Congress established the Inspector General of the United States Postal Service, which "is responsible for detecting and preventing fraud, waste, and abuse in the programs and operations of the Postal Service, including, investigating all allegations of violations of postal laws or misconduct by postal employees." *See* First MTD Order at 23 n.5 (citing 5a U.S.C. § 8G(f)(2); 39 C.F.R. § 230.1(d)). Even if the hotline were not the appropriate place to lodge their complaint, these provisions support that an alternative remedial structure exists.

[7] Because I am dismissing the only remaining claims against the individual defendants, I need not address their arguments about qualified immunity or their motion to strike requests for declaratory relief from the SAC. *See* Individual Defs.' MTD at 12:9-19:14.

**CONCLUSION**

The individual defendants' motion to dismiss is GRANTED. The United States' motion to dismiss is DENIED in part and GRANTED in part, with limited leave to amend to substitute Lee for one of the Doe defendants. The amended complaint is due within 20 days of the issuance of this Order.

A Case Management Conference is scheduled for August 15, 2023, at 2:00 p.m. A Joint Case Management Statement is due by August 8, 2023.

**IT IS SO ORDERED.**

Dated: June 29, 2023



William H. Orrick
United States District Judge

17