Jaba Tsitsuashvili (CA Bar No. 309012)
Patrick Jaicomo* (MI Bar No. P-75705)
Bobbi Taylor* (NJ Bar No. 435162023)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
jtsitsuashvili@ij.org

*Admitted pro hac vice

Anna M. Barvir (CA Bar No. 268728)
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Phone: (562) 216-4444
Fax: (562) 216-4445
abarvir@michellawyers.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| RENÉ QUIÑONEZ and MOVEMENT INK LLC, | Case No. 3:22-cv-3195-WHO |
| Plaintiffs, | **FOURTH AMENDED COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| UNITED STATES OF AMERICA, | Judge: Hon. William H. Orrick |
| Defendant. | |

**INTRODUCTION**

1. A U.S. Postal Service ("USPS") clerk baselessly diverted to the agency's law enforcement wing (the U.S. Postal Inspection Service, "USPIS") the political packages of his longtime customer René Quiñonez—knowing the diversion would delay the packages' arrival and harm Movement Ink, Quiñonez's small screen-printing business. Then, USPIS officials proceeded to search and detain the packages only to let them languish, all with no reasonable suspicion of wrongdoing and zero investigative efforts. Finally, facing internal and external scrutiny when the story made national news—and knowing full well the political and economic nature of the situation—USPIS officials fabricated the source of the packages' initial diversion in an effort to obscure the retaliatory reality of the situation and keep Quiñonez and Movement Ink from clearing their name and reclaiming their reputation as a safe and dependable vendor for their politically active customers. Those customers—understandably concerned about inviting further law enforcement interference with their protests against abusive law enforcement practices—stopped doing business with Movement Ink, costing the small business its most lucrative business opportunities and dashing Quiñonez's opportunity to work on political issues near and dear to his beliefs. Those opportunities never returned.

2. That series of events violated the First Amendment and the Fourth Amendment. It also constituted several state torts, including trespass to chattels, interference with contractual relations, and interference with prospective economic relations.

3. The wisdom of our constitutional design is that it knows significant harms befall the public when government officials exceed constitutional bounds and violate rights. That is exactly what happened here. Federal officials' unconstitutional and tortious seizures and searches have inflicted several significant harms, including reputational harms on Plaintiffs Quiñonez and Movement Ink that have cost them not only the opportunity to expand their labor of love but also significant business growth.

4. So Quiñonez and Movement Ink seek to hold personally accountable the postal and

United States District Court
Northern District of California

law enforcement officials responsible for their injuries under the Constitution, *Bivens*, the Westfall Act (28 U.S.C. § 2679(b)(2)(A)), and California law, as well as the federal government as those officials' employer under the Federal Tort Claims Act (FTCA).[1]

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, 1356, 1357, 1367, 2201, 2202, 2674, and 2679 and the United States Constitution.

6.      Venue is proper in the Northern District of California under 28 U.S.C. § 1391.

**PARTIES**

7.      Plaintiff René Quiñonez is an adult resident of California. He is the majority owner and manager of Plaintiff Movement Ink LLC.

8.      Plaintiff Movement Ink LLC is a California limited liability company. Its majority owner and manager is Plaintiff René Quiñonez.

9.      Defendant United States of America is the national federal government established by the United States Constitution and liable for the acts of its officials pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671–2680. For purposes of counts 1 and 3 (as well as the currently-dismissed count 2), those officials include Robin Lee, Steven Fajardo, Carlos Ruiz, Mark Hodges, and Aaron Doo.

10.     The individual defendants that Plaintiffs seek to hold liable under the currently-

---

[1] Assessing Plaintiffs' prior complaints, the Court held that regardless of the First Amendment and Fourth Amendment violations committed by USPS and USPIS officials in this case, no individual remedies are cognizable under the Constitution, *Bivens*, the Westfall Act (28 U.S.C. § 2679(b)(2)(A)), or California's Bane Act (Cal. Civil Code § 52.1). *See* ECF Docs. 62, 80, 91. The Court also held that FTCA statutory exceptions bar (1) the cognizability of seizure- or detention-based claims (but not search-based claims) as to count 1 under the FTCA and (2) the cognizability of a claim for interference with contractual relations as to count 2 under the FTCA. *See* ECF Docs. 62, 80. Accordingly, relief pursuant to those theories of liability is not repleaded here. Plaintiffs preserve for appeal and remand their theories of liability under those sources of law—as pleaded and as relate back to counts 1, 2, and 4 through 18 of the Third Amended Complaint, and as supported by the factual allegations herein. *See* ECF Doc. 92. Per the holdings of the Court as to the cognizability of remedies, Plaintiffs proceed for now only on count 1 (search-based trespass to chattels under the FTCA) and count 3 (interference with prospective economic relations under the FTCA).

1  dismissed counts 4 through 18 via the Constitution, *Bivens*, the Westfall Act (28 U.S.C.

2  § 2679(b)(2)(A)), or California's Bane Act (Cal. Civil Code § 52.1) include Robin Lee, Steven

3  Fajardo, Carlos Ruiz, Mark Hodges, and Aaron Doo.

### STATEMENT OF FACTS

#### *Background*

6      11.    René Quiñonez is a family man, entrepreneur, organizer, businessperson, activist,

7  former youth gang prevention nonprofit director, and current executive director of a youth outreach

8  and job skills development nonprofit. All those aspects of his personality find expression in

9  Movement Ink LLC, the small screen-printing business he and his family have spent the last decade

10  building into a community presence, known for its brand of activism-inspired business practices and

11  relationships.

12      12.    From its inception, as the company's name indicates, Movement Ink has been

13  publicly allied and involved with social justice and activism movements, organizations, nonprofits,

14  and individual organizers.

15      13.    René and Movement Ink have spent years cultivating their brand, their image, and

16  their reputation in these spaces, including community involvement and social media presence.

17      14.    As a result of years of commitment to causes, trust-building, and high-quality screen-

18  printing, René and Movement Ink successfully developed business relationships with activist

19  movements, organizations, nonprofits, and individual organizers, who relied on René and

20  Movement Ink for various screen-printing needs for years leading up to and into 2020, regularly

21  ordering products ranging from t-shirts, to hoodies, to onesies.

22      15.    René and Movement Ink methodically built and carved out this niche, making René

23  very proud of what he and his family have built.

24      16.    The business of screen-printing is hard, labor-intensive work. So is the work of

25  community building and activism. But both, especially together, are a labor of love for René and his

26  family.

27

28

Fourth Amended Complaint and Demand for Jury Trial – Case No. 3:22-cv-3195-WHO

United States District Court
Northern District of California

United States District Court
Northern District of California

17.  From 2016 to 2019, Movement Ink's gross annual sales grew steadily.

18.  So did its reputation—until that long-earned reputation was dashed one day by federal officials' baseless seizures and searches of Movement Ink's most high-profile, lucrative, and promising shipments.

19.  Defendants' seizures and searches of those shipments impeded Movement Ink's opportunities for business and activism expansion.

20.  Defendants' seizures and searches of those shipments also dashed René's newfound dream that he might actually be able to retire someday.

21.  In the early months of the Covid-19 pandemic, from March to May 2020, Movement Ink was able to weather the economy's lockdowns and downturns, thanks to increases in certain types of orders, including, most notably, screen-printed facemasks.

22.  Thanks to the years René and Movement Ink spent promoting and developing social justice causes and organizations, they were the supplier of choice when Movement For Black Lives ("M4BL") organizers around the country began ordering Covid-protective facemasks bearing political messages for the mass protests that broke out following the police killings of George Floyd and Breonna Taylor in 2020.

23.  In the first week of June 2020, René, his family, and community members worked around the clock to print, pack, and ship thousands of masks around the country. René could count on two hands the number of hours he slept over the course of several days.

24.  The masks that René, Movement Ink, his family, and his community printed for M4BL were emblazoned with core political messages, such as "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE."

25.  To be sure, Movement Ink was getting paid for its products. But this hard work and dedication were borne of much more than a profit motive; they were borne of a desire to contribute to the protest movement and express René's and Movement Ink's support for the messages they were printing for M4BL.

1

***The seizures, searches, and detentions***

2

26.    On June 3, René took four boxes of the screen-printed masks to the Oakland Main

3

Post Office for mailing to protest organizers in Brooklyn, DC, Minneapolis, and St. Louis.

4

27.    He shipped those boxes from the same postal facility, with the same postal clerk

5

(Robin Lee), and using similar packaging, payment, and shipping methods as he had done for years

6

on behalf of Movement Ink.

7

28.    The postal officials at that facility, including Robin Lee, knew René and his business.

8

They were friendly with each other, and René and Lee used to joke about René's and Movement

9

Ink's last-minute rush shipments and the high prices René paid for next-day deliveries.

10

29.    Lee also knew about the screen-printing and activist nature of René's business

11

because René regularly discussed those things while making his shipments.

12

30.    Lee also should have seen that one or more of the boxes had a label that said "masks"

13

or "BLM masks," which was affixed by Movement Ink's supplier of the blank masks (The Apparel

14

Source).

15

31.    The boxes did not exhibit any of the characteristics that USPS employees are trained

16

to look for to indicate hazardous or dangerous materials. If the boxes did exhibit such characteristics,

17

Lee would not have accepted them for shipment.

18

32.    Lee had explicit written instructions from local USPIS team leader Mark Hodges

19

regarding when Lee should and should not divert packages to USPIS for assessment by law

20

enforcement. Those instructions expressly told Lee not to divert any package to USPIS unless it had

21

a strong odor of marijuana.

22

33.    René's boxes did not have any odor of marijuana coming from them, let alone a

23

strong odor. But Lee diverted all four of René's boxes—which Lee knew were on behalf of René's

24

screen-printing business, Movement Ink—to USPIS anyway.

25

34.    Lee provided no reason for his diversion of the packages.

26

35.    But Lee knew that:

27

28

Fourth Amended Complaint and Demand for Jury Trial – Case No. 3:22-cv-3195-WHO

United States District Court
Northern District of California

(1) his diversion of the packages would result in their delay (which it did),

(2) his diversion of the packages would likely result in a notice to René and his mask customers that the packages had been "Seized by Law Enforcement" (which it did),

(3) the packages would likely be detained for weeks and then opened in accordance with USPIS policies (which they would have been, had Lee's diversion of the political masks not made national news), and

(4) even if not opened, the packages would likely be searched by USPIS officials by squeezing or other physical intrusion (which they were).

36.    When the packages arrived at USPIS, they were assessed by Steven Fajardo and Carlos Ruiz, pursuant to USPIS's package "profile" for seizing, detaining, searching, and opening mail without exigent circumstances or warrants.

37.    To decide whether to detain the packages or return them to the mail stream, Fajardo and Ruiz visually inspected the packages and their labels, determined whether the packages smelled like marijuana or narcotics, squeezed the packages, and entered the names and addresses on the labels into a federal database ("CLEAR") to determine any associations with known criminal activity—finding none.

38.    Fajardo and Ruiz did not call any of the phone numbers listed in the sender or recipient fields of the packages or do any other investigation, such as googling "Movement Ink" (which was clearly identified on every package). As one of their bosses noted the next day, however, Fajardo and Ruiz had plenty of time to take those or other investigative steps.

39.    Like Lee, Fajardo and Ruiz should have seen that one or more of the boxes had a label that said "masks" or "BLM masks," which was affixed by Movement Ink's supplier of the blank masks (The Apparel Source).

40.    Fajardo and Ruiz decided to detain Movement Ink's packages at USPIS.

41.    Pursuant to USPIS policy, that meant the packages would sit on a shelf for several weeks before being opened by USPIS—without any further investigation or a warrant.

United States District Court
Northern District of California

42.     To justify detaining Movement Ink's packages and letting them languish in detention without any investigation, Fajardo and Ruiz gave only the following reasons, as contemporaneously reflected in writing:

>    (1) "Bulging contents"
>
>    (2) "Parcel mailed from a known drug source area"
>
>    (3) "Frequently mailed parcels from the same sender/address"
>
>    (4) "Parcel destination is a known drug trafficking area"
>
>    (5) "Missing sender's name"
>
>    (6) "Taped or glued on all seams"

43.     No USPIS definition exists as to the meaning of "Bulging contents."

44.     Per USPIS, there is not a single city or state in the country that could not qualify as "a known drug source area." Every package sent from California qualifies for that descriptor.

45.     Per USPIS, simply mailing multiple packages at once—without ever having mailed a single package before—qualifies as "Frequently mailed parcels from the same sender/address." Every shipment of multiple packages to multiple locations qualifies for that descriptor.

46.     Per USPIS, there is not a single city or state in the country that could not qualify as a "known drug trafficking area." Every package mailed to Brooklyn, DC, Minneapolis, or St. Louis qualifies for that descriptor.

47.     Movement Ink's packages were not "Missing sender's name." That information was clearly visible and legible on the packages.

48.     "Taped . . . on all seams" is how USPS itself publicly advises customers to prepare their boxes for shipping. And it is how USPIS officials themselves repackage boxes before returning them to the mail stream after opening. Complying with USPS's public guidance (as well as the common sense of securely taping one's packages) qualifies for that descriptor.

49.     Fajardo and Ruiz testified that if any other reasons existed to justify detaining Movement Ink's boxes and letting them languish for weeks without any investigation, they would

United States District Court
Northern District of California

1    have contemporaneously been reflected in writing.

2        50.    No reasons other than those listed in ¶ 42 above were written. The only additional

3    post-hoc justification offered was messy or crossed out handwriting. No USPIS definition exists as

4    to the meaning of those descriptors. Those descriptors apply to the packages of anyone who has

5    imperfect penmanship or makes a mistake.

6        51.    Fajardo was fired for his role in detaining Movement Ink's masks packages without

7    investigation. Inexplicably, Ruiz—who behaved no differently—was not fired.

8                            ***The fallout and the coverup***

9        52.    The result of Robin Lee's baseless decision to divert what he knew were Movement

10   Ink's commercial mask shipments and Fajardo's and Ruiz's baseless decision to detain and let

11   languish those same shipments was that instead of receiving their protest-emblazoned mask

12   shipments, Movement Ink's M4BL customers received alerts that their law-enforcement-protest

13   apparel had been "Seized by Law Enforcement."

14       53.    The story made national news, resulting in Mark Hodges—Fajardo's and Ruiz's team

15   leader—being admonished by his supervisors before dawn the next day to immediately return the

16   packages to the mail stream, find out what happened, and report back to some of the highest-ranking

17   USPS and USPIS officials.

18       54.    Jeff Agster (one of Hodges's supervisors) saw the reasons Fajardo and Ruiz wrote

19   for detaining the packages and, without seeking any further investigation or details, ordered that the

20   packages immediately be returned to the mail stream.

21       55.    Hodges succeeded in returning all four detained packages to the mail stream that day.

22       56.    Hodges went to the Oakland Main Post Office—where Robin Lee had diverted the

23   four detained masks packages to USPIS in violation of Hodges's directive telling Lee not to divert

24   any package to USPIS unless it had a strong odor of marijuana.

25       57.    At the post office, Robin Lee explained to Hodges that he diverted the four packages

26   to USPIS and that he recognized René. Lee also told Hodges that René shipped "suspicious"

27

28       Fourth Amended Complaint and Demand for Jury Trial – Case No. 3:22-cv-3195-WHO

United States District Court
Northern District of California

1    packages in the past—but he did not provide any explanation or reason, and he had never rejected

2    any of René's packages for shipment.

3        58.    That afternoon, Hodges and his team (including Carlos Ruiz and Aaron Doo) learned

4    that Movement Ink had shipped three other boxes on June 4 from another post office, and they made

5    sure those three were not detained.

6        59.    Movement Ink's three June 4 boxes—sent from the Laurel Post Office, and

7    addressed to Atlanta, Chicago, and Detroit—were not diverted to USPIS. They were very similar to

8    the four June 3 boxes that Robin Lee did divert to USPIS: all were in similar or identical brown

9    boxes; all were densely packed; at least one in each batch could be described as somewhat "bulging";

10   all were sent via express overnight shipment; all were labeled with "Movement Ink" or "Movement"

11   as the sender; all were going from Oakland to other major American cities; all likely had a label

12   from The Apparel Source indicating that they contained "masks" or "BLM masks"; and all were

13   heavily taped.

14       60.    There were just two noticeable differences between the four June 3 packages (which

15   were diverted to USPIS) and the three June 4 packages (which were not diverted to USPIS): (1) the

16   June 3 packages had sender and recipient information written in large green sharpie on the boxes

17   (in addition to being written on the USPS-provided slips), and (2) the June 3 packages were

18   processed by Robin Lee—who, unlike the retail postal clerk who processed the June 4 packages at

19   the Laurel Post Office, knew René and the nature of his business and activism.

20       61.    Even though Mark Hodges knew René and Movement Ink shipped the four diverted

21   June 3 packages, he—like Fajardo and Ruiz before him—decided to never call René or Movement

22   Ink, even though their phone number was clearly listed on every single package, and even though

23   Jeff Agster indicated that was the number that needed to be called.

24       62.    Even though Hodges already knew what happened to the four diverted June 3

25   packages (Lee admitted to diverting them, as Hodges memorialized on June 5 or June 6), he ordered

26   USPIS inspector Aaron Doo to write a new investigative memorandum nearly two weeks later.

27

28
        Fourth Amended Complaint and Demand for Jury Trial – Case No. 3:22-cv-3195-WHO

United States District Court
Northern District of California

63.     By this time, both Hodges and Doo knew the nature of Movement Ink's business and their activism, knew that Movement Ink's business relationships with M4BL were implicated, knew that Congresswoman Barbara Lee had submitted a congressional inquiry on René's behalf, and knew that there was a litigation risk arising from the packages' treatment.

64.     Suddenly, per Hodges's instructions, Doo wrote a whole different story about what happened: Doo wrote that it was not Robin Lee who diverted Movement Ink's packages, but rather Tito Cuevas, who never interacted with customers (unlike Robin Lee, who already admitted to knowing René). Doo wrote that Cuevas explained at length his reasons for diverting the packages (which just happened to align with Fajardo's and Ruiz's reasons). And Doo wrote that Johnny Leong (who worked near Cuevas, both frantically sorting express mail packages) corroborated that it was Cuevas who diverted Movement Ink's packages.

65.     But Doo made that all up.

66.     Leong testified under oath that no one from USPIS interviewed him about the packages or the events at issue in this case.

67.     Cuevas testified under oath that no one from USPIS interviewed him about the packages or the events at issue in this case.

68.     Cuevas testified under oath that he did not divert Movement Ink's June 3 packages to USPIS.

69.     When government counsel asked Cuevas, "Do you believe that the postal inspector who wrote this Memorandum of Interview is lying?", Cuevas answered unequivocally: "Yes."

70.     The only postal official who ever admitted to diverting René's packages was Robin Lee.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States District Court*
*Northern District of California*

***Harms to René and Movement Ink***

71.     René and the diverted June 3 packages' intended recipients were greeted by this cryptic "Alert" on USPS's online tracking system, which said only that Movement Ink's political mask shipments were "Seized by Law Enforcement":



72.     The four political mask shipments would not end up arriving at their destinations until June 6—two days and several protests late, only because they were baselessly diverted, searched, and detained by the government.

73.     René and the mask recipients were all confused, dismayed, and disrupted in their critical work. Instead of focusing on printing and shipping political masks and other apparel, René and Movement Ink had to waste time figuring out why their innocuous packages were seized by law enforcement, and how to get them released, while also fielding questions, concerns, and even accusations from partners, community members, and social media commenters.

74.     Similarly, the recipient organizers had to divert attention and resources to the seizure issue, having to consult legal counsel and field calls about this distraction, and having to post on social media about this latest disruption to their organizing efforts and their health and safety efforts.

75.     René, Movement Ink, M4BL and its affiliates, and Movement Ink's other affiliates were all left wondering why these political masks protesting law enforcement were in the hands of law enforcement officials instead of on the faces of political protestors. They were also left

1    wondering who law enforcement was targeting and why.

2        76.    The confusion, dismay, and disruption were compounded by Robin Lee's lying to

3    René the day after Lee diverted René's packages. When René went to the post office to inquire

4    about the situation, Lee lied and pretended the packages were not diverted at all. He knew that was

5    false, and he knew it would cause further confusion and disruption for René and his politically active

6    customers. René felt gaslighted, unnerved, and distressed by the inability to do anything to clear his

7    and Movement Ink's name.

8        77.    All that uncertainty had a catastrophic impact on the reputation, the relationships,

9    and the business that René and Movement Ink had worked so hard and so long to build.

10        78.    M4BL was satisfied with the quality, speed, and price of Movement Ink's work. But

11    members were internally expressing concern about law enforcement's seizure of the June 3

12    packages.

13        79.    After completing the mask orders that had already been placed, M4BL and its

14    affiliated groups and members severed all ties with René and with Movement Ink—ties that were

15    never restored. They did so even though M4BL viewed Movement Ink as a values-aligned

16    organization, and continues to view Movement Ink as a values-aligned organization to this day.

17        80.    But for the pall of suspicion, distraction, uncertainty, and confusion caused by the

18    government's baseless seizures, searches, and detentions of the June 3 political mask shipments,

19    M4BL and its affiliated groups and members would not have severed ties with René and Movement

20    Ink, and would have continued ordering screen-printed apparel from René and Movement Ink.

21    Indeed, it was René's understanding that significant additional and future orders were forthcoming,

22    of masks and other apparel.

23        81.    But for Mark Hodges's and Aaron Doo's fabricated narrative about the source of the

24    baseless diversion of the June 3 political mask shipments to law enforcement, René and Movement

25    Ink could have put the word out about what actually happened—i.e., that the masks were diverted

26    by one retaliatory postal clerk who knew René, and who he would no longer return to—and assuaged

27

28    Fourth Amended Complaint and Demand for Jury Trial – Case No. 3:22-cv-3195-WHO

1    concerns about potential future disruptions or surveillance.

2         82.    Hodges's and Doo's fabricated narrative kept René and Movement Ink from being

3    able to clear their names in the eyes of the social justice community, and in particular in the eyes of

4    M4BL and its affiliated groups and members—who only ever expressed any concerns about

5    Movement Ink arising from the government's seizure and detention of the June 3 packages, and

6    never any concerns with the quality, speed, or price of Movement Ink's work.

7         83.    In addition to Doo's memos expressly stating the false narrative that he and Hodges

8    peddled, Hodges contributed to the false narrative by deliberately choosing not to photograph the

9    sides of the June 3 boxes that would have The Apparel Source's "masks" or "BLM masks" labels

10   affixed to them. By doing so, Hodges contributed to the false information given Congresswoman

11   Barbara Lee, which insisted that the packages had no external indication of their contents and that

12   the diversion of the packages had nothing to do with the sender—both of which were false.

13        84.    That peddling of false narratives to Congresswoman Lee further ensured that René

14   and Movement Ink would be unable to clear their names from the uncertainty and suspicion created

15   by the government's seizure and detention of the packages.

16        85.    As a result of the baseless and retaliatory seizures, searches, and detentions and the

17   false narrative about them, talks with M4BL affiliates for future orders were terminated, and after

18   the existing orders were completed, René could not get any responses from his M4BL contacts or

19   from affiliated groups or members.

20        86.    In addition to the recipients of the political mask shipments at issue in this case, who

21   terminated talks for future orders, other groups who had regularly ordered from and collaborated

22   with René and Movement Ink ceased their partnerships and cut off all ties with René and Movement

23   Ink.

24        87.    Those partnerships have not revived, and that business has not returned.

25        88.    Moreover, René's relationships with individuals from those groups soured, and he

26   began to feel like an outcast in communal spaces and events that he cherishes.

27

28        Fourth Amended Complaint and Demand for Jury Trial – Case No. 3:22-cv-3195-WHO

United States District Court
Northern District of California

89.    The loss of potential significant revenue from ongoing mask and other apparel orders from M4BL and its affiliated groups meant that Movement Ink's screen-printing operation could not, as it had always done, continue to sustain Movement Ink's small retail shop (which could no longer bring in any of its own revenue—minimal though that always was—due to Covid-related closures).

90.    René and Movement Ink—who in prior years were recipients of awards from the city of Oakland for their social justice infused business—suffered severe reputational harm because of the government's baseless and retaliatory seizures, searches, and detentions of the June 3 political mask shipments.

91.    Because the government's misconduct destroyed René's business relationships and caused his clients to sever all ties with him, René does not know what condition the packages at issue in this case were in when they finally arrived at their destinations. The photographs that Mark Hodges took of the packages did not include every side, so they did not dispel the possibility that that packages were opened.

92.    Even if the packages were not opened, Steven Fajardo and Carlos Ruiz searched the packages by sniffing and squeezing them to ascertain their contents. Robin Lee knew that by diverting the packages he was likely to cause them to be searched by USPIS.

93.    René's and Movement Ink's substantial, steady revenue opportunity and their opportunity to do substantial, consistent work supporting movements and causes they are deeply committed to were dead on arrival because of the government's baseless and retaliatory seizures, searches, and detentions of René's and Movement Ink's political mask shipments, and because of the government's subsequent false, publicly distributed narrative about the circumstances of those baseless and retaliatory seizures, searches, and detentions.

94.    The government's actions also caused and continue to cause René significant emotional and mental distress—not just because of his and Movement Ink's financial and reputational hits, but because he and Movement Ink have been effectively shut out of a movement

and a community that they spent (and continue to spend) years investing their time and energy in.

95.    The government's actions also caused and continue to cause René significant emotional and mental distress because of the yearslong campaign of lying, gaslighting, and fabricated narratives about the nature of the baseless and retaliatory seizures, searches, and detentions of his political packages.

96.    The government's actions have left René feeling targeted, surveilled, despondent, and desperate for information and vindication, which the government's initial conduct caused and which the government's yearslong campaign of lying, gaslighting, and fabricated narratives greatly compounded.

97.    The government's actions have directly resulted in the chilling of René's and Movement Ink's political speech in two ways: (1) René and Movement Ink are less active and vocal on social media and in the community because of the shadow of suspicion and fear of surveillance that the government's conduct has cast over them, and (2) René and Movement Ink have lost substantial opportunities to express their political views through their work because the government's conduct has significantly depressed their client base and their apparel production, which have always been built on the basis of political activism and speech.

98.    The government's letter to Congresswoman Barbara Lee's office asserted that USPIS assisted René in obtaining a refund for the cost of the mailings. That is not true. René and Movement Ink did not receive refunds.

99.    In any event, a refund could and would do nothing to account for any of the harms described above, which remain entirely unremedied.

100.    On March 11, 2022, USPS and USPIS confirmed their receipt of—and the sufficiency of—René's and Movement Ink's administrative claims for relief under the Federal Tort Claims Act. The agencies refused to provide any relief, permitting René and Movement Ink to bring their FTCA claims in this lawsuit, pursuant to 28 U.S.C. § 2675(a).

101.    Besides the FTCA and individual damages claims in a court of law, there is no other

1    process—let alone potential remedy—that René or Movement Ink could or can pursue.

2        102.    René's and Movement Ink's complaints do not fall within the purview of the Postal

3    Service Office of Inspector General Hotline, which states expressly that it "generally does not handle

4    individual issues, except for whistleblower reprisal complaints and related executive

5    investigations." Regardless, that OIG process expressly forecloses any individual remedy or

6    reprieve. Indeed, OIG expressly disclaims any obligation to even investigate any given complaint.

7        103.    In deposition testimony, neither USPS's nor USPIS's organizational representatives

8    could identify any avenue for René or Movement Ink to be made whole for the harms described

9    above, except for the discretionary possibility of refunded shipping costs—which René and

10   Movement Ink did not even get.

**CLAIMS FOR RELIEF[2]**

**Count 1**
**Trespass to Chattels**
**Against Defendant United States of America**
**Under the Federal Tort Claims Act**

14       104.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 103.

15       105.    Under the Federal Tort Claims Act, Defendant United States of America is liable for

16   the tortious acts, violations, and injuries alleged in this action caused by Robin Lee's, Steven

17   Fajardo's, and Carlos Ruiz's trespasses to Plaintiffs' chattels.

18       106.    Plaintiffs timely and properly exhausted the Federal Tort Claims Act's administrative

19   claims process.

20       107.    Plaintiffs shipped four packages of their personal property via the United States

21   Postal Service. Plaintiffs retained ownership rights and interests and possessory rights and interests

---

[2] Pursuant to the Court's holdings regarding the cognizability of (1) the seizure- and detention-based aspects of count 1 and (2) the entirety of counts 2 and 4 through 18 of the Third Amended Complaint, those theories of liability are not repleaded here. But Plaintiffs preserve for appeal and remand their theories of liability as pleaded and as relate back to those aspects of counts 1, 2, and 4 through 18 of the Third Amended Complaint, and as supported by the factual allegations herein. *See* note 1, *supra*. Per the Court's holdings as to the cognizability of remedies, Plaintiffs proceed for now only on count 1 (search-based trespass to chattels under the FTCA) and count 3 (interference with prospective economic relations under the FTCA).

United States District Court
Northern District of California

1    in their packages until the packages were delivered to their intended recipients.

2        108.    Without consent, cause, or legal authority, Lee, Fajardo, and Ruiz intentionally

3    interfered with Plaintiffs' possession, right to possess, use, right to use, enjoyment, and right to

4    enjoy their personal property by searching Plaintiffs' personal property.[3]

5        109.    Lee's, Fajardo's, and Ruiz's conduct caused: severe reputational harms to Plaintiffs;

6    Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business

7    relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing

8    emotional and mental distress to Plaintiff Quiñonez.

9        110.    Plaintiffs are entitled to compensatory damages and all other damages available at

10    law or equity for their injuries caused by Lee's, Fajardo's, and Ruiz's unconstitutional and tortious

11    conduct.

12
                                    **Count 3**
13                    **Interference with Prospective Economic Relations**
                        **Against Defendant United States of America**
14                          **Under the Federal Tort Claims Act**

        111.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 103.
15
        112.    Under the Federal Tort Claims Act, Defendant United States of America is liable for
16
    the tortious acts, violations, and injuries alleged in this action caused by Robin Lee's, Mark
17
    Hodges's, and Aaron Doo's interference with Plaintiffs' prospective economic relations.
18
        113.    Plaintiffs timely and properly exhausted the Federal Tort Claims Act's administrative
19
    claims process.
20
        114.    Plaintiffs had contracts and other economic relationships with protest organizers for
21
    the rush printing and immediate delivery of four packages containing Covid-protective masks
22
    emblazoned with political speech and for similar ongoing and regular orders in the future.
23
        115.    Lee, Hodges, and Doo knew, should have known, or had reason to know of Plaintiffs'
24
    contracts and their contemporaneous, ongoing, and future commercial activities.
25

26    _____

27        [3] Plaintiffs preserve for appeal and remand the cognizability of their seizure- and detention-based theories of liability as to count 1. *See* notes 1 and 2, *supra*.

28                    Fourth Amended Complaint and Demand for Jury Trial – Case No. 3:22-cv-3195-WHO

United States District Court
Northern District of California

116.    Lee, Hodges, and Doo knew, should have known, or had reason to know of Plaintiffs' contracts and their contemporaneous, ongoing, and future economic benefits.

117.    Lee, Hodges, and Doo intentionally or recklessly interfered with Plaintiffs' contracts and their contemporaneous, ongoing, and future economic benefits.

118.    Lee's, Hodges's, and Doo's tortious interference with Plaintiffs' economic relations violated Plaintiffs' First Amendment rights to speech, expression, and association.

119.    Lee's, Hodges's, and Doo's conduct caused: severe reputational harms to Plaintiffs; Plaintiffs' packages' intended recipients to sever all ongoing and future contractual and business relationships with Plaintiffs; significant loss of Plaintiffs' ongoing and future revenue; and ongoing emotional and mental distress to Plaintiff Quiñonez.

120.    Plaintiffs are entitled to compensatory damages and all other damages available at law or equity for their injuries caused by Lee's, Hodges's, and Doo's unconstitutional and tortious conduct.

### PRAYER FOR RELIEF[4]

Plaintiffs respectfully request that this Court:

121.    Declare that Defendant United States of America is liable in damages under the Federal Tort Claims Act for trespasses to Plaintiffs' chattels.

122.    Declare that Defendant United States of America is liable in damages under the Federal Tort Claims Act for interference with Plaintiffs' prospective economic relations.

123.    Declare that if there is no remedy available for Plaintiffs' injuries under the Constitution, *Bivens*, the Federal Tort Claims Act, the Westfall Act, and the Bane Act, then the Federal Tort Claims Act and the Westfall Act are unconstitutional as applied, and that individual

---

[4] Plaintiffs preserve for appeal and remand the additional prayers for relief pleaded in their Third Amended Complaint pertaining to counts 1, 2, and 4 through 18, including compensatory and all other damages, fees, costs, and expenses available at law or equity. *See* notes 1, 2, and 3, *supra*. Plaintiffs also preserve their demand for a jury trial on all issues so triable under those counts—as demanded in the Third Amended Complaint—pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6.

United States District Court
Northern District of California

defendants are liable in damages under California law for their unconstitutional and tortious conduct in violation of Plaintiffs' constitutional rights (trespasses to Plaintiffs' chattels, interference with Plaintiffs' contractual relations, and interference with Plaintiffs' prospective economic relations).

124.   Award Plaintiffs compensatory and all other damages available at law or equity for Defendants' unconstitutional and tortious conduct, in amounts to be proven at trial.

125.   Award Plaintiffs attorneys' fees, costs, and expenses under 28 U.S.C. § 2412, Cal. Civil Code § 52.1(i), and any other applicable provisions of law or equity.

126.   Award any further legal or equitable relief the Court deems just and proper.

August 15, 2024

s/ Jaba Tsitsuashvili
Jaba Tsitsuashvili (CA Bar No. 309012)
Patrick Jaicomo* (MI Bar No. P-75705)
Bobbi Taylor* (NJ Bar No. 435162023)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
jtsitsuashvili@ij.org

*Admitted pro hac vice

Anna M. Barvir (CA Bar No. 268728)
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Phone: (562) 216-4444
Fax: (562) 216-4445
abarvir@michellawyers.com

*Counsel for Plaintiffs*

United States District Court
Northern District of California