1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 RENE QUINONEZ, et al.,

Plaintiffs,

Case No. 22-cv-03195-WHO

8

9 v.

10 UNITED STATES OF AMERICA, et al.,

11 Defendants.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 120, 121, 129, 144, 145, 148, 151

12

13     Plaintiffs René Quiñonez and Movement Ink, LLC ("Movement Ink") (together, the

14 "plaintiffs") allege that United States Postal Inspection Service ("USPIS") officers unlawfully

15 seized, detained, and searched four packages containing masks screen-printed with political

16 messages that the plaintiffs had sent to customers via the United States Postal Service ("USPS").

17 After three years of litigation, only the plaintiffs' claims for Trespass to Chattels and Interference

18 with Prospective Economic Relations remain. The only remaining defendant, the United States of

19 America, moves for summary judgment on both claims. No reasonable trier of fact could find in

20 the plaintiffs' favor on either claim: The plaintiffs have produced no evidence that their packages

21 were opened during the two days that they were detained, and they have failed to show a

22 probability of future economic benefit arising from their relationship with any customer whose

23 package was delayed. These deficiencies, among others, warrant summary judgment in the

24 government's favor on both claims. The government's motion is GRANTED, and this action is

25 dismissed in its entirety.

26                              **BACKGROUND**

27     The facts in this case were described in my prior order granting in part defendants' motion

28

United States District Court
Northern District of California

to dismiss. *Quiñonez v. United States*, No. 22-CV-03195-WHO, 2023 WL 4303648, at *7 (N.D. Cal. June 29, 2023). The following facts are relevant to the remaining claims and to the resolution of the government's motion.[1]

---

[1] There are several sealing matters. The materials marked confidential by the non-party Movement for Black Lives ("M4BL") (Exhibit 5 to the government's Motion for Summary Judgment, containing excerpts from M4BL's deposition transcript, and corresponding portions of the government's Motion and Reply brief) shall remain filed under seal, as they contain confidential information concerning the business practices of non-parties. *See* Dkt. No. 144, 145, 151; *see Nixon v. Warner Commnc'ns, Inc.*, 435 U.S. 589, 597 (1978). So shall the document marked confidential by plaintiffs, produced as Bates number Plaintiffs01923. *See* Dkt. No. 145-2 (sealed).

As for the rest of the material that the government wishes to be filed under seal, (*see* Dkt. No. 148, Exs. C-I, Dkt. No. 120, Exs. C-E), I agree with the plaintiffs that it has likely been over-inclusive: the government has designated entire deposition transcripts as "confidential." *See* Dkt. No. 148-1 ¶¶ 4-5. As such, within twenty (20) days of the date of this Order, the government shall file revised versions of the documents contemplated in the plaintiffs' Administrative Motions to Consider Whether Another Party's Material Should be Sealed found at Dkt. Nos. 120, 129, and 148, that redact **only** that information for which the government can show a "compelling reason" for sealing. *See Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092, 1096-97 (9th Cir. 2016) ("a court may seal records only when it finds 'a compelling reason and articulate[s] the factual basis for its ruling[.]"). To guide the government: Internal email correspondence between USPIS employees regarding ANP investigations may remain sealed, as may non-public manuals regarding ANP procedures prepared for the Contraband Interdictions & Investigations unit at USPIS. This material is sensitive and reveals law enforcement techniques the description of which is not otherwise available to the public. *See In re U.S. Dep't of Just. Motion to Compel Facebook to Provide Tech. Assistance in Sealed Case*, 357 F. Supp. 3d 1041, 1044 (E.D. Cal. 2019), *aff'd sub nom. United States Dep't of Just. v. Am. C.L. Union Found.*, 812 F. App'x 722 (9th Cir. 2020) (sealing material containing "law enforcement techniques" under compelling reasons standard whose public disclosure would "compromise law enforcement efforts" in future investigations). However, deposition testimony about ANP procedures that merely recounts information that is otherwise available to the public must be filed publicly. It is not clear to the court what deposition testimony falls into what category. For example, it is not obvious that all of the excerpts of the Cuevas deposition that discuss USPIS ANP procedures (transcript pages 52-71), which the government has marked "confidential," discuss "law enforcement techniques" the disclosure of which would "compromise law enforcement efforts." The same is true for the Leong, Ruiz, and Farjado depositions. To keep deposition transcripts concerning the everyday conduct of government employees sealed would violate the "strong presumption of access to judicial records." *Ctr. for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016). As such, the government shall file public versions of these transcripts that redact only testimony as to *sensitive* law enforcement techniques, the description of which is otherwise unavailable to the public. *See In re U.S. Dep't of Just.*, 357 F. Supp. 3d at 1044.

Because this Order references material that the government has marked "confidential," I will file it provisionally under seal. There does not appear to be a compelling need to redact much, if anything, in this Order. Within **three days** of the date of this Order, the government shall file a redacted version, omitting **only** that information about USPIS procedures that constitutes "sensitive law enforcement information" not otherwise available to the public.

United States District Court
Northern District of California

A.      **The Shipping Delay**

1.      **Overview of the USPIS Administrative Non-Mailability Protocol ("ANP")**

The plaintiffs allege that USPIS personnel Carlos Ruiz and Steven Farjado opened the plaintiffs' packages when they were detained pursuant to the USPIS's Administrative Non-Mailability Protocol ("ANP"), which is an administrative procedure that the USPIS may use to detain, document and process mail that is reasonably suspected of containing non-mailable matter, namely marijuana.  *See* 30(b)(6) Deposition of Jeffrey Agster ("Agster Depo.") [Dkt. No. 120-7] Ex. 48 (publicly available ANP instructions); Fourth Amended Complaint ("4AC") [Dkt. No. 114] ¶¶ 26-51.  In the context of ANP, to "detain" a package means "actually taking a piece of live mail out of the mailstream and detaining it administratively in [the] program." Agster Depo. 57-59.  The word "process," in the ANP context, means "[w]hen a mailpiece is detained in ANP, within 24 hours letters go out to both the sender and the addressee as part of the administrative process where the customers . . . are noticed [that] their mail was detained because [USPIS officials] believe it contains nonmailable matter." *Id.*

Prior to a package being detained pursuant to ANP, inspectors can "triage" packages that have been identified for ANP.  *Id.* 155-157; Deposition of Mark Hodges ("Hodges Depo.") [Dkt. No. 148-7] 37-39 (sealed).  During this triage, the inspectors might call the phone number for the customer associated with the package to "clear it," or confirm what it contains.  If a USPIS inspector calls the phone number associated with a package flagged for ANP, gets consent from the customer to open it, opens the package, and determines that it contains only mailable material, that package is returned to the mailstream, *having never been detained*.  Agster Depo. 157.

Whether a package has been officially detained pursuant to ANP is indicated by whether a letter and notice of detention goes out.  If a package is detained, within 24 hours of that detention, a letter goes out to the customer informing them that their package has been detained, and a notice is automatically placed on the USPS tracking feature stating that the package has been "seized by law enforcement." Agster Depo. 77.[2]

_____

[2] In 2020, when the events giving rise to this litigation occurred, the letters informed the customer that their package was "seized by law enforcement"; now, the letters inform the customer that their

A 21-day clock starts to run from the issuance of that letter. During that period, the package cannot be opened to determine whether it contains non-mailable material, unless the customer's consent is obtained, a judicial search warrant issues, or any ongoing appeal process resolves. *Id.* Most packages that were opened pursuant to ANP in San Francisco in 2020 were opened after the expiration of the 21-day detention window.[3] *See* Declaration of Jeffery Agster ("Agster Decl.") [Dkt. No. 125-2] (USPIS 2020 Statistics Chart, hereafter, the "ANP Chart"). When postal inspectors visit ANP offices, they check the ANP shelves for packages that have passed the 21-day period and open those parcels that have. At that point, the inspector runs an "opening report," which shows the number of parcels opened, along with other information about the parcels, including what was inside them. Agster Depo. 154. The USPIS aims to have their ANP program operate at a 90% hit rate, meaning that 90% of the packages that they detain and open have nonmailable material in them. In 2020, the San Francisco ANP program found non-mailable material in 90.1% of the packages that they detained and opened. *Id.*

### 2.    Detention of the Plaintiffs' Packages

On June 3, 2020, Quiñonez sent four packages containing face masks emblazoned with political messages to four customers, including the organization Movement for Black Lives (known as and hereafter, "M4BL"). Declaration of René Quiñonez [Dkt. No. 147-1] ¶ 4. While the four packages were en route, Movement Ink and its customers were notified that the packages had been "Seized by Law Enforcement." *Id.* ¶ 12; Deposition of M Adams ("Adams Depo.") [Dkt. No. 148-3] at 87-88 (sealed).

Mark Hodges was the inspector and the team leader of the San Francisco ANP team in

—————————————————

package has been "[h]eld to determine mailability." *Id.*

[3] The period during which the USPIS must hold a package prior to opening it (absent consent from the customer, a judicial search warrant, or the resolution of an appeal process) was 21 days in 2020—it is now 30 days. The delay is put in place to give the customer the chance to appeal the detention of the package after they receive notice of the detention via the generated letter but before the package is opened. In an email from Mark Hodges to Steven Sherwood on June 8, 2020, Hodges stated that "[t]he Inspection Service only opens parcels while executing a federal search warrant, or with the consent of the sender or addressee." Agster Depo. Ex. 4 (email from Hodges to Sherwood). This was an incorrect statement.

4

United States District Court
Northern District of California

1    June 2020.  Agster Depo. 42-43.  He supervised USPIS contractors Steven Farjado and Carlos

2    Ruiz.  *See* Deposition of Steven Farjado ("Farjado Depo.") [Dkt. No. 120-5] (sealed); Deposition

3    of Carlos Ruiz ("Ruiz Depo.") [Dkt. No. 120-6] (sealed).  Ruiz and Farjado both testified that they

4    *detained* the plaintiffs' packages pursuant to USPIS ANP procedures but *did not open* them.  *See*

5    Farjado Depo. 126, 143; Ruiz Depo. 12, 81, 86, 141.  The packages were entered into the ANP

6    system on June 4, 2020, the day after Quiñonez mailed them.  Hodges Depo. 173-174.  On June 5,

7    2020, Agster contacted Hodges and prompted him to return the packages to the mailstream. 4AC ¶

8    54.  The packages were returned to the mailstream and ultimately delivered to their destinations.

9              **3.    USPIS ANP Statistics for 2020**

10          Jeffrey Agster responded to the plaintiffs' interrogatory asking for information about the

11   disposition of parcels processed through the ANP by compiling data from the ANP database.  *See*

12   Agster Decl. (ANP Chart).  The ANP Chart shows that the USPIS detained 50,832 parcels in the

13   year 2020 pursuant to ANP procedures.  *Id.*  It also shows that of those detained parcels, 2,777 of

14   them were opened after USPIS officials gained consent to open them from the customer, 48,016 of

15   them were opened after the expiration of the 21-day window, 24 were opened pursuant to a

16   judicial search warrant, 15 were opened as a function of the appeal process, and zero were opened

17   up to three days prior to the expiration of the 21-day window.  *Id.*

18          The ANP Chart also indicates that in 2020, USPIS assessed 6,318 parcels pursuant to ANP

19   and returned those parcels to the mailstream *without being detained*, and that it assessed 62 parcels

20   pursuant to ANP and returned *those* to the mailstream *without being opened*.  *Id.*  According to

21   Agster, the plaintiffs' parcels were among those 62 packages assessed by the USPIS pursuant to

22   ANP and returned to the mailstream *without being opened*.  Agster Decl. ¶ 7 ("[t]he data indicates

23   that, in 2020, 62 parcels were assessed by USPIS and returned to the mailstream [] without being

24   opened [. . .] this number includes [the plaintiffs' packages].").

25            **B.    Movement Ink's Relationship with Relevant Customers**

26          The plaintiffs claim that the detention of their parcels caused business relationships with

27   protest organizers to fall through.  4AC ¶¶ 84-86   According to the complaint, "[a]fter completing

28   the mask orders that had already been placed, M4BL and its affiliated groups and members

severed all ties with [Quiñonez] and Movement Ink—ties that were never restored." 4AC ¶ 79.
The plaintiffs claim that "[b]ut for the pall of suspicion, distraction, uncertainty and confusion caused by the government's baseless seizures, searches, and detentions of the June 3 political mask shipments, M4BL and its affiliated groups and members would not have severed ties with [Quiñonez] and Movement Ink, and would have continued ordering screen-printed apparel from [Quiñonez] and Movement Ink." *Id.* ¶ 80.

Quiñonez declares that "[b]efore the government's interference with the mask orders, [he] had discussions with Karissa Lewis, Fresco Steez, and other M4BL affiliates about expanding the scope of Movement Ink's work for M4BL to include various types of apparel (from hoodies to onesies) going forward." Quiñonez Decl. ¶ 15.  He states that "the discussions with Fresco Steez were particularly pronounced, with the expectation on both sides that Movement Ink's success with the mask orders would lead to more national M4BL work for Movement Ink." *Id.* ¶ 16.  This relationship did not come to fruition.  Quiñonez states that "[i]n explaining to [him] what was happening, Steez pointed directly and solely to the government interference at issue in this case and the resulting concerns about law enforcement disruption of M4BL's mission." *Id.*  Plaintiffs do not provide testimony from Lewis, Steez, or the other M4BL affiliates implied in Quiñonez's declaration besides that of M Adams.

In Adams' "person most qualified" deposition on behalf of M4BL, Adams stated that in 2020, M4BL had no plans to place ongoing merchandise orders with Movement Ink LLC.  *See* M Adams Deposition ("Adams Depo.") [Dkt. No. 148-3] 53-54 (sealed).  Aside from the order of face masks that got delayed but that M4BL ultimately received, M4BL had no other orders for other products from Movement Ink in the works.  *Id.* at 48.  Adams also stated that there "wasn't a reason" that M4BL did not intend to place future orders with Movement Ink.  *Id.* 50-51.  Finally, Adams explained that Steez did not have the authority in 2020 to make promises or commitments to vendors on behalf of M4BL; Steez was not an M4BL employee.  *Id.* 37, 50.

### LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The

1  substantive law determines which facts are material; only disputes over facts that might affect the

2  outcome of the suit under the governing law properly preclude the entry of summary judgment."

3  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing

4  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute about a material fact is

5  "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving

6  party.  *Anderson*, 477 U.S. at 248.

7      "A moving party without the ultimate burden of persuasion at trial . . . has both the initial

8  burden of production and the ultimate burden of persuasion on a motion for summary judgment."

9  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "[T]o carry its

10 burden of production, the moving party must either produce evidence negating an essential

11 element of the nonmoving party's claim or defense or show that the nonmoving party does not

12 have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

13 *Id.* "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade

14 the court that there is no genuine issue of material fact." *Id.* "If . . . a moving party carries its

15 burden of production, the nonmoving party must produce evidence to support its claim or

16 defense."  *Id.* at 1103.  "Where the record taken as a whole could not lead a rational trier of fact to

17 find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v.

18 Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment must be granted "against a

19 party who fails to make a showing sufficient to establish the existence of an element essential to

20 that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.

21 Catrett*, 477 U.S. 317, 322 (1986).

22     "If the nonmoving party produces direct evidence of a material fact, the court may not

23 assess the credibility of this evidence nor weigh against it any conflicting evidence presented by

24 the moving party." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th

25 Cir. 1987).  Inferences may be drawn from underlying facts that are either not in dispute or that

26 may be resolved at trial in favor of the nonmoving party, but only if they are "rational" or

27 "reasonable" and otherwise permissible under the governing substantive law.  *Id.*  The court must

28 view all evidence and justifiable inferences "in the light most favorable to the nonmoving party."

*Id.* at 630–31.  However, a party cannot defeat summary judgment based solely on the allegations or denials of the pleadings, conclusory statements, or unsupported conjecture.

*Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *see also FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

## DISCUSSION

### I.   TRESPASS TO CHATTELS

To state a claim for trespass to chattels, the plaintiffs must show "intentional interference with the possession of personal property [that] has proximately caused injury." *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1350–51 (2003).  I have already held that the only plausible theory of trespass to chattels in this case is predicated upon the packages having been *opened* and searched. *See Quiñonez v. United States*, No. 22-CV-03195-WHO, 2023 WL 4303648, at \*7 (N.D. Cal. June 29, 2023).  The government asks that I grant it summary judgment on this claim because the record establishes that the packages were never opened while they were detained pursuant to ANP. Motion for Summary Judgment ("Motion") [Dkt. No. 145-4] 8 (sealed).[4]

The plaintiffs have failed to produce credible evidence supporting their theory that the four parcels that Movement Ink sent to customers on June 3, 2020, were opened when they were detained.  In contrast, the government offers (1) sworn testimony from the USPIS officials who detained the plaintiffs' packages stating that they *did not open* the packages before returning them to the mailstream, *see* Farjado Depo. at 126, 143 and Ruiz Depo. at 12, 81, 86, 141, and (2) a sworn declaration from USPIS inspector Jeffrey Agster explaining that compiled ANP data from 2020 shows that the packages *were not opened* during the two days that they were detained pursuant to ANP procedures, *see* Agster Decl. (ANP Chart) and Agster Depo. at 77, 154, 155.

---

[4] When the plaintiffs moved for summary judgment on this same claim, I explained that I could not grant it to them because disputes of material fact persisted as to whether the packages were opened.  Prior Order [Dkt. No. 138] at 6.  Because the government did not move for cross-summary judgment on the issue, I did not go further at the time.  Evaluating the full record clarifies that the undisputed facts support the government, not the plaintiffs.

It is undisputed that the plaintiffs' packages were detained pursuant to USPIS's ANP procedure. This much is evident from Farjado and Ruiz's testimony, and from the notice of seizure that was associated with the packages' tracking number. *See* Farjado Depo. at 126, 143 (stating that he detained three of the four packages); Ruiz Depo. at 12, 81, 86, 141 (stating that he detained one of the four packages); Quiñonez Decl. ¶¶ 9-10 (stating that notice of seizure was attached to the packages' tracking number as of June 4, 2020); Adams Depo. at 87-88 (stating the same). The USPIS contractors' testimony speaks for itself, and as Agster explained, when USPIS detained a package pursuant to ANP in 2020, a notice stating that the package was "Seized by Law Enforcement" would attach to the package's tracking number, and a letter would go out to the sender within 24 hours of detention. *See* Agster Depo. 77. Testimony from USPIS officials and M4BL offers a clear picture of the packages' *detention*.

That evidence does not show that the packages were *also opened* while they were detained. Plaintiffs' argument to the contrary is predicated on a strained interpretation of the ANP Chart and unsupported speculation that Farjado and Ruiz's testimony is not credible. This does not create a material disputed fact.

To repeat, the ANP Chart shows that in 2020, 50,832 packages were detained by USPIS pursuant to ANP. Of those 50,832 packages, 48,016 of them were opened "based on" expiration of the 21-day period, 2,777 of them were opened "based on" consent, 24 of them were opened "based on" a judicial search warrant, 15 of them were opened "based on" something else (namely, resolution of or ambiguity with respect to the appeal process), and zero of them were opened "up to [three] days prior to the expiration of the 21-day window." *See* Agster Decl. (ANP Chart). In addition, the ANP Chart also shows that there were 62 packages in 2020 that were assessed pursuant to ANP protocol and were returned to the mailstream *unopened*. *Id.*

The plaintiffs argue that the government cannot rely on Agster's statement that their packages were among those "assessed pursuant to ANP protocol and returned to the mailstream without being opened" because the ANP Chart distinguishes between packages that were "assessed by USPIS pursuant to ANP and returned to the mailstream without being detained" and those that were "detained by USPIS pursuant to ANP." Opposition to Motion for Summary

1    Judgment ("Oppo.") [Dkt. No. 148-2] 9 (sealed).  The plaintiffs contend that the ANP Chart, if

2    accurate, would show that their packages were among those described as "assessed by USPIS

3    pursuant to ANP and returned to the mailstream without being detained," which is inconsistent

4    with the USPIS contractors' testimony that they did detain the plaintiffs' packages.  Oppo. 9.

5         This is not persuasive.  The ANP Chart shows a category of packages that were assessed

6    by USPIS pursuant to ANP and returned to the mailstream without being *detained* (6,318

7    packages in 2020), and a *separate* category of packages that were assessed by USPIS pursuant to

8    ANP and returned to the mailstream without being *opened* (62 of packages in 2020).  Agster has

9    stated that the plaintiffs' packages belong in the latter category.

10        Plaintiffs insist that it is logically impossible for their packages to fall into both the

11   "without being detained" category, as Agster says they do in the ANP Chart, and the "detained"

12   category, as is implied by the USPIS officials' testimony.  Oppo. 10.  But plaintiffs misread the

13   ANP Chart.  The category of "packages assessed pursuant to ANP and returned to the mailstream

14   without being detained" does not encompass the category of "packages assessed pursuant to ANP

15   and returned to the mailstream without being opened."  The latter is not a subcategory of the

16   former.  Packages like the plaintiffs' may fall into the latter category and still have been detained,

17   as this record supports that they were.

18        Agster's conclusion that the plaintiffs' packages were among the 62 packages in 2020 that

19   were detained pursuant to ANP but not opened is consistent with the testimony of Farjado and

20   Ruiz in the most important respect.  The plaintiffs offer no reason why either man's testimony

21   should be discredited, or why the ANP Chart is otherwise unreliable.[5]  The plaintiffs do not argue

22   that their packages met any of the criteria that the USPIS uses to determine when a package may

23   be opened—they did not consent to the packages being opened, the 21-day period had not expired,

24

25   _____

26   [5] Further supporting the defendants' position is the fact that on the morning of June 5, 2020, Postal Inspector Hodges retrieved the four packages and photographed them. Dkt. 125-1, Declaration of Postal Inspector Hodges ("Hodges Decl.") ¶ 11 & attachment (photographs of the parcels taken by Postal Inspector Hodges). The parcels were not open at the time Postal Inspector Hodges retrieved them, and Postal Inspector Hodges did not observe any signs that the parcels had been opened and resealed.  Hodges Decl. ¶¶ 8-9.

27

28

United States District Court
Northern District of California

1   no warrant was issued, and no appeal process was completed.  What is more, the data that Agster

2   compiled shows that of the 50,832 packages detained pursuant to ANP in 2020, none were opened

3   "up to [three] days prior to expiration of the 21-day window."  Plaintiffs' packages were detained

4   for only two days.  If they had been opened, the data that the USPIS collects on packages

5   processed via ANP procedures would have shown as much.[6]

6         There is no material fact in dispute.  The plaintiffs' packages were detained by USPIS

7   officials for two days before being released—delayed but unopened—back into the mailstream.

8   The plaintiffs' proposed alternative interpretations of the ANP Chart are unpersuasive, both on

9   their face and particularly when considered in the context of the entire record.  The government's

10   motion for summary judgment as to Claim One is GRANTED.

11   **II.    INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

12         The government also seeks summary judgment in its favor on the plaintiffs' claim for

13   interference with prospective economic relations.  The plaintiffs initially identified four customer

14   relationships with which the government allegedly interfered: their relationship with Movement

15   for Black Lives ("M4BL"), Black Lives Matter ("BLM"), the Black Organizing Project, and/or

16   APTP.  The plaintiffs concede that their interference claim fails as it is asserted with respect to

17   Movement Ink's relationship with BLM, the Black Organizing Project, and APTP, but argue that

18   they can succeed with respect to Movement Ink's relationship with M4BL.  They cannot.

19         In order to prove their claim for interference with prospective economic relations, the

20   plaintiffs must show: (1) an economic relationship between the plaintiff and a third party, with the

21   probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of that

22   relationship; (3) intentional acts by the defendant designed to disrupt the relationship; (4) actual

23   disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the

24   defendant's acts.  *CRST Van Expedited, Inc. v. Werner Enters., Inc*., 479 F.3d 1099, 1107-08 (9th

25

---

26   [6] As Agster has testified, when postal inspectors visit ANP offices, they check the ANP shelves
for packages that have passed the 21-day period and open those parcels that have. At that point,

27   the inspector runs an "opening report," which shows the number of parcels opened, along with
other information about the parcels, including what was inside them.  Agster Depo. 154.  Such

28   reports informed the data Agster compiled in the ANP Chart.

United States District Court
Northern District of California

1    Cir. 2007) (citation omitted).  The purpose of the requirement that the plaintiffs identify a

2    particular relationship or opportunity with which the defendant's conduct is alleged to have

3    interfered is to distinguish between established and speculative relationships.  *Westside Ctr.*

4    *Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 524 (1996).

5        At least two elements remain elusive for the plaintiffs: probability of future economic

6    benefit and actual disruption.  The plaintiffs argue that a rational trier of fact could conclude,

7    "based on Plaintiffs' contemporaneous discussions for future work with M4BL's national director

8    and graphic design consultant, leading into a summer and fall of 2020 when M4BL ordered a lot

9    more screen-printed apparel," that their relationship with M4BL had a probability of future

10   economic benefit.  Oppo. 15-22.  They also contend that a trier of fact could conclude that "[those]

11   relationships were actually disrupted (based on cancelation of those discussions, premised directly

12   and solely on the Government's interference)." *Id.*  But the developed record does not support

13   their position; the plaintiffs' argument relies on self-serving affidavits and conclusory statements,

14   and is directly contradicted by sworn testimony from M4BL employees and Quiñonez himself.

15       Overall, courts have narrowly construed this first element of an interference claim,

16   requiring specific facts to show that a benefit was almost certain.  *See Roy Allan Slurry Seal, Inc.*

17   *v. American Asphalt South, Inc.*, 2 Cal. 5th 505, 518 (2017); *Pac. Gas & Elec. Co. v. Bear Stearns*

18   *& Co.*, 50 Cal. 3d 1118, 1136–1137 (1990) (noting that courts "have been cautious in defining the

19   interference torts, to avoid promoting speculative claims.").  That a plaintiff has a preexisting

20   business relationship with a party is not sufficient; to prevail on an interference claim, the plaintiff

21   must provide details about the impending contract or other economic benefit.  *Soil Retention*

22   *Prod., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 961 (S.D. Cal. 2021).  For example,

23   failure to specify "what the terms were, when the contracts were being negotiated … and how

24   much money, if any, Plaintiff lost as a result" is fatal for an interference claim.  *Id.* at 962.

25       The plaintiffs have failed to show that there was ever a reasonable probability of an

26   economic benefit stemming from their relationship with M4BL.  As a preliminary matter, the

27   plaintiffs do not claim to have ever had a written contract with M4BL setting forth that there

28   would be an ongoing or future economic relationship between Movement Ink and M4BL.  *See*

United States District Court
Northern District of California

1     Quiñonez Decl. ¶ 10 (stating that Movement Ink "did not have a written contract for the orders,

2     just invoices upon completion.").  They rely entirely on Quiñonez's own interpretations of the

3     purported statements of third parties to support the first element of an interference claim.

4          The plaintiffs have a Rule 602 problem.  *See* Fed. R. Evid. 602 ("[a] witness may testify to

5     a matter only if evidence is introduced sufficient to support a finding that the witness has personal

6     knowledge of the matter"); *see also Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir.

7     1995) (declarant on summary judgment cannot testify to matters outside their personal

8     knowledge); *see also Boyd v. City of Oakland*, 458 F. Supp. 2d 1015, 1025 (N.D. Cal. 2006)

9     (declarant's testimony about what others allegedly knew or did not know was not within

10    declarant's personal knowledge and was inadmissible).  Quiñonez offers in his declaration that he

11    and Fresco Steez, a M4BL contractor, both had an "expectation . . . that Movement Ink's success

12    with the mask orders would lead to more national M4BL work for Movement Ink." Quiñonez

13    Decl. ¶ 16.  Nothing in the record supports that Quiñonez has personal knowledge of Steez's

14    beliefs such that he could testify about what was in Steez's mind.

15         The plaintiffs also have a hearsay problem.  Quiñonez states in his declaration that "in

16    explaining to [him] why" M4BL did not engage in more business with the plaintiffs after the mask

17    order, "Steez pointed directly and solely to the Government interference at issue in this case and

18    the resulting concerns about law enforcement disruption of M4BL's mission." Quiñonez Decl. ¶

19    18.  Testimony pertaining to the statements of others is inadmissible hearsay, unless the party

20    offering that testimony can show that a hearsay exception applies.  Fed. R. Evid. 801(c); *see*

21    *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1130 (S.D. Cal. 2022)

22    (sustaining plaintiffs' hearsay objections where the evidence took the form of out-of-court

23    statements offered for their truth and "no hearsay exception appear[ed] to apply.").  The plaintiffs

24    offer no exception that could apply to salvage these hearsay statements.

25         Finally, Quiñonez's unsupported portrayal of the plaintiffs' expectations is contradicted by

26    deposition testimony from M4BL's Adams (testimony that is responsive to this exact question,

27    i.e., whether M4BL planned to continue doing business with Movement Ink and whether they

28    stopped because of the government's actions), and his *own* testimony.  *See* Quiñonez Depo. 173.

United States District Court
Northern District of California

1   Quiñonez states in his declaration that he had discussions with M4BL employees and contractors,

2   including Steez, about "expanding the scope of Movement Ink's work for M4BL to include

3   various types of apparel . . . going forward." Quiñonez Decl. ¶ 15. Adams' testimony refutes this:

4   Adams testified that M4BL had no plans to place ongoing merchandise orders with Movement

5   Ink, *see* Adams Depo. 53-54, and Quiñonez conceded in *his* deposition that Steez never told him

6   that the production of masks was a trial run for future business, he simply "believed" that was true.

7   Quiñonez Depo. 173:14-18. Even if Quiñonez *could* testify to the statements of third parties for

8   their truth, it does not appear that truth would support the plaintiffs' position.[7]

9       I cannot rely on Quiñonez's self-serving affidavit (much of which appears to violate the

10  rules of evidence) to create a disputed material fact, particularly when that affidavit is conclusory,

11  unsupported by evidence, and contradicted by his own sworn testimony and the testimony of

12  M4BL. *See Nilsson v. City of Mesa*, 503 F.3d 947 (9th Cir. 2007) (a conclusory, self-serving

13  affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine

14  issue of material fact, as is required to avoid summary judgment). These evidentiary shortcomings

15  doom the plaintiffs' argument that they have shown "actual disruption," as does M4BL's

16  uncontradicted position that it was not the government's detention of the mask packages that

17  caused M4BL to cease doing business with Movement Ink.

18      The plaintiffs have offered no evidence to support their position that there was a

19  probability of future economic benefit arising from their relationship with M4BL or that the

20  relationship was actually disrupted by the government's actions. Without any such evidence, the

21  government is entitled to summary judgment on this claim.[8]

22  _____

23  [7] Further contradicting Quiñonez's (unsupported) statements is Adams's testimony that in 2020, Steez *had no authority* to make future contracts on behalf of M4BL. *See* Adams Depo. 50:16-20.

24  [8] Plaintiffs also seek damages based on violations of the First Amendment as part of their

25  interference claim. *See* 4AC ¶ 118 ("tortious interference with Plaintiffs' economic relations violated Plaintiffs' First Amendment rights to speech, expression, and association."). They invoke

26  the First Amendment because, to prevail on their interference claim, they would also have to prove "an act that is wrongful independent of the interference itself." *CRST Van Expedited, Inc. v.*

27  *Werner Enters., Inc*., 479 F.3d 1099, 1107-08 (9th Cir. 2007) (citation omitted). Because plaintiffs' interference claim fails for the reasons outlined above, I need not reach the question of

28  whether the claim could proceed based on an allege First Amendment violation as the underlying "independently wrongful act."

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, the government's motion is GRANTED as to both claims, and this action is dismissed in its entirety.  The Clerk shall enter judgement accordingly.

**IT IS SO ORDERED.**

Dated: March 25, 2025

William H. Orrick
United States District Judge

15